f6b2newc kjc

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4            v.                            14 Cr. 534(JSR)

5   HARVEY NEWKIRK,

6              Defendant.

7   ------------------------------x

8                                          June 12, 2015
                                           4:15 p.m.
9

10  Before:

11                  HON. JED S. RAKOFF,

12                                         District Judge

13

14
                        APPEARANCES
15
    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  BY:  ANDREW C. ADAMS
         Assistant United States Attorney
18

19  LAW OFFICES OF PRIYA CHAUDHRY
         Attorney for Defendant
20  BY:  PRIYA CHAUDHRY

21

22

23

24

25
```

f6b2newc kjc

1              (Case called)

2              MR. ADAMS:  Good afternoon, your Honor.  Andrew Adams

3     for the United States.

4              THE COURT:  Good afternoon.

5              MS. CHAUDHRY:  Good afternoon, your Honor.  Priya

6     Chaudhry for Mr. Newkirk, who is present and standing to my

7     right.

8              THE COURT:  Good afternoon.  Please be seated.

9              The only motion that was filed was a request for a

10    bill of particulars, which the government opposes, and I'm not

11    quite sure why it opposes all of the bill of particulars.  The

12    response of the government is, oh, we have given you tons of

13    information, go fish.  Why should the defense have to go fish?

14    I'm sorry.  Did you want to say something?

15             MR. ADAMS:  Not to interrupt your Honor, I'm sorry.

16             THE COURT:  Let's start with the ones that I think are

17    quite colorable.

18             Request number 3, "Please specify the date on which

19    the government believes Mr. Newkirk joined the conspiracy."

20             What's the problem with providing that?

21             MR. ADAMS:  Your Honor, I think that the issue is just

22    providing it in the form of a bill of particulars.  It is

23    alleged in the indictment on or about August 2013, so I would

24    say around August 1 or thereabouts is what we would be --

25             THE COURT:  So to the extent that this information was

f6b2newc kjc

1    already with the defense in one form or another, I don't

2    understand why you didn't just say, okay, it is the second time

3    we are telling you, in effect, but here is a one-sentence

4    answer, and it would be a three-word answer, on or about blank

5    blank blank.

6           MR. ADAMS:  Your Honor, just to clarify the position,

7    rather than hemming ourselves in in the way a bill of

8    particulars might --

9           THE COURT:  That's what they are trying to do.  That

10   is, of course, the strategic advantage to them and the

11   strategic disadvantage to the government.  And as to some of

12   these requests, I think that is more than adequate.  But it is

13   not adequate to things like when the defendant joined the

14   conspiracy, because that is critical to objections that this

15   court will have to rule on as to whether statements come in or

16   not into evidence on hearsay grounds and on other grounds.  So

17   the defense counsel needs that, needs it in a reasonably

18   binding way in order to prepare her defense.  You can say it,

19   just like you just said it, which is on or about, but that

20   means the date that you then give will have a leeway, say, of a

21   week or two in either direction, but not months in either

22   direction.  So number 3 is granted.

23          MR. ADAMS:  Your Honor I would just also say, as we

24   are going through this, just to sort of flesh out the record,

25   one thing that is not really mentioned, other than in quoting

f6b2newc kjc

1    my response, Mr. Newkirk has received two different reverse

2    proffers.  This is not a case where we have been cagey in any

3    way.  I have sent document after document.

4              THE COURT:  I am not suggesting you are being cagey.

5    You identified the exact issue.  The point of a bill of

6    particulars in this kind of circumstance, when there has been

7    discovery and now I know about the proffers as well, is to pin

8    the government down.  The government has a natural desire not

9    to be pinned down.  The defense has a natural desire to pin you

10   in every way possible.  But from a judge's standpoint, some

11   pinnings are appropriate because they bear on rulings the court

12   will have to make, and other pinnings are not.  So that's

13   really where we are at.

14             MR. ADAMS:  Thank you, sir.

15             THE COURT:  With respect to number 4, "Please identify

16   all other conspirators and the dates on which they joined the

17   conspiracy," that is also granted.

18             Those were the only ones that seemed to me to be

19   necessary for the purposes I have just outlined, but if the

20   defense wants to argue on behalf of the remaining particulars,

21   I will hear it.

22             MS. CHAUDHRY:  Thank you, your Honor.

23             The first two were actually sort of the same request,

24   which is what is their theory of prosecution, what was the goal

25   of the scheme.  And I asked this not to harass Mr. Adams,

f6b2newc kjc

1    because I have asked him a few times, but I asked this because

2    genuinely, having reviewed the indictment, going through the

3    discovery, having had the benefit -- and thank you again -- of

4    the reverse proffer, it is not clear what the government is

5    alleging the actual goal of this conspiracy was.

6         THE COURT:  Maybe it was my misunderstanding of your

7    request.  All the government needs to prove to prove mail fraud

8    and wire fraud is that there was a scheme to obtain money or

9    property by means of false or fraudulent pretenses,

10   representations, or promises.  So it sounded like you wanted

11   something beyond that.  The object of the scheme, of a mail

12   fraud scheme, is to cheat someone else out of money.  That's in

13   the normal course.  This is not a 1346, honest services case.

14        MS. CHAUDHRY:  My question was permanently?  That's

15   the question.  Are they saying he was trying to cheat people

16   out of their money permanently?

17        THE COURT:  What does that matter?  If I make false

18   representations to you so that you will give me some money now

19   and I intend and maybe do pay it back a month later, I have

20   committed all of the elements of mail and wire fraud assuming I

21   used the mails or the interstate wires.

22        MS. CHAUDHRY:  Right.  The distinction here is the

23   allegation, as I understand it, is that a group of people was

24   brought together to try to buy *Maxim Magazine*.  Those people

25   gave money to try to buy *Maxim Magazine*, and the sale didn't

f6b2newc kjc

```
 1  end up going through.  So I think what I am trying to

 2  understand --

 3          THE COURT:  It doesn't matter whether the sale went

 4  through.  The question is, did they give their money on the

 5  basis of misrepresentations or not?

 6          MS. CHAUDHRY:  Right.  So my question is what is the

 7  misrepresentation?

 8          THE COURT:  Intent, etc.

 9          MS. CHAUDHRY:  I guess my question -- and you will

10  tell me if you disagree -- is was the misrepresentation that we

11  are trying to buy Maxim Magazine or something else?

12          THE COURT:  We will get to representations in a

13  minute.  But, 1, the way you worded it was, Please specify the

14  object of the magazine scheme.  So 1 is denied, and 2 is also

15  denied.  3 and 4 have been granted.  I think you are referring

16  to 6six, "Please identify all false statements allegedly made

17  by Mr. Newkirk; and, for each statement, please specify the

18  date of the statement, to whom the statement was made, and what

19  was false about the statement."

20          I certainly understand why you would want that, but I

21  think that is a level of evidentiary detail that is not

22  normally appropriate for a bill of particulars.

23          Remind me, because I haven't gone back and read the

24  indictment.  What does the indictment say?  Were the false

25  representations?
```

f6b2newc kjc

          MR. ADAMS:  There are a number of false

representations laid out in detail in the indictment.  There

are a number of e-mails specifically referenced in the

indictment as well as in the proffers that we have.

          THE COURT:  I see why you would want number 6, but I

don't need to know that to make rulings.

          MS. CHAUDHRY:  To me, the case looks different under

two scenarios.

          We will take scenario one, that the misrepresentation

is we are actually trying to buy *Maxim Magazine*.  So then the

defense is putting on evidence and challenging their evidence,

showing that they were actually trying to buy *Maxim Magazine*.

          The second theory is, they were never trying to buy

*Maxim Magazine* and the misrepresentation is something else,

that the stocks are forthcoming or this will be collateralized

by something else.  And then that is a different defense.  That

is a different trial in a different case, each of which has a

lot of -- the Venn diagrams --

          THE COURT:  Why can't the government try both of those

cases?  We think he misrepresented his ultimate intention, but

we also think that, in any event, he made various

misrepresentations along the way, so to speak.

          MS. CHAUDHRY:  If that's their theory, that would be

extremely helpful.  Then we know how to defend that.  The

discovery they have given us actually makes the indictment even

f6b2newc kjc

1    more confusing, because I can't really tell where they are

2    going with it.

3            THE COURT:  Let me take a look, which I really should

4    have done before we convened, at the indictment and see what it

5    says in that regard, because it is a fairly detailed indictment

6    as these things go.

7            Here.  This is paragraph 8, "The purpose of the

8    magazine scheme was to induce the lenders into loaning millions

9    of dollars to the media company in order to finance the media

10   company's purchase of the magazine." So there, really, you have

11   the answer to number 1, even though I ruled you weren't

12   entitled to it on a bill of particulars, but there it is in the

13   indictment.

14           "In lending money and engaging in negotiations

15   regarding such loans, the lenders relied, at least in part, on

16   material misrepresentations made by Newkirk including, among

17   other things, that the executive who Newkirk claimed to

18   represent as legal counsel was providing financing and

19   collateral for the loans for the media company's purchase of

20   the magazine.  In truth and in fact, Newkirk and CC1 never

21   obtained authorization from the executive to promise the

22   executive's financial backing or the posting of the executive's

23   personal assets as collateral of loans from the lenders."  That

24   was part of the overview.  Then they go on to specify

25   particular representations regarding victim 1, victim 2, victim

f6b2newc kjc

1    3, etc.

2         So at least there they are not opining one way or the

3    other as to whether or not they intended to not purchase the

4    magazine.  So if it is not in the indictment, I am not sure

5    that they have to commit one way or the other.  What they have

6    to show, according to the indictment, I will read it again,

7    "The purpose of the magazine scheme was to induce the lenders

8    into loaning millions of dollars to the media company in order

9    to finance the media company's purchase of the magazine." And

10   then they go on to say that those monies were obtained through

11   false representations.  I don't see anywhere on the face of the

12   indictment -- but I will ask the government to correct me if I

13   have missed it -- the allegation that they also never intended

14   to purchase the magazine and represented falsely that they

15   were.

16        MR. ADAMS:  Your Honor, you are correct.  It is not

17   specifically laid out as Ms. Chaudhry has said.  The attempted

18   purchase was stopped at a certain point before the culmination

19   of the deal, so we don't really know what exactly was going to

20   happen.

21        THE COURT:  So now you have your answer.

22        Anything else you wanted to raise about this?

23        MS. CHAUDHRY:  I'm sorry, on that particular, no.

24        THE COURT:  The only other thing we need to do is set

25   a trial date.

f6b2newc kjc

1        MS. CHAUDHRY:  Actually, your Honor, you didn't rule

2    on number 5.

3        THE COURT:  Oh.  Sorry.  "Please specify when the

4    government believes Mr. Newkirk knew that the executive, *i.e.*,

5    Calvin Darden, Sr., was not actually providing collateral for

6    the loan."

7        I didn't understand that, forgive me, even as a matter

8    of English.  The date on which someone knew that something

9    wasn't happening?  That is like saying -- I assume the

10   government is taking the position that he never knew that there

11   were real loans.

12       MR. ADAMS:  I think, as I understood the request, it

13   was a question of whether Mr. Newkirk knew that Calvin Darden,

14   Sr., had been either fooled or that these loans -- collateral

15   was being hidden from him; and, if so, when he found out.  This

16   is actually specifically alleged in the indictment.

17       THE COURT:  Why don't you point me to that?

18       MR. ADAMS:  "Mr. Newkirk is alleged to have had

19   conversations" --

20       THE COURT:  Where are you reading from?

21       MR. ADAMS:  I'm sorry, I am at 21 and 22.  This is

22   page 9 of the indictment.  You will see here.

23       THE COURT:  Hold on a minute.  I will just read it.

24       (Pause)

25       THE COURT:  21 says, in effect, that after Newkirk had

f6b2newc kjc

1    falsely assured the executive that he would not be a guarantor,

2    Newkirk continued to represent that the executive would

3    guarantee.

4            This has been helpful.  So what the defense is saying

5    is, so he might have made representations that were not false

6    before the representation to the executive that is in the

7    indictment, like you will be a guarantor or I understand you

8    will be a guarantor, or anything like that, and then later on,

9    no, you are not going to be a guarantor, and it is only at that

10   point that the representations to the victims that, yes, he is

11   a guarantor become false.

12           Is that the way the government intends to go on this?

13           MR. ADAMS:  Not exactly, your Honor.  These are

14   allegations that make it clear, at least as of these dates,

15   Mr. Newkirk very clearly is making false statements about the

16   collateral not being --

17           THE COURT:  You think you could push it back earlier.

18           MR. ADAMS:  Yes, sir.  There are also allegations in

19   here that Mr. Newkirk was aware throughout the course of the --

20           THE COURT:  I think that is classic evidentiary

21   detail, and I see actually no reason why the defense is

22   entitled, other than as strategic value, to have that specific

23   date.  The jury maybe presented with several different options

24   there, all of which the government can argue, all of which the

25   defense can oppose, and all of which would involve a wealth of

f6b2newc kjc

1    evidentiary detail that ought to be before them and not cabined

2    by any bill of particular determination.  Again, it doesn't

3    relate to any rulings I am going to have to make, so that

4    request is also denied.

5            Did you want to say something else?

6            MS. CHAUDHRY:  Yes.  The reason I asked for that is

7    the government's maybe second discovery letter, the letter that

8    accompanied their discovery, had a statement saying, We are

9    including false bank statements of Calvin Darden, Sr.'s, and we

10   have a witness that will say that Mr. Newkirk did not know that

11   these statements were false.

12           THE COURT:  Okay.

13           MS. CHAUDHRY:  That was part of tying into when are

14   they saying he joined the conspiracy, then, if --

15           THE COURT:  Who is the witness?  I will ask the

16   government that.  Mr. Prosecutor?

17           MR. ADAMS:  Yes, your Honor, if I could just review, I

18   brought the discovery letters.  If I can just review that for

19   one second.

20           MS. CHAUDHRY:  I think it is the second one.

21           MR. ADAMS:  Do you have a date?

22           MS. CHAUDHRY:  May 4.

23           THE COURT:  This is presumably a *Brady* disclosure,

24   yes?

25           MR. ADAMS:  One moment, your Honor, I think it is a

f6b2newc kjc

1    different letter.

2              THE COURT:  I see.  All right.

3              MS. CHAUDHRY:  I'm sorry, it is the first one.

4              MR. ADAMS:  Your Honor, what we wrote in the discovery

5    letter, for the record, is, "Please be aware that an individual

6    who the government may call as a witness in this matter, who I

7    will call witness 1, has previously informed the government in

8    substance and in part that:

9         "1.  Newkirk and witness 1 discussed the need to

10   obtain the signature of Calvin Darden, Sr., for certain

11   documents relating to the attempted purchase of *Maxim Magazine*

12   and related assets and that witness 1 informed Newkirk that

13   Calvin Darden, Sr., would never sign such documents; and

14        "2.  Newkirk was not initially aware of the falsity or

15   forgery of bank statements purporting to reflect that of Calvin

16   Darden, Sr., at the time such documents were provide today a

17   potential lender in the course of the attempted purchase of

18   *Maxim Magazine* and the related assets."

19             THE COURT:  So that was presumably a *Brady* disclosure.

20   So who is the witness?

21             MR. ADAMS:  Who is?

22             THE COURT:  Who is the witness.

23             MR. ADAMS:  Likely to the Calvin Darden, Jr., if we

24   choose to call him.

25             THE COURT:  So you have that now.  That actually

f6b2newc kjc

1    wasn't what you were seeking to obtain through your formal

2    motion, but you got it anyway.

3              So now I think we are ready to set a trial date, are

4    we not?

5              MS. CHAUDHRY:  I have another couple of issues to

6    raise.

7              THE COURT:  Okay.  Go ahead.

8              MS. CHAUDHRY:  Just, we see each other so rarely, I

9    figured I would take as much time as we could.

10             So, your Honor, I am aware that yesterday was my date

11   to submit all motions.  An issue has come up, and I can tell

12   you the issue first and then how it came up yesterday, just to

13   trigger to the court that there may be additional things we

14   need to do that we did not expect to do.

15             The issue is this:  A huge part of this case is about

16   Harvey Newkirk, as a lawyer, working at Bryan Cave, working on

17   this *Maxim* deal, and the deal was a fraud.  Both reading the

18   indictment and the discovery and having had some conversations

19   with Bryan Cave, a big part of the government's case is he was

20   also defrauding Bryan Cave, and he knew from the outset that

21   this was a fraud.  He was lying to the law firm about who his

22   client was, what was really going on, and I expect that

23   there --

24             THE COURT:  Who is the "he" in that sentence?

25             MS. CHAUDHRY:  Mr. Newkirk.

f6b2newc kjc

1            THE COURT:  Mr. Newkirk was lying.

2            MS. CHAUDHRY:  That Mr. Newkirk was lying to his own

3    law firm --

4            THE COURT:  You are saying this is part of the

5    government's theory.

6            MS. CHAUDHRY:  Yes, it is part of their theory, and a

7    big part of their case, that he was achieving this big fraud by

8    being part of this big law firm, having partners and associates

9    work with him, and the other --

10            THE COURT:  What law firm was he working at?

11            MS. CHAUDHRY:  Bryan Cave.

12            The evidence in this case will show that a lot of

13    lawyers for Bryan Cave were working on this exact matter with

14    Mr. Newkirk and part of our theory of defense is that there was

15    nothing in it for Bryan Cave; it was all open and notorious;

16    that Mr. Newkirk is another victim of Calvin Darden, Jr.'s.

17            We had approached Bryan Cave in April, right when

18    Mr. Newkirk was indicted, about payment of legal fees, and we

19    had been in discussion with them, and they sort of led us along

20    until May, when they finally told us that they will not be

21    paying fees.  So then we were drafting a complaint, and so

22    Mr. Newkirk was in our office, we had been in communication

23    with Bryan Cave's lawyers, and the issues we are bringing up in

24    that complaint is their duty to defend and their duty to keep

25    defending Mr. Newkirk, and that's the first time we learned, in

f6b2newc kjc

 1    connection with drafting our complaint against Bryan Cave, that

 2    Bryan Cave actually represented Mr. Newkirk when the government

 3    first came to investigate this case.  They had a white collar

 4    litigation partner sit down and meet with Mr. Newkirk and go

 5    with him to meet with the agents.  That partner stepped outside

 6    the room with Mr. Newkirk when he had questions, answered his

 7    questions, and we are aware that it is Bryan Cave's policy to

 8    usually self-represent itself in litigation and matters.

 9            So Mr. Newkirk was never given any sort of *Upjohn*

10    warnings that, We are representing the firm and not you.  In

11    fact, he was told, We will stand beside you.  We are all in

12    this together.  He spoke with them, he met with them, and they

13    have since thrown him under the bus.

14            We now believe, having learned this, that Bryan Cave

15    may have turned over documents that are privileged, that

16    contain information that Mr. Newkirk gave them, believing that

17    they were his lawyers, and that they may have turned that over

18    to the government.  I don't know the extent --

19            THE COURT:  Out of this scenario you just read, you

20    might have a motion, but you are not sure yet.

21            MS. CHAUDHRY:  Yes.  I can't describe every --

22            THE COURT:  I can see that possibility.  So we will

23    give you an opportunity to bring such a motion if you wish.  We

24    will factor that into the schedule we are about to set.

25            MS. CHAUDHRY:  One small thing to also factor in is, I

f6b2newc kjc

1   would like to ask the government for the entire file they got

2   from Bryan Cave; and, if the government is going to refuse, I

3   would like to ask them to refuse quickly, so I can put that in

4   the motion.

5           THE COURT:  Maybe the assistant can provide some help

6   here to narrow this.  Documents received from Bryan Cave by

7   subpoena or voluntary?

8           MR. ADAMS:  By subpoena originally.  There have

9   been -- they are still subject to the original subpoena, and I

10  would consider essentially everything that they have given

11  me --

12          THE COURT:  Okay, so pursuant to a subpoena.

13          MR. ADAMS:  Yes.

14          THE COURT:  And they did not indicate any claim of

15  privilege.

16          MR. ADAMS:  To rewind to the original situation, it

17  was not clear to Bryan Cave exactly who their client was as a

18  result of this fraud.  There were discussions of privilege and

19  things were withheld on that basis.

20          THE COURT:  The client that defense counsel is talking

21  about is the defendant.

22          MR. ADAMS:  Yes, sir.

23          THE COURT:  So normally when there is a lawyer from a

24  firm who is representing an individual, it is implicit and

25  often explicit that first he is to determine there is no

f6b2newc kjc

1    conflict between the two; and, second, that he is representing

2    both because, in any criminal investigation, the firm will have

3    an involvement as well as any individual.  So assuming he was

4    representing both, then of course there could be no privilege

5    objection, because if either party to a joint representation

6    waives the privilege, the privilege is waived.

7             However, if the defendant reasonably believed that

8    they were only representing him, then there might be the basis

9    for some sort of motion, assuming there was any privileged

10   material.

11            So I guess the question is what was the nature, to the

12   extent that you can generally describe, of the documents

13   received?

14            MR. ADAMS:  Originally e-mails that I think there is

15   no question there is no claim of privilege for a variety of

16   reasons.  They predate any sort of -- it is from the course of

17   the deal itself.  It is not in the context of any sort of

18   internal investigation or investigation after the fact.

19            I have not been given any notes, any paper documents

20   written down by partners or attorneys of Bryan Cave or partners

21   for Bryan Cave that are -- that would be notes or memoranda of

22   any internal investigation.

23            THE COURT:  That's where I think most likely a

24   privilege question might arise, if they had disclosed to you,

25   We interviewed the defendant and he told us X.

f6b2newc kjc

1              MR. ADAMS:  Your Honor, if I could.

2              THE COURT:  There might still be no privilege issue

3    but, at least absent that, it is hard to see whether there

4    would be a privilege issue at all.

5              MR. ADAMS:  And just to give you the full picture, I

6    have had discussions in the course of witness preparation with

7    members of Bryan Cave who have described interviews of

8    Mr. Newkirk that took place after he was essentially placed on

9    leave or just before he was terminated with the firm.  It is

10   not my understanding that they were having those discussions

11   with him in the context of him as a client.

12             THE COURT:  At what point did they represent him, if

13   at, all in this?

14             MR. ADAMS:  I think never.  I don't believe that they

15   ever represented him.

16             THE COURT:  Let me ask defense counsel, when do you

17   think they represented him.

18             MS. CHAUDHRY:  Your Honor, I believe when the

19   investigation began from the government.  The litigation

20   department -- this is a corporate deal.  The litigation

21   department came in, started counseling all of the people

22   involved in the deal, not just Mr. Newkirk, and that continued

23   and he kept meeting with the firm even after he was --

24             THE COURT:  Wait a minute.  Now you are claiming

25   something different.  You are saying they gathered all the

f6b2newc kjc

1    people who were involved in the detail and they gave them some

2    joint instructions or some joint questions or whatever.

3         MS. CHAUDHRY:  I believe they spoke to everybody.  I

4    don't know if it was jointly, but I know that every person was

5    spoken to by a litigator, and Mr. Newkirk was spoken to

6    separately by Marybeth Buchanan, who is one of their white

7    collar litigators.

8         THE COURT:  That sounds like an internal investigation

9    by the law firm.

10        MS. CHAUDHRY:  Except she then prepped him for his

11   meetings with the agents, and she advised him to meet --

12        THE COURT:  Who is "she," by the way?

13        MS. CHAUDHRY:  Marybeth Buchanan.

14        And then she advised him to meet with the government

15   and went with him and stepped out with him and answered

16   questions during the meeting.

17        MR. ADAMS:  And I can tell you I have no notes from

18   Ms. Buchanan or anyone at Bryan Cave relating to that.

19        THE COURT:  And the agents have not told you verbally

20   what occurred there?

21        MR. ADAMS:  Well the agents interviewed Mr. Newkirk.

22   I have their notes, and those have been provided to defense

23   could you be.

24        MS. CHAUDHRY:  Can I ask, I keep hearing that the

25   government has no notes.  Were they verbally, was the

f6b2newc kjc

1  government verbally informed?  Often the government will meet

2  with someone and say, Don't give me your notes, just read what

3  they say or tell me what happened.

4           MR. ADAMS:  And, in full candor, with respect to an

5  interview that took place after he was placed on leave, yes.  I

6  don't have notes from it, but I have been given sort of a --

7           THE COURT:  Let me just go back.  An interview that

8  occurred after he was placed on leave, an interview of the

9  defendant by whom?

10          MR. ADAMS:  By partners at Bryan Cave in the

11  context -- it's my understanding that this was in the

12  context --

13          THE COURT:  And you said to the partners, Don't give

14  me the notes, but tell me what was said.

15          MR. ADAMS:  The partners consider -- I think they

16  consider the piece of paperwork product privilege.  They were

17  not willing to read me what was on the piece of paper.  I did

18  get a proffer of what Mr. Newkirk said, as opposed to what

19  their impressions as work product were.  But it's not their

20  position that it was attorney/client.

21          THE COURT:  Are those statements being introduced?

22          MR. ADAMS:  Potentially, your Honor.  I got these

23  statements on Wednesday.  I have not provided them as of today.

24          THE COURT:  So it sounds like we are down to those

25  statements.

f6b2newc kjc

1          MR. ADAMS:  I'm sorry, sir.  Just the very last piece,

2     so that we have got everything on the table.  At some time well

3     after the fact, I think even after Mr. Newkirk was formally

4     terminated, although potentially just before that, but around

5     July of 2014, an associate, in the context of responding to

6     some sort of civil discovery demand served on Bryan Cave, and I

7     think directly on Bryan Cave as either a party or a third

8     party, again called Mr. Newkirk in order to get information

9     relevant to this third-party subpoena, and Mr. Newkirk provided

10    some information there.  Again, that wasn't made at the request

11    of law enforcement or to law enforcement.

12          THE COURT:  That was at the point where he already had

13    his own counsel?

14          MR. ADAMS:  I don't believe so.  Again, I think at

15    that point for sure he was out of the firm as an employee is my

16    understanding.

17          THE COURT:  But that doesn't mean he might not have

18    been under the reasonable impression he was still being

19    represented by the firm.

20          So it sounds like there were a few statements in the

21    second category that the government is about to turn over, I

22    gather, yes, the ones you just got on Wednesday.

23          MR. ADAMS:  Your Honor, to be honest, I don't consider

24    them Rule 16.  I consider them 3500 material.

25          THE COURT:  Turn them over.

f6b2newc kjc

1          MR. ADAMS:  Yes, sir.

2          THE COURT:  And then the last item was in a memo form.

3          MR. ADAMS:  No.  In witness preparation, Mr. Newkirk's

4    statements were related to me.

5          THE COURT:  By the associate.

6          MR. ADAMS:  By the associate.  I did not receive a

7    piece of paper.

8          THE COURT:  Are those statement you are planning to

9    offer in evidence?

10         MR. ADAMS:  One of those statements, yes.

11         THE COURT:  So I think the statement that you are

12   planning to offer in evidence, you need to provide that to the

13   defense.

14         MR. ADAMS:  Yes, sir.

15         THE COURT:  Now we know the scope of possible

16   suppression, if there is any basis for suppression, as well.

17         I will not accept a motion to suppress on this ground

18   unless there is an affidavit from the defendant personally

19   setting forth the bases on which he believed he was -- both the

20   fact that he did believe he was being solely represented, not

21   jointly represented, and the basis on which he so believed, and

22   then you can make your legal argument as well in an

23   accompanying memo of law.  But, as you know, under Second

24   Circuit law, a suppression motion requires the affidavit of the

25   defendant.

f6b2newc kjc

1        Anything else we need it take up?

2        MS. CHAUDHRY:  Yes, your Honor.  I would also like to

3   ask the government for all of its correspondence with Bryan

4   Cave.  I believe that is both relevant and something that we

5   need now in order for us to both investigate and make motions,

6   because it is unclear to me what was actually asked and also I

7   have a sense from my litigation already with Bryan Cave that

8   they are being pretty cooperative with the government via

9   subpoena.  They are not going to be cooperative with us.

10        THE COURT:  I would call that standard practice.

11        MS. CHAUDHRY:  They are going to claim privileges,

12   they are going to be uncooperative, and we don't want to be in

13   a position where we have a witness everybody expects at trial

14   to testify who has made statements not to government agents but

15   to an internal investigation that's been turned over.

16        THE COURT:  I don't see how that -- I don't know if

17   the correspondence is voluminous or short, but I think the

18   relevant thing is that the government's position is that all of

19   this was pursuant to a subpoena, so you should get a copy of

20   the subpoena, but I don't see why the correspondence would be

21   something you are entitled to.

22        MS. CHAUDHRY:  I was just wondering what --

23        THE COURT:  That also presumably would be government

24   work product.

25        MS. CHAUDHRY:  Letters the government sent to Bryan

f6b2newc kjc

1    Cave?

2            THE COURT:  Yes, if they reflect the government's

3    theories.

4            MS. CHAUDHRY:  But they have already published it to a

5    third party.

6            THE COURT:  I'm sorry.  For these purposes Bryan Cave

7    is being treated as, in effect, an adjunct of the government.

8    And indeed, that's basically what you are telling me they are.

9    But, anyway, for now; we can revisit the correspondence if you

10   have something more particularized to offer.  I think for now

11   just a copy of the subpoena is sufficient.

12           Assuming the government gets all that stuff to you by,

13   say, Tuesday of next week, how long do you want to make any

14   motion?

15           MS. CHAUDHRY:  I don't have my calendar.  What date is

16   Tuesday of next week?

17           MR. ADAMS:  I believe it is the 16th.

18           THE COURT:  Tuesday of next week is June 16.

19           MS. CHAUDHRY:  Two weeks after that would be great.

20           THE COURT:  I'll bet it would, but how about ten days,

21   June 26.

22           MS. CHAUDHRY:  Okay.

23           THE COURT:  And how long does the government want to

24   respond?  You have a choice:  Ten days from the 26th would be

25   July 6, but there is some obscure holiday somewhere in that

f6b2newc kjc

1  period, so you have the choice of July 8, July 7, July 6, July

2  3, July 2, July 1.  Which one would you like?

3              MR. ADAMS:  If July 8 was on the menu, I'll take that.

4              THE COURT:  I thought you might.  So July 8.  Do you

5  want to put in reply papers or just have oral argument?

6              MS. CHAUDHRY:  If we do, we won't need more than two

7  days.

8              THE COURT:  So reply papers by July 10.  We can

9  schedule oral arguments after the papers.  If I think it is not

10  necessary, we can always cancel it.  Let's at least have it on

11  the schedule.  How are we fixed for July 16?

12              MS. CHAUDHRY:  Your Honor I am beginning a trial

13  before Judge Garaufis in the Eastern District on July 13.  It

14  should not last more than two weeks.  It should be maybe ten

15  days.

16              THE COURT:  I think I am going to dispense with oral

17  argument then; or, I will put it this way, I am not going to

18  set a date for it.  If, after I look at the papers, I can

19  decide it without oral argument, fine.  If oral argument is

20  necessary, then of course it will be after your trial, but I

21  don't want to put it off and you shouldn't want me to put it

22  off if it can be decided earlier.

23              Now let's talk about a trial date.  So given all of

24  this new development, my plan to try it next Monday has gone by

25  the boards, but how long a trial is the government

f6b2newc kjc

1    contemplating?

2              MR. ADAMS:  Your Honor, we expect seven trial days or

3    thereabouts.

4              THE COURT:  Defense counsel agrees with that?

5              MS. CHAUDHRY:  I would say seven to ten.

6              THE COURT:  So we will put aside two weeks.  That may

7    be more than necessary, but we will put aside two weeks.  How

8    about August 3?

9              MR. ADAMS:  Fine with the government.

10             MS. CHAUDHRY:  Your Honor, my other trial will be

11   ending right before then.  Is it possible to do it later in

12   August?

13             THE COURT:  How about August 17?

14             MS. CHAUDHRY:  That would be fine for me.  Given

15   your -- previously you said you wanted to try this case in

16   August.  Ms. Farber from my office has a conflict, so John

17   Harris from my office will be trying it with me.  He is

18   scheduled to be out of the country August 24 to September 7.

19   We are happy to start September 10, which is long enough to get

20   from JFK back here.

21             THE COURT:  Unfortunately I have commitments through

22   most of September.  How about August 31?

23             MS. CHAUDHRY:  That's right in the middle of when he

24   is not in the country.

25             THE COURT:  Give me the dates again.

f6b2newc kjc

1          MS. CHAUDHRY:  August 24 through September 7.  I think

2     Labor Day is in the middle of that, so those days weren't

3     really --

4          THE COURT:  What's the story on your present

5     colleague?

6          MS. CHAUDHRY:  Beth Farber has a murder trial in this

7     courthouse that is scheduled to start in the beginning of

8     August and take like three weeks that she is trying with Avi

9     Moskowitz.

10          THE COURT:  How many people in your firm?

11          MS. CHAUDHRY:  Oh, total maybe 20 lawyers.

12          THE COURT:  All of whom presumably are dying to try a

13     case.

14          MS. CHAUDHRY:  Actually all of whom are trying cases

15     right now.

16          THE COURT:  Right now is fine but we are talking

17     about -- I have given you three possibilities in August and you

18     have said no.  I don't want to be harsh, but I have to be

19     concerned.  This is a criminal case.  September 10 does not

20     work for the court.  I have trials basically throughout

21     September.  I have a one-month trial in a criminal case

22     beginning October 5.  So it is either going to be one of those

23     dates in August or it is going to be October 26.  And if we do

24     it on October 26, we would sit on the 26th, 27th, 28th but only

25     half day on the 29th, only a half day on the 30th, and if it

f6b2newc kjc

```
1    went into the next week, only a half day on the 4th.  So that's
2    not as ideal from many standpoints as August, but let me hear
3    which one defense counsel prefers.
4                (Defense counsel and defendant confer)
5                MS. CHAUDHRY:  Your Honor, I would prefer my
6    co-counsel to be able to attend the whole thing, so even though
7    it is not ideal, I would prefer October.  And if your other
8    trial goes away and you want us to come earlier, we will come
9    earlier.
10               THE COURT:  What's the government's view.
11               MR. ADAMS:  I have no -- well, the October date is
12   acceptable.  I would just ask that if it is going to be set, so
13   that I can work with witnesses who are attorneys and busy, that
14   we not be in a situation where if we say October and then two
15   weeks from now it turns out it is back in August.
16               THE COURT:  I agree.  I like firm, fixed, and final
17   dates rather than moving targets.  What I am concerned about is
18   the speedy trial rule and not in the technical sense, because I
19   think this qualifies for exclusion under the Speedy Trial Act
20   because co-counsel for the defense are otherwise occupied and
21   counsel for the defense as well between the various dates.  But
22   just the spirit of the speedy trial rule, it is unusual that I
23   put a criminal case off this long.  But if both sides want it,
24   I saw that defense counsel consulted with her client before
25   making her answer, correct?
```

f6b2newc kjc

1          MS. CHAUDHRY:  I did.

2          THE COURT:  And given all of those commitments from

3    what is clearly going to be a very busy and undoubtedly rich

4    law firm, we will convene the trial on October 26.  Look at my

5    individual rules, because there are a bunch of things you have

6    to get me the week before.

7          How long before trial does the government want to turn

8    over 3500 material?

9          MR. ADAMS:  Your Honor, given the nature of some of

10   it, I am happy to do it earlier than we normally do, a week

11   before trial, if that's acceptable.

12         THE COURT:  Yes, that's what I was going to suggest as

13   well, a week before trial.

14         So pursuant to Section 3161 of Title 18, I will

15   exclude from calculations under the Speedy Trial Act all time

16   between now and October 26, finding that, for the reasons

17   previously mentioned, as well as the overriding principle that

18   even lawyers are entitled to vacations, and for all the reasons

19   apparent from this transcript, the best interests of justice in

20   excluding such time substantially outweigh the interests of the

21   public and the defendant in a speedy trial.

22         Anything else we need to take up?

23         MR. ADAMS:  Nothing for the government.

24         MS. CHAUDHRY:  One small issue regarding permission

25   from the court for Mr. Newkirk to travel out of where he is

f6b2newc kjc

1    currently allowed to go.  If I am permitted to send a letter to

2    the court requesting, I am happy to do that.

3                THE COURT:  Yes, but consult first with the

4    government.

5                MS. CHAUDHRY:  I will.

6                THE COURT:  See if they are in disagreement or not.

7                MS. CHAUDHRY:  I just wanted permission to send a

8    letter to the court.

9                THE COURT:  All right.  Very good.  Thanks so much.

10               MR. ADAMS:  Thank you.

11               MS. CHAUDHRY:  Thank you.

12                                  – – –

13

14

15

16

17

18

19

20

21

22

23

24

25