F8l2newH kjc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,              New York, N.Y.
3
               v.                           14 Cr. 534(JSR)
4
     HARVEY NEWKIRK,
5
                    Defendant.
6    ------------------------------x

7                                           August 21, 2015
                                            4:15 p.m.
8
     Before:
9
                         HON. JED S. RAKOFF,
10
                                            District Judge
11

12                       APPEARANCES

13   PREET BHARARA
          United States Attorney for the
14        Southern District of New York
     BY:  ANDREW C. ADAMS
15        SARAH PAUL
          Assistant United States Attorneys
16
     LAW OFFICES OF PRIYA CHAUDHRY
17        Attorney for Defendant
     BY:  PRIYA CHAUDHRY
18
     HARRIS, O'BRIEN, ST. LAURENT & CHAUDHRY
19        Attorneys for Defendant
     BY:  JAMES KENEALLY
20

21   ALSO PRESENT:

22   CHLOE MARMET, Paralegal, U.S. Attorney's Office

23   PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
          Attorneys for Bryan Cave, LLP
24   BY:  MOSES SILVERMAN

25

F8l2newH kjc

| 1 | (Case called)
| 2 | MR. ADAMS:  Good afternoon, your Honor.  Andrew Adams

and Sarah Paul for the United States.  With us at counsel table

is paralegal Chloe Marmet.

THE COURT:  Good afternoon.

MS. PAUL:  Good afternoon, your Honor.

MS. CHAUDHRY:  Good afternoon, your Honor.  Priya

Chaudhry and James Keneally for Harvey Newkirk, who is present

standing between us.

THE COURT:  Good afternoon.

MR. SILVERMAN:  Good afternoon, your Honor.  Moses

Silverman, from Paul, Weiss, Rifkind, Wharton & Garrison.  We

represent Bryan Cave, LLP, and I believe your Honor asked that

an attorney for Bryan Cave be here.

THE COURT:  Yes.  Why don't you take a seat at one of

the tables up here.  We will not construe which side you

take --

MR. SILVERMAN:  I don't know which one to pick.

THE COURT:  If you want, you can take the jury box.

We also will at some point want to get on the phone

Ms. Buchanan.  Do we have a phone number for her.

MR. ADAMS:  Yes, your Honor.  I have two.  My

understanding is we need to call one first, and then she will

move to a second one after that.

THE COURT:  I think what we should do is just call her

F8l2newH kjc

1    now and tell her we will call her back when we reach the point

2    in the proceeding where we want her testimony.

3          MR. ADAMS:  Certainly, your Honor.  I can pass up the

4    phone number.

5          THE COURT:  If there are any witnesses other than the

6    defendant, they should go into the witness room at this time.

7          MR. ADAMS:  Certainly, your Honor.

8          (Pause)

9          THE COURT:  There are two motions before the court,

10   and though they are interrelated, the one I want to first deal

11   with is the motion that asks for various forms of relief based

12   on an alleged attorney/client relationship between Mr. Newkirk

13   and Bryan Cave.

14         Mr. Newkirk bears the burden on that, so let's put him

15   on the stand first.

16         MS. CHAUDHRY:  I think, your Honor, before we begin,

17   if I can just clarify one thing.  The government has not given

18   us a witness list, but they have given us 3500 material that

19   causes me to believe that they will be calling both agents.  I

20   had confirmed and asked the government to let me know that the

21   agents would be here and available.  Because it is my belief

22   that they are calling the witnesses, I don't plan to call them;

23   but if they are not, I would like to be told so that I can call

24   them.  I don't want to waive my option of having them testify.

25         THE COURT:  All right.

F8l2newH kjc

1              So let's get Mr. Newkirk on the stand.

2    HARVEY NEWKIRK,

3         the defendant, having been duly sworn, testified as

4         follows:

5              THE COURT:  Mr. Newkirk, you went to Columbia Law

6    School and graduated in 2001, is that right?

7              THE WITNESS:  Yes, your Honor.

8              THE COURT:  So you had some familiarity, even from law

9    school, as to the attorney/client privilege, yes?

10             THE WITNESS:  Yes, your Honor.

11             THE COURT:  And you then worked with a number of large

12   firms here in New York, yes?

13             THE WITNESS:  Correct.

14             THE COURT:  So on or about February 12, 2014, a

15   partner at Bryan Cave, where you were at the time, named Jay

16   Dorman, called you and asked you to go to a conference room, is

17   that it?

18             THE WITNESS:  I left the office for the day, so he

19   called and asked me to come back to the office.

20             THE COURT:  What time of day was this approximately?

21             THE WITNESS:  Probably between 5 and 5:30, 5 and 6.

22             THE COURT:  What level were you at at the time?

23             THE WITNESS:  Counsel.

24             THE COURT:  So you went to the conference room and who

25   was there?

F8l2newH kjc

1          THE WITNESS:  At the time I didn't know him, but he

2     introduced himself as Austin Campriello.  He is a partner at

3     the firm.  And then there was Agent Deal and Agent Hilliard

4     seated inside the conference room.

5          THE COURT:  Did Mr. Campriello or anyone else from the

6     firm say anything to you before you entered the room?

7          THE WITNESS:  No.

8          THE COURT:  What occurred after you entered the room?

9          THE WITNESS:  Mr. Campriello introduced himself to me.

10    We walked to the corner of the conference room so that we were

11    approximately 10 to 15 feet from where the agents were.  He

12    told me that the agents wanted to speak to me regarding the

13    Maxim transaction; that he wouldn't be sitting in; that Mary

14    Beth Buchanan would be sitting in and she was on her way; and

15    then he told me -- he said that I may not have remembered him,

16    but that he was a white collar defense attorney.

17         THE COURT:  And what happened next?

18         THE WITNESS:  There was a little bit of small talk for

19    less than a minute with Mr. Campriello, then we sat down and

20    the agents told us that they had arrested Darden, Jr.

21         THE COURT:  Stopping the music right at that point,

22    you had been told that Ms. Buchanan would be sitting in.  Did

23    you have any reason to believe that she was acting as your

24    personal lawyer?

25         THE WITNESS:  Yes, your Honor.

F8l2newH kjc

```
 1              THE COURT:  What?

 2              THE WITNESS:  Because for the previous -- since we

 3     were made aware that an investigation was ongoing, the firm had

 4     been in a hunker-down mode regarding potential civil

 5     litigation, so there were a number of interviews and

 6     conversations that I had with different people at the firm, and

 7     I felt that we had a joint interest because our interests were

 8     aligned as far as potential civil litigation.

 9              THE COURT:  These were conversations prior to February

10     12?

11              THE WITNESS:  Correct; prior to and after, but yes.

12              THE COURT:  After I am not yet concerned with.

13              What conversations did you have prior to this time

14     regarding a government investigation?

15              THE WITNESS:  Sometime in -- well, there were two.

16     First, when we notified Citibank that there was a potential

17     fraud with the wire, Citibank notified us that they were going

18     to notify the Secret Service, as they are required to by law.

19              At that point Mr. Alfieri, who ran part of the office,

20     or shortly thereafter had mentioned that there was an

21     investigation started.  And then sometime in November or

22     December, I was contacted by Agent Deal.

23              THE COURT:  Take it one at a time.

24              In the first conversation you just said, where

25     Citibank told you there was an investigation --
```

F8l2newH kjc

 1          THE WITNESS:  They said, We are going to notify the

 2   Secret Service.

 3          THE COURT:  Okay, the Secret Service.  At that point

 4   did you have any conversations that led you to believe that you

 5   were being personally represented by someone at Bryan Cave in

 6   this connection?

 7          THE WITNESS:  No.  It followed later.

 8          THE COURT:  So keep going, then.  When was it that you

 9   first believed that you had an attorney/client privilege,

10   personal attorney/client privilege attach?

11          THE WITNESS:  I don't remember the exact date, but

12   there was -- it was subsequent to my being contacted by Agent

13   Deal when I notified the firm.

14          THE COURT:  You had already talked to him?

15          THE WITNESS:  I spoke to him briefly because he sent

16   me an e-mail and called.

17          THE COURT:  Okay.

18          THE WITNESS:  And then I notified the firm.

19          THE COURT:  When you talked to him, did he give you

20   any -- what did he say to you before the conversation began?

21          THE WITNESS:  I don't remember if he gave me any

22   specific warnings in that conversation.

23          THE COURT:  So anyway, keep going, then, after that

24   conversation.

25          THE WITNESS:  After that conversation, there was

F8l2newH kjc

1    potential civil litigation that the firm identified, so I had

2    numerous conversations and interviews with two members of the

3    firm's general counsel, as well as with litigation partners,

4    senior M&A partner, as well as with the managing partner of the

5    office.

6            THE COURT:  At any time, did you say to them something

7    like, Do I have personal liability?

8            THE WITNESS:  I didn't say that, but in our

9    conversation we talked about the potential that the firm could

10   be named and I could be named.

11           THE COURT:  The firm being named.

12           THE WITNESS:  Yes.

13           THE COURT:  So this was all in terms of protecting the

14   firm, yes?

15           THE WITNESS:  No.  We talked about there was a

16   potential that the firm could be named in a civil lawsuit and I

17   could be named in a civil lawsuit.

18           THE COURT:  Okay.  Who brought up your being named?

19           THE WITNESS:  It was in a conversation with

20   Vinnie Alfieri, Noah Weissman, and Jay Dorman.  We were just

21   talking about the potential liabilities.

22           THE COURT:  Approximately when was this?

23           THE WITNESS:  It would have been in November or

24   December.

25           THE COURT:  What did you say?

F8l2newH kjc

1          THE WITNESS:  I said that if there is a possibility

2     that we could be sued, I thought that we had done nothing

3     wrong, that we would cooperate, I would cooperate with the

4     firm.

5          THE COURT:  What made you think that you were being

6     personally represented?

7          THE WITNESS:  Well, we were having the conversations.

8     The purpose of the conversation was initially the firm had

9     potential liability and I had liability, so in my -- I assumed

10    that, in my cooperation with the firm, they would defend myself

11    and the firm because Bryan Cave has a reputation of

12    self-representing.

13         THE COURT:  If I understand what you are saying, you

14    thought they were representing both you and the firm?

15         THE WITNESS:  Correct.

16         THE COURT:  You knew, as a lawyer, that that could

17    only occur if they and you saw no conflict.

18         THE WITNESS:  Right, yeah, and I didn't see a

19    conflict.

20         THE COURT:  You were busy telling them that you had

21    done nothing wrong and therefore they wouldn't have a reason to

22    see any conflict, right?

23         THE WITNESS:  Right, and that I didn't see a conflict.

24         THE COURT:  So if they represented both you and the

25    firm in your understanding, then was it your understanding that

F8l2newH kjc

1    either side could waive the attorney/client privilege?

2            THE WITNESS:  I don't remember.  I think so.  I don't

3    remember the specifics of that.

4            THE COURT:  Before we got to the February 12 meeting,

5    you had just one conversation with the agent or several?

6            THE WITNESS:  I think one e-mail and one brief phone

7    conversation.

8            THE COURT:  At any point in time did you say to the

9    agent, Am I in trouble?  Am I a subject?  Anything like that?

10            THE WITNESS:  No.  When he called, he just notified me

11    that they were beginning their investigation.

12            THE COURT:  When you had this meeting on February 12,

13    after Mr. Darden had been arrested, you answered the questions

14    they put to you, the agents put to you?

15            THE WITNESS:  Yes.

16            THE COURT:  So you weren't invoking any

17    attorney/client privilege.  You were giving a third party your

18    answers, yes?

19            THE WITNESS:  Well, for certain questions I invoked

20    attorney/client privilege.

21            THE COURT:  You did?

22            THE WITNESS:  Yes.

23            THE COURT:  You said, I decline to answer on the

24    grounds of privilege?

25            THE WITNESS:  Yes.

F8l2newH kjc

1          THE COURT:  And the privilege was the attorney/client

2     privilege?

3          THE WITNESS:  There were certain -- when Agent Deal

4     came in, he said, We want to be very careful about the

5     attorney/client privilege, so certain things we are not going

6     to ask you or, if you feel it is attorney/client privilege,

7     don't answer it.  There were a couple of instances -- one

8     instance where I stepped out with Ms. Buchanan asked her a

9     question, whether she thought something was privileged.

10          THE COURT:  The privilege he was referring to, didn't

11     you understand that to be the privilege between the law firm

12     and its client that it had been representing in these matters?

13          THE WITNESS:  Correct.

14          THE COURT:  Not your attorney/client privilege.

15          THE WITNESS:  Right.

16          THE COURT:  Okay.  Now I am with you.  But other than

17     that attorney/client privilege, you answered the questions that

18     were put.

19          THE WITNESS:  Correct.

20          THE COURT:  Did you have conversations during that

21     meeting with Ms. Buchanan?

22          THE WITNESS:  Yes.

23          THE COURT:  Were any of them regarding your personal

24     liability as opposed to other things you might be discussing

25     with her?

F8l2newH kjc

1         THE WITNESS:  I asked her two questions that weren't

2    related to the firm's privilege.

3         THE COURT:  What were they?

4         THE WITNESS:  One, I asked her what does it mean to be

5    a subject of an investigation, and then I asked her regarding a

6    statute that one of the agents had referenced because I didn't

7    know what the statute was.

8         THE COURT:  When the subject came up because

9    someone -- either the agents or she -- had asked were you a

10   subject or something like that.

11        THE WITNESS:  Yes, Ms. Buchanan asked the agents.

12        THE COURT:  What did they say?

13        THE WITNESS:  At first they hesitated, then they said

14   that I was a subject of the investigation and they gave

15   information regarding the status of other people in the

16   investigation.

17        THE COURT:  And Ms. Buchanan, in her response, did she

18   say anything other than explaining what a subject was?

19        THE WITNESS:  In her response to me or response to the

20   agents?

21        THE COURT:  Her response to you.

22        THE WITNESS:  No.  She just explained to me what a

23   subject was.

24        THE COURT:  So you knew from her explanation that you

25   had at least some potential criminal liability.

F8l2newH kjc

1           THE WITNESS:  Correct.

2           THE COURT:  Did you say to her at that point, or at

3   any point, do I need to get my own counsel?

4           THE WITNESS:  No, I didn't ask her that.

5           THE COURT:  The other question you asked her was what

6   a particular statute meant or what it was?

7           THE WITNESS:  Yes.

8           THE COURT:  Which statute was that?

9           THE WITNESS:  I don't recollect.

10          THE COURT:  A statute that the agents had cited.

11          THE WITNESS:  Yes.

12          THE COURT:  And she told you what it was.

13          THE WITNESS:  Yes.

14          THE COURT:  After that meeting, you were placed on

15   leave later in that day, right?

16          THE WITNESS:  Correct.

17          THE COURT:  That was in a conversation with

18   Mr. Alfieri?

19          THE WITNESS:  Correct.  We had a phone conversation

20   and then, either late that night or early in the morning, he

21   sent an e-mail formalizing.

22          THE COURT:  Was that a conversation that he initiated

23   or you initiated?

24          THE WITNESS:  He called me initially and then he

25   called me back later that evening.

F8l2newH kjc

| 1 | THE COURT:  Did he say why you were being terminated? |

1          THE COURT:  Did he say why you were being terminated?

2          THE WITNESS:  Well, they placed me on leave.

3          THE COURT:  Leave?

4          THE WITNESS:  Yes, because of being named a subject.

5          THE COURT:  Okay.  Did you say anything to him about

6     the facts of the case?

7          THE WITNESS:  He asked me generally what I had spoken

8     to the agents about, but I had given him numerous updates

9     previously, so he was up to date.

10          THE COURT:  But you didn't ask him, What should I do

11     or anything like that?

12          THE WITNESS:  No, not at that time.

13          THE COURT:  On February 14, you spoke with the agents

14     again, yes?

15          THE WITNESS:  The agents and assistant United States

16     attorney, Jim Pastore.

17          THE COURT:  Who is that?

18          THE WITNESS:  Jim Pastore I believe was his name.

19          THE COURT:  This was a telephone conversation?

20          THE WITNESS:  No, I went to the building nextdoor.

21          THE COURT:  One St. Andrews Plaza.

22          THE WITNESS:  Yes.

23          THE COURT:  That was on the invitation from whom?

24          THE WITNESS:  No, I recollected that there were two

25     potential pieces of information I had forgotten the day before,

F8l2newH kjc

```
 1    so I wanted to make sure that I gave that to the agents and the
 2    government.
 3              THE COURT:  So you initiated the conversation, or you
 4    initiated the meeting.
 5              THE WITNESS:  Yes, I wanted to give them that
 6    information because I didn't want to omit anything.
 7              THE COURT:  And you didn't ask to have any attorney
 8    come with you?
 9              THE WITNESS:  No, I did not.
10              THE COURT:  If you had thought you were represented by
11    counsel at Bryan Cave, why wouldn't you have asked them to come
12    with you to that meeting?
13              THE WITNESS:  For two reasons.  One is, prior to, like
14    I said, the 12th, my understanding was that they were
15    representing me with regards to civil matters and, based upon
16    things that were obviously discussed after, I continued to have
17    that understanding.  As far as the criminal matter, I didn't --
18    I felt that I had done nothing wrong, that I didn't have
19    anything to hide or keep from the government, and I wanted to
20    give them those two pieces of information.
21              THE COURT:  So you didn't think they were representing
22    you in the criminal matter?
23              THE WITNESS:  I thought at the meeting on the 12th
24    that they were, and then I chose to go down there without
25    counsel subsequent to that.
```

F8l2newH kjc

1          THE COURT:  At various times thereafter in March, you

2     got calls from Bryan Cave attorneys, and then eventually,

3     around March 28, you went down and met in their offices, true?

4          THE WITNESS:  Correct, yes.

5          THE COURT:  There were a number of attorneys there,

6     including Ms. Buchanan, Mr. Dorman, and Noah Weissman.

7          THE WITNESS:  Right.

8          THE COURT:  At that time, you understood this was a

9     meeting about the potential civil litigation.

10         THE WITNESS:  Yes, because I had -- during some of

11    those conversations you referenced, there were -- I was getting

12    updates from Mr. Alfieri and others regarding a threatened

13    litigation.  I'm not certain if it was in March or maybe right

14    after in April, a litigation that was filed, and they would

15    call and say, all right, the firm was named, but you weren't

16    named, but this other person is threatening to sue the firm and

17    you.  So we were talking throughout that period regarding

18    potential civil litigation, and they wanted my cooperation with

19    regard to helping them out and helping myself out.

20         THE COURT:  You already knew that you had been labeled

21    a subject.

22         THE WITNESS:  Yes, correct.

23         THE COURT:  And you knew that that was the ground at

24    which they had put you on leave.

25         THE WITNESS:  Correct.

F8l2newH kjc

1          THE COURT:  So you knew that they couldn't be

2     representing you on the criminal side because there would be a

3     conflict of interest, yes?

4          THE WITNESS:  Well, yeah, post that day I would

5     understand that.

6          THE COURT:  So you thought this -- if you thought they

7     were representing you in connection with this meeting on March

8     28, it would have been on the civil side.

9          THE WITNESS:  Correct.

10         THE COURT:  At any point in that meeting -- first of

11    all, did you ask to be represented by your own counsel?

12         THE WITNESS:  No.  There were -- no.  Vinnie had asked

13    me if I chose to get separate counsel to let him know, but I

14    told him at that time I declined to get separate counsel.

15         THE COURT:  So at that meeting, he --

16         THE WITNESS:  I'm sorry.  That was a phone

17    conversation, not at the meeting.

18         THE COURT:  I'm sorry?

19         THE WITNESS:  That was a phone conversation, not at

20    the meeting.

21         THE COURT:  I see.  This is Mr. Alfieri?

22         THE WITNESS:  Correct, sorry.

23         THE COURT:  Before the meeting, in the telephone

24    conversation with Mr. Alfieri, he had said, Do you want

25    separate counsel and you had declined?

F8l2newH kjc

1          THE WITNESS:  I'm not sure whether it was before or

2   after the meeting.  It was in the same time period.

3          THE COURT:  But at the meeting you didn't raise this?

4          THE WITNESS:  No.  At the meeting, for example, I

5   believed I was getting counsel.  For example, Mr. Weissman

6   advised me on exercising attorney/client privilege and certain

7   things --

8          THE COURT:  That, again, though was the privilege

9   between Bryan Cave and the firm's client, yes?

10         THE WITNESS:  Well, in our conversation, we were

11  talking about protecting myself from civil liability.

12         THE COURT:  But I am just trying -- my understanding

13  from your affidavit, you say here at paragraph 10 of your

14  affidavit, "During this interview, Noah Weissman spoke to me

15  about the possibility of civil litigation occurring.

16  Mr. Weissman emphasized that if I were called to be deposed in

17  connection with or testify in any civil proceeding, I should be

18  vigilant about preserving the attorney/client privilege that

19  existed between Bryan Cave, Reign, and/or Mr. Darden, Sr.,"

20  right?  That's the attorney/client privilege he was talking

21  about.

22         THE WITNESS:  Correct.

23         THE COURT:  Okay.  Let me ask your counsel if she

24  wants to put any additional questions.

25         Counsel?

F8l2newH                        Newkirk – Direct

1   DIRECT EXAMINATION

2   BY MS. CHAUDHRY:

3   Q.  Mr. Newkirk, the evening of February 12, did Mr. Alfieri

4   send you an e-mail telling you that you had been suspended?

5   A.  Yes.  It could have been late that evening or early in the

6   morning.  The time stamp is on it.

7   Q.  Did he tell you that you are required to keep cooperating

8   with the firm?

9   A.  Yes.

10  Q.  And did you keep cooperating with the firm?

11  A.  Yes.

12  Q.  Did you answer all of their questions?

13  A.  Yes.

14  Q.  Did you provide them with materials that the firm didn't

15  already have access to?

16  A.  Yes.

17  Q.  Did you meet with the firm?

18  A.  Yes.

19  Q.  Were you doing this under the understanding that you were

20  working on a joint defense basis with the firm in connection

21  with the civil --

22          THE COURT:  Sustained, leading.

23  Q.  Why did you do that?

24  A.  I felt that we had a joint interest and that our interests

25  were aligned.

F8l2newH                          Newkirk - Direct

```
 1   Q.  In what?
 2   A.  In defending ourselves against the litigation.
 3   Q.  Did the firm ever tell you that you had no privilege with
 4   regards to these conversations?
 5   A.  No.
 6   Q.  Do you know what an Upjohn warning is?
 7   A.  At that time I didn't.
 8   Q.  Do you know now?
 9   A.  Yes.
10   Q.  What is your understanding of what an Upjohn warning is?
11   A.  Now it is when there is an employee/employer relationship
12   and there is some form of investigation, that the employer will
13   give the employee a warning that they do not represent the
14   employee and that there are certain steps that they should take
15   on being given that warning.
16   Q.  Did anything like that ever happen?
17   A.  No.
18   Q.  To this date, did Bryan Cave give you anything resembling
19   an Upjohn warning?
20   A.  No.
21   Q.  Did Bryan Cave give you anything in writing between the
22   beginning of the Maxim transaction and today?
23   A.  No.
24   Q.  Did Bryan Cave ever give you a list of lawyers for you to
25   hire to represent yourself?
```

F8l2newH                    Newkirk - Direct

1   A.  No.

2   Q.  Did Bryan Cave ever discuss with you a joint representation

3   of you and another lawyer?

4   A.  I don't understand the question.  Sorry.

5       THE COURT:  I'm glad you raised that objection,

6   because neither do I.

7       MS. CHAUDHRY:  Thank you.

8   Q.  Did Bryan Cave ever discuss the civil litigation with you

9   in the context of you hiring another firm?

10  A.  No, they were self-representing on the civil litigation at

11  that point.

12  Q.  By self-representing, what do you mean?

13  A.  The firm was -- attorneys at the firm were handling the

14  discussions with the parties that were suing and/or threatening

15  to sue and handling the interviews.

16  Q.  Did Bryan Cave tell you that they were providing the

17  information you gave them to anyone else?

18  A.  No.

19  Q.  Did you think that they were doing that?

20  A.  No.

21  Q.  If you had believed that Bryan Cave was turning this

22  information over to another party, what would you have done?

23  A.  I would not have given them the information or at least

24  asked them what the basis was to make an informed decision.

25  Q.  Did you know at the time that Bryan Cave was cooperating

F8l2newH                      Newkirk - Direct

1    with the government?

2    A.  No.

3            THE COURT:  Were you cooperating with the government?

4            THE WITNESS:  I guess if -- I answered the questions

5    on the 12th.

6            THE COURT:  And you went down to add further

7    information.

8            THE WITNESS:  Yes.

9            THE COURT:  Before you went down to add further

10   information on the 14th, did you ask Bryan Cave whether they

11   approved of your going down?

12           THE WITNESS:  No, but when I told Vinnie after, he

13   said I should have let him know and to let him know if I am

14   going to talk to the government again or talk to anybody else.

15           THE COURT:  All right.

16   BY MS. CHAUDHRY:

17   Q.  Before you went down on your own on the 14th, did you

18   notify the firm that you were reaching out to the agents?

19   A.  No, not specifically.

20   Q.  Did you ask the firm for the agents' contact information?

21   A.  Yes.

22   Q.  Did the firm provide it?

23   A.  Yes.

24   Q.  On February 12, Judge Rakoff asked you how you got into

25   that conference room.  Who called you to tell you to come back

F8l2newH                        Newkirk - Direct

1    into the office?

2    A.   Jay Dorman, who at that time was a partner and head of the

3    M&A group.

4    Q.   Someone you already knew?

5    A.   Yes.

6    Q.   Is he someone you were working with on the civil litigation

7    side of this?

8    A.   Yes.

9    Q.   What did he tell you?

10   A.   He asked me to come back to the office.  I didn't ask him

11   why, I just came back because he gave me a call.

12   Q.   Where did you go in the office?

13   A.   I went back -- he and I were on the same floor, and I don't

14   remember if I bumped into his secretary or him first, but when

15   I was coming off the elevator, I bumped into someone who told

16   me to go down to the conference room or to the conference

17   floor.  I went down to 35B, and that's when I bumped into

18   Austin and he introduced himself to me.

19   Q.   How many people were in that conference room?

20   A.   Three at the time.

21   Q.   Who were they?

22   A.   Austin Campriello, Agent Deal, and Agent Hilliard.

23   Q.   When did you learn that you had been called back to speak

24   to the agents?

25   A.   Well, I knew they called me back, but I didn't speak to the

1    agents as I walked into the room.

2    Q.   Did Mr. Campriello speak to you outside of the room?

3    A.   No.

4    Q.   What exactly did he tell you in the conference room?

5    A.   Shook my hand, introduced himself; said we hadn't spoken

6    other than in passing; told me that he was a white collar

7    defense attorney; told me that the agents were here to talk

8    about the Maxim transaction; that he wouldn't be sitting in the

9    meeting, and that Mary Beth Buchanan, who I may have met at the

10   previous partners luncheon, would be sitting in.

11   Q.   What was your understanding of why he was there?

12   A.   I thought he was there at that point representing me but

13   that Mary Beth would be handling the matter, so that he was,

14   you know, there as a placeholder.

15   Q.   Did he prep you at all for the meeting?

16   A.   No.

17   Q.   Did he take you outside the room and ask you about the

18   transaction?

19   A.   No.

20   Q.   Did he tell you whether he had spoken to the government

21   before you walked into the room?

22   A.   No.

23   Q.   Did he tell you that he was not there to represent you?

24   A.   No.

25   Q.   Did he tell you you should get your own lawyer?

1    A.  No.

2    Q.  Did he recommend any lawyers to you?

3    A.  No.

4    Q.  Did he tell you that you should not speak to the

5    government?

6    A.  No.

7    Q.  Did you have an impression of whether, based on your

8    interaction with him, that you should speak to the government?

9    A.  I know that the firm wanted me to.  That's why Jay called

10   me back.  I assumed when he walked in he knew why he called me.

11   So it's my understanding the firm wanted me to speak to the

12   government.

13        THE COURT:  You didn't have any hesitancy at that

14   meeting in talk to the agents, did you?

15        THE WITNESS:  No, because I felt that I did nothing

16   wrong.  The firm called me back just --

17        THE COURT:  Right.  In law school I assume you had a

18   course in criminal law?

19        THE WITNESS:  First year, yes.

20        THE COURT:  So you were familiar with what the Fifth

21   Amendment provided, yes?

22        THE WITNESS:  Yes.

23        THE COURT:  Go ahead, counsel.

24   BY MS. CHAUDHRY:

25   Q.  How long did you speak with Mr. Campriello before Mary Beth

F8l2newH                          Newkirk - Direct

1    Buchanan showed up?

2    A.  I spoke to him in the corner for about a minute, we sat

3    down, and then within a couple of minutes of that she walked in

4    the room.

5    Q.  Did you know Mary Beth Buchanan before she walked into that

6    room?

7    A.  She had been introduced at a meeting, I think in maybe

8    November or December -- I'm not certain when -- when she joined

9    the office, so they went through her background and history as

10   being a former U.S. Attorney.

11   Q.  Had you ever spoken to her before?

12   A.  At that meeting briefly.  We were a couple of chairs away,

13   so I introduced myself to her, but not a substantive

14   conversation.

15   Q.  Had you ever spoken to Ms. Buchanan about the Maxim

16   transaction?

17   A.  No.

18   Q.  Had you ever spoken to Mr. Campriello about the Maxim

19   transaction?

20   A.  No.

21   Q.  How long did you speak to Ms. Buchanan before the interview

22   began?

23   A.  Very briefly.  She introduced herself and then sat down and

24   the agent continued.  They gave her a brief update of what they

25   had said before she came in, and then they continued.

1    Q.  How did she introduce herself?

2    A.  To me or to the agents?

3    Q.  Both, please.

4    A.  Well, when she was introduced to the agents, Agent Deal

5    said he knew who she was.  She introduced herself to me.  She

6    gave me her full name, said she had just joined -- I don't

7    think she remembered that we had spoken briefly -- and she told

8    me that she was in the white collar group.

9    Q.  What was your understanding of why she was there?

10   A.  I thought that she was representing myself and the firm.

11   Q.  And did she give you anything that is like an *Upjohn*

12   warning?

13   A.  No.

14   Q.  Did she tell you to get your own lawyer?

15   A.  No.

16   Q.  Did she tell you you don't have to speak to the agents?

17   A.  No.

18   Q.  Did she tell you that you could delay this meeting and talk

19   to her before?

20   A.  No.

21   Q.  Did she give you any names of lawyers that you should hire?

22   A.  No.

23   Q.  Did she tell the agents to leave because she hadn't spoken

24   to you yet?

25   A.  No.

F8l2newH                    Newkirk - Direct

1    Q.   Did she tell you that you could ask her questions during

2    the meeting?

3    A.   Yes.

4    Q.   Is there anything she said you could not ask her about?

5    A.   No.

6    Q.   Did she answer all of your questions?

7    A.   Yes, she answered the few questions I asked of her, yes.

8    Q.   Did you step outside the room with her?

9    A.   Yes.

10   Q.   Did she tell you that she is not there to represent you?

11   A.   No.

12   Q.   If she had said that, what would you have done?

13   A.   I would have thought about what the purpose of the meeting

14   was and who to call to get advice on what to -- what the

15   meeting was about, what to say, what was the proper procedure.

16   Q.   After that meeting, did you speak with Mary Beth Buchanan?

17   A.   Briefly after the meeting ended.

18   Q.   What did you talk to her about?

19   A.   She had asked if I was a subject at the end of the meeting.

20   That's when I asked her what did being a subject mean, and then

21   she told me what it meant.  Then she told me she was going to

22   call Mr. Alfieri and let him know what happened at the meeting

23   and that the government had said I was a subject.

24   Q.   At any time after that meeting, did Ms. Mary Beth Buchanan

25   memorialize with you an understanding that she did not

1    represent you at that meeting?

2    A.  No.

3    Q.  At any point after that meeting, did anyone from Bryan Cave

4    memorialize with you that you were not represented at that

5    meeting?

6    A.  No.

7    Q.  At any point did Mary Beth Buchanan tell you that

8    everything you tell her, she can reveal to the government.

9    A.  No.

10   Q.  At any point did Mary Beth Buchanan tell you that anything

11   you tell her, she can reveal to Calvin Darden, Sr.?

12   A.  No.

13   Q.  Did she subsequently speak to you after February 12?

14   A.  She sent me an e-mail, but Vinnie jumped in, so I finished

15   that conversation with Vinnie.

16   Q.  Did Mary Beth Buchanan --

17   A.  Sorry.  She did speak to me on the interview on -- I forgot

18   the date, March 28.

19   Q.  At any point did Mary Beth Buchanan suggest to you a list

20   of lawyers you should hire once she told you that you were a

21   subject?

22   A.  No.

23   Q.  Did anyone at Bryan Cave ever suggest to you hiring a

24   lawyer?

25   A.  No, other than Vinnie asking me if I was going to get

F8l2newH                    Newkirk - Direct

1    separate counsel.

2    Q.  Did anyone provide a list of lawyers, criminal defense

3    lawyers for you?

4    A.  No.

5    Q.  If, on February 12, Austin Campriello had told you not to

6    meet with the government, would you have met with the

7    government?

8    A.  No.

9    Q.  If, on February 12, Mary Beth Buchanan would have told you

10   not to meet with the government, would you have met with the

11   government?

12   A.  No.

13            MS. CHAUDHRY:  Just one second.

14            (Counsel confer)

15   Q.  You had mentioned that Bryan Cave had asked you to fully

16   cooperate?

17   A.  Yes.

18   Q.  Did you fully cooperate with them?

19   A.  Yes.

20   Q.  Would you have done so had you thought that they would

21   reveal everything you told them to anyone they chose?

22   A.  No.

23            MS. CHAUDHRY:  I have no further questions, your

24   Honor.

25            THE COURT:  Anything from the government?

1              MR. ADAMS:  Yes, your Honor.  Thank you.

2    CROSS EXAMINATION

3    BY MR. ADAMS:

4    Q.  Mr. Newkirk, in your affidavit, you say that you were the

5    originating attorney on this deal, is that right?

6    A.  Correct, yes.

7    Q.  And the entity that retained Bryan Cave, in your view, was

8    the Reign Entertainment Group, is that right?

9    A.  Yes, that was the original entity.

10   Q.  And you said that you participated in some conversations

11   about some civil litigation after news of a fraudulent wire

12   transfer had come to light in about November, is that right?

13   A.  Yes.

14   Q.  That's November of 2013?

15   A.  Yes.

16   Q.  And I believe you said you spoke with Mr. Dorman about

17   that, is that correct?

18   A.  Mr. Dorman, Mr. Alfieri, Mr. Weissman.

19   Q.  In speaking about that fraudulent wire transfer, did you

20   explain the circumstances under which that wire had been sent?

21   A.  In different conversations, yes.

22   Q.  You spoke to Mr. Dorman about those circumstances?

23   A.  Yes.

24   Q.  Did you also talk about some of the background to that

25   wire?

F8l2newH                          Newkirk – Cross

1    A.   What do you mean by "background"?

2    Q.   Did you discuss with Mr. Dorman a Bank of America statement

3    purporting to show the assets of Calvin Darden, Sr.?

4             MS. CHAUDHRY:  Objection.

5             THE COURT:  Ground?

6             MS. CHAUDHRY:  Both outside the scope and relevance.

7             THE COURT:  I will allow it.

8    A.   What was the question?

9    Q.   Did you discuss with Mr. Dorman the Bank of America

10   statement purporting to shows the assets of Calvin Darden, Sr.,

11   after the fraudulent wire --

12   A.   Yes, we had discussions with regard that statement.

13   Q.   Had you discussed that statement with Mr. Darden before the

14   wire had --

15   A.   Before the wire, Mr. Darden wasn't on the transaction.

16   Q.   But you hadn't discussed that with Mr. Darden before the

17   wire, correct?

18   A.   Correct.

19   Q.   And that Bank of America statement was a September 2013

20   Bank of America statement, is that correct?

21   A.   Correct.

22   Q.   It was also an October 2013 Bank of America statement,

23   correct?

24             MS. CHAUDHRY:  Objection: relevance.

25             THE COURT:  I am beginning to wonder about the

F8l2newH                    Newkirk - Cross

1   relevance of any of this.

2           MR. ADAMS:  Your Honor, with respect to -- this goes

3   to Mr. Newkirk's belief, one, that he did not do anything wrong

4   or that the firm would not have believed that he had done

5   anything wrong and, thus, that there was no obvious conflict

6   between the two such that Bryan Cave could have believed it was

7   personally representing him in connection with some civil

8   litigation.

9           MS. CHAUDHRY:  Would you like me to respond?

10          THE COURT:  Well, I think the global question, which I

11  think he has already answered, but let me put it to him:

12          Did you ever at any time say to the Bryan Cave

13  attorneys or any of them that you felt you had done something

14  wrong?

15          THE WITNESS:  No.

16          THE COURT:  Did they ever say to you that they

17  believed you had done something wrong?

18          THE WITNESS:  No.  After the arrest they asked me

19  questions which I answered, but never that statement.

20          THE COURT:  Okay.  I don't think we need to get into

21  further detail on that.

22          MR. ADAMS:  Thank you, your Honor.

23  BY MR. ADAMS:

24  Q.  Mr. Newkirk, let me direct your attention to February 12,

25  2014.  That was the first time that you had met Mr. Campriello,

F8l2newH                        Newkirk – Cross

1    is that correct?

2    A.  I had met him in passing.  It was the first time I had a

3    real conversation with him.

4    Q.  That's the first time you had any conversation with

5    Ms. Buchanan, is that correct?

6    A.  No.  At her luncheon, I spoke to her briefly.  I was a

7    couple of seats away.

8    Q.  Before that date, had you ever spoken about anything

9    regarding the Maxim transaction with either Mr. Campriello or

10   Ms. Buchanan?

11   A.  No.

12   Q.  When you were introduced to Ms. Buchanan that day, there

13   were two law enforcement agents present in the same room, is

14   that right?

15   A.  Yes.

16   Q.  And they were there when the introduction between you and

17   Ms. Buchanan was made on that day?

18   A.  Yes.

19   Q.  And you agreed to speak with the agents on that day,

20   correct?

21   A.  Yes.

22   Q.  Before that interview began, you did not consult privately

23   with Ms. Buchanan, did you?

24   A.  No.

25   Q.  In fact, you didn't have any private discussions with her

F8l2newH                     Newkirk - Cross

1    at all at any point before speaking with law enforcement agents

2    on that day, right?

3    A.  No.

4    Q.  Let me direct you to the following day, the day after the

5    interview, on February 13, 2014.  You received an e-mail from

6    Vincent Alfieri, correct?

7    A.  I think the e-mail was sent the night before in the early

8    morning and the time stamp is off, but I responded to him in

9    the morning, the following morning.

10          MR. ADAMS:  Your Honor, marked as Government Exhibit 3

11   there is a stipulation which I would offer.  If you want me to

12   read it, I am happy to read it.

13          THE COURT:  Let me just get my copy from my law clerk.

14          So Exhibits 1, 2, and 3, received.

15          MR. ADAMS:  Thank you, your Honor.

16          (Government's Exhibits 1, 2 and 3 received in

17   evidence)

18          MR. ADAMS:  Your Honor, may I approach?

19          THE COURT:  Yes.

20   BY MR. ADAMS:

21   Q.  Mr. Newkirk, showing you what has been marked as Government

22   Exhibit 3, do you recognize that e-mail?

23   A.  Yes.

24   Q.  This is the e-mail where --

25   A.  It is not the complete thread, but yes.

F8l2newH                          Newkirk - Cross

1   Q.  This is an e-mail where -- or this includes an e-mail where
2   Mr. Alfieri provided you the contact information for Agent
3   Deal, correct?
4   A.  Correct.
5   Q.  In your affidavit on -- in paragraph 8, you state that you
6   had e-mailed Mr. Alfieri to see if he had Agent Deal's contact
7   information.  This is the response to that e-mail request,
8   right?
9   A.  Correct.
10  Q.  Mr. Alfieri provided the contact information in an e-mail,
11  not during a phone call, right?
12  A.  Correct.
13  Q.  Mr. Alfieri is a labor lawyer primarily, is that right?
14  A.  He is a litigator.  I'm not certain what area he
15  specializes in.
16  Q.  He is the managing partner at Bryan Cave, correct?
17  A.  Of the New York office, yes.
18  Q.  And you don't know what Mr. Alfieri's primary practice --
19  primary practice area is?
20  A.  No, I was at the firm a short time and we never worked on a
21  matter together.
22  Q.  Mr. Alfieri is one of the primary attorneys to recruit you
23  to Bryan Cave, wasn't he?
24  A.  Yes.
25  Q.  You had multiple conversations with Mr. Alfieri, correct?

1          MS. CHAUDHRY:  Objection: relevance.

2          THE COURT:  Sustained.

3    Q.  Nowhere in that e-mail in Government Exhibit 3 does

4    Mr. Alfieri indicate that Bryan Cave or anyone at Bryan Cave is

5    representing you personally.

6          THE COURT:  I have read the e-mail, counsel.

7          MR. ADAMS:  Thank you, sir.

8    Q.  After you got Agent Deal's contact information, you reached

9    out and contacted Agent Deal shortly thereafter, right?

10   A.  Correct.

11   Q.  And before you contacted Agent Deal, you did not consult

12   with Mary Beth Buchanan, did you?

13   A.  No.

14   Q.  You didn't ask Ms. Buchanan to reach out to Agent Deal on

15   your behalf, did you?

16   A.  No.

17   Q.  You didn't ask Mr. Campriello to reach out to Agent Deal on

18   your behalf, did you?

19   A.  No.

20   Q.  You did, however, eventually meet with the agents on about

21   February 14, 2014, right?

22   A.  Yeah, I believe -- yes, that was the correct date.

23   Q.  And you went there by yourself, right?

24   A.  Correct.

25   Q.  You didn't invite Ms. Buchanan along for that meeting,

F8l2newH                         Newkirk - Cross

1    correct?

2    A.  No, I did not.

3    Q.  And you didn't invited Mr. Campriello to join you on that

4    day, did you?

5    A.  Correct.

6              THE COURT:  I want to, just to move things along,

7    caution both counsel that follow-up questions that are

8    self-evident from the answer to the previous questions are just

9    a waste of time.

10             Go ahead, counsel.

11             MR. ADAMS:  Okay.

12   Q.  Mr. Newkirk, you were a party to a lawsuit entitled One

13   West v. Harvey Newkirk, correct?

14             MS. CHAUDHRY:  Objection: relevance.

15             THE COURT:  Overruled.

16   A.  Yes.

17   Q.  You represented yourself pro se in that lawsuit, didn't

18   you?

19   A.  The lawsuit didn't initiate.  I showed up for a hearing and

20   I paid off the money to settle.

21             MR. ADAMS:  Your Honor, may I approach?

22             THE COURT:  Yes.

23   Q.  Let me show you what I have marked as Government Exhibit 6.

24   Mr. Newkirk, do you recognize that document?

25   A.  Yes, I do.

F8l2newH                        Newkirk - Cross

1    Q.  What is it?

2    A.  It is titled a conference order.

3    Q.  Is that an order from the civil litigation that you were

4    just discussing a second ago?

5    A.  Yes, it is.

6            MR. ADAMS:  Your Honor, the government offers

7    Government Exhibit 6.

8            THE COURT:  I will receive it, but I think -- I do

9    think it meets the very modest threshold of relevance, which is

10   why I overruled the objection.  I think its materiality is not

11   of an order that would warrant further questions about it.

12           MR. ADAMS:  Thank you, your Honor.

13   BY MR. ADAMS:

14   Q.  Not to belabor a related point but, Mr. Newkirk, you also

15   represented yourself *pro se* in a lawsuit entitled Joshua Malvin

16   v. Harvey Newkirk?

17   A.  Yes.  Similarly, in that, there were only conferences and a

18   settlement.

19   Q.  Mr. Newkirk, turning back to February 14 for a moment, you

20   understood that Bryan Cave was not representing you during that

21   meeting with the government, correct?

22   A.  Which date?

23   Q.  February 14.

24   A.  Yeah, I went there without counsel, yes.

25   Q.  And you understood, after being placed on leave by Bryan

F8l2newH                              Newkirk – Cross

1    Cave, that there would obviously be a conflict between you and

2    Bryan Cave at that point, correct?

3    A.  No, I didn't think that there would be a conflict on the

4    civil matters.

5    Q.  You understood that you were a subject of the investigation

6    at that point, right?

7    A.  Yes.

8    Q.  But you didn't believe that there was a potential conflict

9    between you and Bryan Cave with you as a subject of a criminal

10   investigation?

11              MS. CHAUDHRY:  Objection.  Asked and answered.

12              THE COURT:  Overruled.

13   A.  No.

14   Q.  And, similarly, at that point that you had been declared a

15   subject, you didn't believe that there was a conflict between

16   you and Bryan Cave in some potential civil litigation, is that

17   right?

18   A.  I thought that was the previous question, sir.  What was

19   the previous question to make sure I answered it properly?

20   Q.  My first question was, knowing that you were a subject of a

21   criminal investigation, did you believe that there was no

22   conflict between and you Bryan Cave with respect to a criminal

23   investigation?

24   A.  That's not my area of expertise, so I didn't know.  I have

25   since learned that that is a position.

F8l2newH                       Newkirk - Cross

1  Q.  At that time you had no understanding that there was or

2  could have been a conflict between you and Bryan Cave with you

3  as the subject of a criminal investigation?

4  A.  I didn't think about that.

5  Q.  And you didn't ask anyone at Bryan Cave about that either,

6  did you?

7  A.  No.

8  Q.  You were charged by complaint on April 1, 2015, right?

9  A.  Yes.

10 Q.  You retained Ms. Chaudhry and her firm shortly after being

11 charged, is that right?

12         MS. CHAUDHRY:  Objection: relevance.

13         THE COURT:  I will allow a little of this area.

14 A.  I am not sure if it was before or after.  I think it was

15 before, but I'm not certain.

16 Q.  Let me ask you this:  Before you were charged, you were

17 briefly represented by an attorney named James Roth, correct?

18 A.  Correct.

19         MS. CHAUDHRY:  Objection: relevance.

20         THE COURT:  Overruled.

21 Q.  And after you were represented by Mr. Roth, you retained

22 Ms. Chaudhry and her firm, correct?

23 A.  Correct.

24 Q.  And after you had obtained Ms. Chaudhry and her firm as

25 counsel, you appeared in this court to be presented in

1    connection with the criminal complaint, is that right?

2              MS. CHAUDHRY:  Objection, relevance.

3              THE COURT:  We will see.  I'm not sure, but I will

4    allow this as foundational.  The court will take judicial

5    notice of the fact that he appeared before this court.

6              MR. ADAMS:  Thank you, sir.

7    Q.  When you retained Ms. Chaudhry, you were not being

8    represented by Bryan Cave, were you?

9    A.  No.

10   Q.  You didn't believe that you were being represented by Bryan

11   Cave at that point, did you?

12   A.  No, because of something Agent Deal told me.

13   Q.  Nowhere in your affidavit do you say when you believed that

14   your representation by Bryan Cave ended, do you?

15   A.  I don't remember.  I have to look at it.

16   Q.  You were here on June 12 of this year at a pretrial

17   conference before the court on this matter, right?

18             MS. CHAUDHRY:  Objection: relevance.

19             THE COURT:  So the answer, since I was there, the

20   answer is yes.  Put the next question.

21   Q.  Mr. Newkirk, you heard Ms. Chaudhry tell the court on that

22   day that she had just learned the prior day, June 11, that you

23   had previously been represented by Bryan Cave in this matter,

24   right?

25   A.  Yes, based upon conversations that she had -- she and I

F8l2newH                    Newkirk - Cross

1     had.

2     Q.   Between the time that you retained Ms. Chaudhry prior to

3     being charged and June 11 of 2015, you never mentioned that you

4     were --

5          MS. CHAUDHRY:  Objection: goes into attorney/client

6     communications.

7          THE COURT:  Well, it is not attorney/client

8     communication because he is trying to establish a negative.  He

9     assumes the answer would be no, but I think, again, the

10    materiality of this approaches -- zero would be unfair -- .0001

11    probably would be fair, so why don't we move on?

12         MR. ADAMS:  Your Honor, very briefly.

13    Q.   Mr. Newkirk, you met with Agent Deal and Agent Hilliard on

14    January 22, 2015, and March 17, 2015, right?

15    A.   I met with them twice.  I'm not sure if those were the

16    exact dates, but they came by my office twice, yes.

17    Q.   At neither of those meetings were you present with counsel,

18    right?

19    A.   No.  Those were unscheduled meetings in which they stopped

20    by my office.

21    Q.   And you had a phone at your office, right?

22    A.   I do.

23    Q.   You didn't call Bryan Cave on that day or either of those

24    days, did you?

25    A.   Again, based upon the conversation I had with Agent Deal at

F8l2newH                        Newkirk - Redirect

1   that meeting.

2   Q.   You actually came into the U.S. Attorney's office another

3   time after the second meeting with the agents, right?

4   A.   Yes.

5   Q.   And, again, you did not have counsel on that day either,

6   right?

7   A.   Correct.

8   Q.   In fact, you, Agent Hilliard, and I walked over to this

9   court and had counsel appointed for you on that day, right?

10  A.   Agent Hilliard and I walked over.  You walked over

11  separately, yes.

12  Q.   And at no point during any of the proceeding on the day

13  that you had counsel appointed did you mention that you had

14  been represented by Bryan Cave, did you?

15  A.   I didn't say anything to you.  That was the instruction I

16  was given.

17            MR. ADAMS:  No further questions, your Honor.

18            THE COURT:  Anything else?

19            MS. CHAUDHRY:  Just two follow-up questions.

20            THE COURT:  Go ahead.

21  REDIRECT EXAMINATION

22  BY MS. CHAUDHRY:

23  Q.   Mr. Newkirk, Mr. Adams just asked you about Jay Dorman's

24  entry into this case and you said, I believe, that he wasn't

25  involved previously.  Can you explain what you meant by that?

F8l2newH                    Newkirk - Redirect

1   A.  After we got notice of the -- at that time an alleged

2   spoofing of e-mail, Jay then started working on the case.  So

3   he took over the matter basically and he was the -- in charge

4   of the matter from mid November until the arrest.

5   Q.  Can you please list for us all the attorneys at Bryan Cave,

6   including the general counsel's office, that you began working

7   with once the spoofed e-mail situation came up?

8   A.  Jay Dorman, Noah --

9   Q.  Also tell us what division they are in.

10  A.  Jay Dorman, at that time he was a corporate partner; Noah

11  Weissman, litigation partner; Vincent Alfieri, litigation

12  partner; Laura Giokas, general counsel's office and litigation;

13  Mike McKinnis, general counsel to the firm; and there were a

14  couple of other people in the New York office who I don't

15  remember offhand but -- I am trying to think -- there were one

16  or two other partners; Jeff Chavkin, a partner.

17  Q.  In what department?

18  A.  Corporate.  And then maybe one other person.  I can't

19  remember specifically.

20  Q.  And for all the litigation partners you mentioned, what was

21  your understanding of why they were now involved?

22  A.  Because there was threatened litigation -- threatened and

23  actual litigation against the client; there was threatened

24  litigation against the firm, which at some point became actual

25  litigation; and then, just looking over the transaction, so

F8l2newH                    Newkirk - Redirect

1  they were involved in looking at the documents and negotiating

2  settlements, etc.

3           THE COURT:  Okay.

4           MS. CHAUDHRY:  Thank you.

5           THE COURT:  Thank you very much.  You may step down.

6           We are next going to call Ms. Buchanan on the phone,

7  so what I want is the reporter to come --

8           MR. SILVERMAN:  Your Honor, Mr. Campriello, who, as

9  you know, is on trial --

10          THE COURT:  He is going to just have to wait.

11          MR. SILVERMAN:  Okay.

12          THE COURT:  I am trying to accommodate Ms. Buchanan at

13  her request.

14          MR. SILVERMAN:  Thank you, your Honor.

15          THE COURT:  What I should have done is had her appear

16  here personally, have Mr. Campriello appear at 7 p.m. when he

17  couldn't possibly have had anything better to do than to eat

18  dinner.  If you don't mind, Mr. Silverman, he and you will

19  wait.

20          MR. SILVERMAN:  Of course, your Honor.  Thank you.

21          (Pause)

22          THE COURT:  Can you hear me?

23          THE WITNESS:  I can, Judge.

24          THE COURT:  I need to first place you under oath.

25   MARY BETH BUCHANAN,

1          having been duly sworn, testified as follows:

2              THE COURT:  Ms. Buchanan, tell us briefly your

3     educational and occupational background.

4              THE WITNESS:  I am a graduate of California University

5     of Pennsylvania in 1984 and in 1987, graduate of the University

6     of Pittsburgh School of Law.

7              I began my legal career in Pittsburgh as an associate

8     with a medium-sized law firm for approximately one year.  I

9     then became an assistant United States Attorney in the Western

10    District of Pennsylvania, where I served for almost 13 years.

11    Then, in 2001, I was appointed to serve as the United States

12    Attorney for the same district; and for the next eight years I

13    held that position as well, as several other concurrent

14    positions at the Department of Justice.

15             In 2009, near the end of 2009, I left that position.

16    I joined the United Nations after that as the United Nations

17    first ethics and reputational risk officer.  I held that job

18    until some point in 2013.

19             I then joined Bryan Cave as a partner in October of

20    2013.

21             THE COURT:  I should have mentioned before that we are

22    here in open court.  There is a reporter taking down everything

23    that is said, and there is counsel for both the government and

24    Mr. Newkirk, as well as Mr. Newkirk himself and counsel for

25    Bryan Cave.

F8l2newH                    Newkirk - Redirect

1           So there was an occasion on February 12, 2014, when,

2   as I understand it, you were called to a meeting that involved

3   Mr. Newkirk and two federal agents, is that correct?

4           THE WITNESS:  That's essentially correct, your Honor.

5   At some point during the afternoon of February the 12th, 2014,

6   I was advised by members of Bryan Cave that later that day a

7   meeting would occur between Harvey Newkirk and several federal

8   agents and they had questions to ask him about the Maxim

9   transaction.  The firm did not want to be obstructionist in any

10  way but was concerned that Harvey Newkirk's answering of

11  questions could breach our attorney/client privilege with our

12  client, and so I was asked to attend that meeting and make sure

13  that we protected the privilege that existed between our client

14  and Bryan Cave.

15          THE COURT:  My understanding was that you were called

16  to the meeting by Mr. Campriello, is that right?

17          THE WITNESS:  I believe that I was told about the

18  meeting by Austin Campriello and some decision was made -- I

19  think by Mr. Campriello, possibly by Mr. Alfieri -- to ask me

20  to attend the meeting.

21          THE COURT:  Why was Mr. Campriello involved.

22          THE WITNESS:  I believe that earlier that day

23  Mr. Alfieri, the managing partner of our firm, had received a

24  call regarding an arrest of Calvin Darden, Jr., and a request

25  to come in and talk to Harvey Newkirk.  I believe that

F8l2newH                    Newkirk - Redirect

1   Mr. Alfieri first spoke to Mr. Campriello about it, and it was

2   later in the day that I was then brought in to the discussion.

3            THE COURT:  So do I have it correct that, based on

4   that, you understood that this was a serious criminal

5   investigation?

6            THE WITNESS:  What I knew at the time was that Calvin

7   Darden, Jr., had been taken into custody that day.

8            THE COURT:  And that the agents who had asked to speak

9   with Mr. Newkirk were criminal investigatory agents, yes?

10           THE WITNESS:  Yes, your Honor, I did.

11           THE COURT:  Was any consideration given to advising

12  Mr. Newkirk that he might need counsel?

13           THE WITNESS:  I did not have any discussions with him

14  beforehand.  I don't know what discussions occurred between him

15  and Mr. Alfieri or the agents.  I only came in to it for the

16  purpose of protecting the attorney/client privilege, so I don't

17  know whether any consideration was given to that.

18           THE COURT:  When you came in, did you have any

19  conversation with Mr. Newkirk at that time.

20           THE WITNESS:  I did not, your Honor.  In fact, I was

21  sitting in the room, the interview room, which was a conference

22  room, large room, with Mr. Campriello and two federal agents.

23  We were already seated at the table, and we were explaining to

24  the agents that we would not obstruct the interview; however,

25  we were there to protect our attorney/client privilege; that if

1    we thought at any time that the question was inappropriate,

2    that we would make an objection, and they agreed they would put

3    the question aside and we would address it at a later time.  So

4    I didn't have any opportunity to speak with Mr. Newkirk because

5    we were already in the room when Mr. Newkirk entered the room.

6            THE COURT:  Well, you could have asked to go outside

7    with Mr. Newkirk, yes.

8            THE WITNESS:  I suppose I could have, but I wasn't

9    there to represent him.

10           THE COURT:  I understand.

11           Do you know whether or not Mr. Campriello had had any

12   conversation with Mr. Newkirk before you entered the room

13   regarding the situation, private conversation as opposed to in

14   front of the agents?

15           THE WITNESS:  I don't know, but not that I am aware

16   of.

17           THE COURT:  Did Mr. Campriello stay or did he leave?

18           THE WITNESS:  Mr. Campriello stayed for just a few

19   minutes at the beginning of the interview.  He then asked me if

20   I was okay to proceed without him and he left a few minutes

21   into the interview.

22           THE COURT:  Did there come a point in the conversation

23   when you asked the agents whether Mr. Newkirk was a subject, or

24   something to that effect.

25           THE WITNESS:  At the very end of the interview -- and

1  I believe the interview was concluded at this point, and people

2  were putting their papers back together, and I believe it was

3  me who asked the agents whether -- what did they consider

4  Mr. Newkirk's status to be.  I believe it was me who asked that

5  question.  And Agent Deal advised then that Harvey Newkirk was

6  a subject.

7          THE COURT:  And did Mr. Newkirk subsequently ask you

8  what was meant by that?

9          THE WITNESS:  He did not.  And the interview was over

10 at that point, so there weren't any other questions following

11 that statement.

12         THE COURT:  What did you understand that statement to

13 mean?

14         THE WITNESS:  Well, I understood that often at the

15 very beginning of an investigation, the government considers

16 anyone who might have information to be a subject, and there

17 are many subjects who are really closer to witnesses but the

18 government is not quite sure, so they will often call everyone

19 subjects, and then there are clearly subjects who are closer to

20 being a target.  The statement that Mr. Newkirk was a subject,

21 while it was the first time they said it, it wasn't necessarily

22 alarming to me because the government often considers anyone

23 who has information as a subject.

24         I did subsequently have a conversation with

25 Mr. Newkirk, as I was walking him to the door, about his

1    status.

2              THE COURT:  What did you say to him?

3              THE WITNESS:  I said to him, Harvey, the last thing

4    the agent said is that you are a subject, and so -- they also

5    asked you about further interviews.  I can give you names of

6    criminal defense lawyers to represent you.  I am new to New

7    York, but I can get a list of names from Mr. Campriello.

8    Please let me know.  We are happy to get you some names.

9              THE COURT:  What did he say?

10             THE WITNESS:  I think he just nodded his head and

11   said, Okay, thanks.

12             THE COURT:  Did you then have a conversation that

13   evening with Mr. Alfieri?

14             THE WITNESS:  I did.  At the conclusion of the

15   interview, which I believe was somewhere between 7 and 7:30,

16   around 7:15, I probably went back to my office and checked to

17   see if Mr. Alfieri was still in the office, and he was, so I

18   went to his office and I told him what had occurred at the

19   meeting.

20             THE COURT:  What did he say?

21             THE WITNESS:  Well, he -- the discussion was fairly

22   long because I tried to recall everything that was said.  There

23   was a discussion regarding what should be done with Harvey

24   Newkirk and I -- we discussed that it was too early to make any

25   judgments, that he should be placed on administrative leave and

F8l2newH                    Newkirk - Redirect

1    see how this comes out.

2              THE COURT:  And that was prompted, was it not, by the

3    fact that he had been labeled a subject?

4              THE WITNESS:  Yes, yes, it was.  But I would say, I

5    would say, your Honor, that the word "subject" probably, to

6    Mr. Alfieri, sounds a lot more sinister than just to be told

7    initially, yes, you are a subject like anyone else who we may

8    get information from.

9              THE COURT:  Now, subsequently, did you participate in

10   any conversations at the law firm with Mr. Newkirk?

11             THE WITNESS:  Yes.

12             THE COURT:  In general terms, what were those

13   conversations about?

14             THE WITNESS:  The purpose of having a conversation

15   with Harvey Newkirk that I was involved in was to find out

16   exactly who our client was -- whether we had one client, two

17   clients, three clients -- and to be certain that we knew

18   exactly whose privilege it was that we were protecting because

19   we had been getting requests for documents from various people,

20   including our clients, and we wanted to make sure -- various

21   requests from people, including the person we thought was our

22   client.  We wanted to make sure that we were turning over

23   appropriate documents to the appropriate people.

24             THE COURT:  This being Reign and Darden or whoever?

25             THE WITNESS:  Yes.  There was a question of whether

F8l2newH                     Newkirk - Redirect

1    Bryan Cave's client was Calvin Darden, Sr., in his individual

2    capacity or Calvin Darden, Sr., in his capacity as the CEO of

3    the newly created entity Darden Media Group; whether it was

4    Reign Entertainment, whether it was Calvin Darden, Jr.  There

5    were several parties that could have been considered our

6    clients, and it was very important, obviously, who exactly we

7    had the attorney/client privilege relationship with and then

8    whose consent we needed to turn over documents to parties who

9    were requesting them.

10            THE COURT:  In those conversations, was there any

11   conversation about the firm's potential civil liability?

12            THE WITNESS:  I'm not sure I understand your question,

13   your Honor.  In which conversation?

14            THE COURT:  In the conversations that you had that

15   Mr. Newkirk was part of subsequent to the February 12

16   conversation.

17            THE WITNESS:  Yes, there was.  Briefly during that

18   discussion we asked Harvey Newkirk questions regarding his view

19   of whether we represented Calvin Darden, Sr., personally, in

20   his personal capacity, for a variety of reasons or did we

21   represent him in his capacity as the head of the entity?  And,

22   yes, so that was the nature of the discussion between myself

23   and Mr. Newkirk.

24            THE COURT:  What I am trying to get at is -- all

25   right.  Let's put Mr. Newkirk aside.

F8l2newH                    Newkirk - Redirect

1            In the conversations that were had, we will say,

2    between February 12 and March 28, 2014, at the firm regarding

3    this matter generally, was there a concern about whether the

4    law firm would be sued?

5            THE WITNESS:  I think that had to be an element of any

6    analysis of this.  As you may know from the pleadings and

7    proceedings, there were allegations that Harvey Newkirk had

8    accepted service of a default judgment against Calvin Darden,

9    Sr., but then there were allegations that Harvey Newkirk said

10   that someone else was representing Calvin Darden, Sr., so we

11   were trying to figure out whether or not we represented Calvin

12   Darden, Sr., in connection with his personal guarantees or his

13   purported personal guarantees on the OpenGate loan and that is

14   a question that we were asking Harvey Newkirk because, yes, we

15   were concerned about Newkirk's acceptance of a default judgment

16   and failure to do anything about it.

17           THE COURT:  In the conversations that you had after

18   February 12 with Mr. Newkirk, did you at any time repeat your

19   offer of getting him counsel or say anything about whether he

20   needed or should be considering separate counsel, anything of

21   that nature?

22           THE WITNESS:  You know, I did not.  However, the only

23   conversation I had with Harvey Newkirk following the February

24   12 meeting between the agents was approximately February 26,

25   and that was the day that Harvey came in to the office to talk

F8l2newH                    Newkirk - Redirect

1    about -- to really clarify exactly who our client is, and that

2    was the sole purpose of the questions; and, no, I did not

3    specifically repeat the statements that I made at the February

4    12 interview because I felt that they were so explicit, no need

5    to say anything more again.  Also, it was not the type of

6    interview that you would be doing in connection with a company

7    employee coming in during the course of an internal

8    investigation, knowing that that information could later be

9    turned over.  It wasn't a situation in which we believed the

10   *Upjohn* warnings were required.  I had just said this two weeks

11   ago.  It was clear and unequivocal, and it never occurred to me

12   that I needed to say the same thing again to a Columbia Law

13   School graduate.

14           THE COURT:  Was there ever at any time, to your

15   knowledge, a discussion within the firm of whether Mr. Newkirk

16   had to be given *Upjohn* warnings or their equivalent beyond the

17   conversation you had had with him on February 12?

18           THE WITNESS:  No, no.

19           THE COURT:  Okay.

20           THE WITNESS:  And, in fact, the February 12 meeting,

21   even then, that was Harvey Newkirk's meeting with law

22   enforcement that really had nothing to do with us.  The only

23   reason that we were there was to make sure that Harvey could

24   answer their questions if he voluntarily chose to do so but

25   that he didn't inadvertently breach his ethical and

F8l2newH                    Newkirk - Redirect

professional obligations to protect the attorney/client

privilege, and so that's why we were there then.  We did not

call Harvey in to go through an internal investigation of all

of the occurrences from start to finish and, because we were

not doing that, there was never a discussion of whether this

was required.  It just appeared pretty clear that we were not

Harvey's counsel.  We told him we weren't his counsel.  No one

ever said that we were going to represent him.  In fact, I

never met Harvey Newkirk before February 12, and I had only

seen him on one occasion, so it never occurred to anyone that

Harvey Newkirk would think that we represented him.

            THE COURT:  Now, there came a time when -- and I am

not clear whether you were involved in this or not, but you can

let me know -- the firm turned over some materials to the

United States Attorney's office, including materials or stuff

relating to Mr. Newkirk, yes?

            THE WITNESS:  Yes.

            THE COURT:  Were you privy to the decision to turn

that over?

            THE WITNESS:  I was.  I recall that the government

made an initial informal request for information related to the

Maxim transaction.  During that initial request, I believe it

took us some time to get the consent of the client to turn over

that information.  I believe that there was also a subpoena

that was served upon the firm approximately a year ago

F8l2newH                    Buchanan - Direct

1    requesting some additional information, and I did have a role

2    in reviewing the subpoena and helping to comply with it.

3            THE COURT:  Was any conversation given to notifying

4    Mr. Newkirk that those materials were going to be turned over?

5            THE WITNESS:  Not at all.

6            THE COURT:  Why not?

7            THE WITNESS:  Well, because the materials that were

8    requested were -- basically there was no purpose for the

9    government -- or for Bryan Cave to object to the production.

10   We were not representing Harvey Newkirk.  We had initially

11   agreed to voluntarily provide some information to the

12   government.  We believed that the government had every legal

13   right to conduct a criminal investigation, and we felt that we

14   had an obligation to cooperate and to turn over what the

15   government requested that we were legally obligated and legally

16   permitted to turn over.

17           THE COURT:  I am going to let counsel first for

18   Mr. Newkirk and then for the government put whatever questions

19   they want to you.  Thank you very much.

20           We will start with counsel for Mr. Newkirk, who needs

21   to identify himself for you.

22           MR. KENEALLY:  Of course.  Thank you, your Honor.

23   DIRECT EXAMINATION

24   BY MR. KENEALLY:

25   Q.  Good afternoon, Ms. Buchanan.  I am with the firm Harris,

F8l2newH                        Buchanan - Direct

1   O'Brien, St. Laurent & Chaudhry, and I am here on behalf of

2   Mr. Newkirk.  You can hear me just fine?

3   A.  I can.

4   Q.  Great.  Thank you.

5        Ms. Buchanan, you said something just a couple of

6   moments ago about the events of February 12 and the interview

7   of Mr. Newkirk at the Bryan Cave offices, and I think you said

8   something along the lines of the interview had nothing to do

9   with us, referring to Bryan Cave.  Do you remember saying that?

10  A.  Yes.

11  Q.  I would just like to clear a couple of things up.

12       How is it that the interview of Mr. Newkirk took place

13  at Bryan Cave's offices?  Isn't it true that --

14  A.  You know what?  I don't know.  I don't know why the

15  interview occurred there.  As I stated a few minutes ago, I

16  learned about the interview late in the afternoon of February

17  12, and I was told that Harvey was going to talk with law

18  enforcement.  I was told that the interview was occurring here.

19  I was told that Harvey Newkirk would likely be asked questions

20  regarding the Maxim transaction and that his truthful answers

21  to those questions could possibly breach attorney/client

22  privilege and that we did not want to stand in the way of

23  Harvey talking to law enforcement if that's what he wanted to

24  do, but we also didn't want to breach our ethical and

25  professional obligations to our client.

F8l2newH                         Buchanan - Direct

1    Q.   And was that information that you gained in a conversation

2    with Mr. Alfieri?

3    A.   I believe so, yes.

4    Q.   Mr. Alfieri didn't tell you that Mr. Newkirk had called him

5    and said, I have made an arrangement to have a meeting at our

6    offices, correct?

7    A.   As I said, what I was told on the afternoon of February 12

8    was that there was going to be -- that Harvey Newkirk was going

9    to talk to law enforcement.

10   Q.   So you didn't know whether law enforcement had contacted

11   Mr. Alfieri or contacted Mr. Dorman or contacted

12   Mr. Campriello, did you?

13   A.   You know, I think by the time the interview occurred, it is

14   my recollection that there had been some earlier discussions

15   that took place that day, but I wasn't a party to them.  But I

16   believe that there were some earlier discussions.

17   Q.   And you didn't speak with the agents at all earlier,

18   correct?

19   A.   You know, I am not certain of that.  And I say this only

20   because when I was brought in to the discussion late in the

21   day, the concern was that, again, we did not want to stand in

22   the way of Harvey talking to the agents, but we also wanted to

23   make sure that he didn't breach the privilege.  And I believe

24   that it was my suggestion that we talk to the agents about

25   letting us be there and make sure that somebody was there to

F8l2newH                      Buchanan - Direct

1   protect the privilege.  So because it was my idea, it is

2   possible that I asked somebody beforehand, but I honestly can't

3   remember whether it was me who asked whether we could be

4   present or whether it was someone else in the firm, but

5   clearly, knowing the way the government works, I don't think

6   that we just invited ourselves.  I think that someone would

7   have asked, Can we be present to protect the privilege.

8   Q.  And other than that discussion that you might possibly have

9   had with the agents, you didn't have any other discussions with

10  the agents prior to the interview, is that correct?

11  A.  I don't think I did.

12  Q.  And do you know who -- have you ever heard the name James

13  Pastore, Ms. Buchanan?

14  A.  Yes, I have.

15  Q.  Who is Mr. Pastore?

16  A.  He was an Assistant U.S. Attorney in the Southern District

17  and he was the original assistant who was in charge --

18  overseeing the investigation.

19  Q.  And did you speak with Mr. Pastore on the afternoon of

20  February 12, 2014, prior to Mr. Newkirk's interview?

21  A.  I don't -- I don't specifically recall that.  As I said, it

22  is possible that it was me who asked if we could be present,

23  but I don't specifically recall.  I know I have had

24  conversations with Assistant U.S. Attorney Pastore.  I don't

25  recall whether I had one on February 12 prior to the interview.

F8l2newH                    Buchanan - Direct

Q.  And just to be clear, before the interview began, you were

aware that Calvin Darden, Jr., had already been arrested,

correct?

A.  That's correct.

Q.  Before the interview began on the 12th of February, 2014,

were you aware of whether or not Calvin Darden, Jr., was a

client of Bryan Cave's?

A.  On the afternoon of February 12, 2014, as it was explained

to me, Bryan Cave's client was the Darden Media Group.

Q.  And did you have an understanding on that afternoon as to

whether Calvin Darden, Jr., was part of the Darden Media Group?

A.  My understanding on that afternoon was that Calvin Darden,

Jr., was somehow involved in the transaction, but that he was

not in a management role of the Darden Media Group; that the

Darden Media Group was controlled by Calvin Darden, Sr.; that

our client was likely Calvin Darden, Sr. in his capacity as

chair of the Darden Media Group, as well as the Darden Media

Group.  I did not believe on February 12, 2014, that Calvin

Darden, Jr., was a client of Bryan Cave.

Q.  You did not believe that at that time?

A.  Well, let me say this again.  I didn't believe it on

February 12, 2014, nor did I believe it at any time subsequent

to that date.

Q.  But you did know that he was somehow involved in the Maxim

transaction?

F8l2newH                        Buchanan - Direct

1    A.  Yes.

2    Q.  And you obviously knew that he was Calvin Darden, Sr.'s

3    son?

4    A.  Yes.

5    Q.  On February 12, 2014, as you sat in at that interview,

6    Ms. Buchanan, whom were you representing?

7    A.  I was representing the Darden Media Group and I was

8    protecting the attorney/client privilege that the Darden Media

9    Group had with Bryan Cave.  I also believed that Harvey Newkirk

10   was -- still had the obligation to protect the attorney/client

11   privilege of Darden Media Group, and I told him that.

12   Q.  Did anyone from Darden Media Group ask you to represent its

13   interests at that interview?

14   A.  No.

15   Q.  And in fact, as of February 12, you didn't have a certainty

16   as to whom Bryan Cave's client was with respect to the Maxim

17   transaction.

18   A.  Well, on February 12, 2014, I believed that our client was

19   the Darden Media Group, and I know that we cannot disclose

20   privileged information to anyone without the client's consent.

21   This all happened very quickly.  I knew that that privilege had

22   to be protected; and, no, I wasn't asked to do it, meaning I

23   was asked to do it by Bryan Cave.  No, I wasn't asked to do it

24   by the client, but every lawyer knows we have that obligation.

25   Q.  Before the interview began on the 12th, you had no

F8l2newH                          Buchanan - Direct

1    conversations in private whatsoever with Mr. Newkirk, is that

2    correct?

3    A.   That is correct.

4    Q.   So before the meeting began on the 12th, you did not tell

5    Mr. Newkirk of his duty to honor the attorney/client privilege

6    between Bryan Cave and Darden Media Group, is that correct?

7    A.   On February 12 I did, yes.  When Harvey Newkirk walked into

8    the room, Harvey Newkirk was introduced to me for the very

9    first time.  I turned to Harvey Newkirk and, again, I

10   reintroduced myself and said that I was here not in the role of

11   his counsel, but I was here on behalf of Bryan Cave, to protect

12   the attorney/client privilege that we had with our client, the

13   Darden Media Group.  I also reminded him that as a lawyer at

14   Bryan Cave he, too, had the continuing obligation to protect

15   the attorney/client privilege and that the agents had agreed to

16   allow me to be present at the meeting to assist him in

17   protecting our client's privilege.  I told Harvey that I didn't

18   know a lot about the transaction, and that I certainly would --

19   if he thought that a question was going to breach the

20   privilege, by all means, please speak up and tell them.  If he

21   isn't sure, he should ask me, we can step out of the room.  If

22   I am not sure, I may ask him and we will step out of the room.

23   But the agents understand that we have that legal duty and they

24   understand those ethical and professional obligations, and they

25   are going to let us do that.  If there is a dispute about

F8l2newH                    Buchanan - Direct

whether something is privileged or not, they had agreed in

advance that they would just table the question until some

determination could be made.

Q.  And this conversation that you just described to us took

place in the presence of the agents in that conference room at

Bryan Cave, correct?

A.  Yes.

Q.  And you had no conversation with Mr. Newkirk about any

details of the Maxim transaction to further familiarize

yourself with possible issues or facts relating to

attorney/client privilege that might arise, is that correct?

A.  From my perspective, Mr. Keneally, I know that if a

communication occurs between a lawyer and the client and it is

not outside, that communication is privileged.  I also know

that if there are communications that extend beyond the lawyer

and the client, those are no longer privileged because they

have been disclosed to third parties.  So, as I was saying, the

reason that I didn't know everything about the transaction is

that I knew that there might be certain documents that,

although discussed between an attorney and the client, might

also have been disclosed to third parties, which would

therefore then make them no longer privileged.

        So those were the kinds of questions and things that I

might have needed to ask Harvey about, because I wasn't sure

with respect to all the documents in the case whether certain

F8l2newH                      Buchanan - Direct

1    documents were just between Bryan Cave and the client or may

2    have gone to other parties.

3    Q.   I understand that, Ms. Buchanan, and I don't want to

4    belabor this point too much, but I am just a little puzzled

5    because it seems to me, on the one hand, this was an

6    understandably crucial issue to Bryan Cave, a crucial issue to

7    whomever Bryan Cave's client turned out to be, and a crucial

8    issue to Mr. Newkirk, and you didn't have any preparatory

9    conversations with Mr. Newkirk prior to letting him go in and

10   speak for two and a half hours to government agents, and I just

11   don't understand what the thought process was behind that.

12          MR. ADAMS:  Objection.

13          THE COURT:  Excuse me.  The government just raised an

14   objection and, Mr. Keneally, great as my respect is for you, I

15   was searching, I think in total vain, for a question in that

16   long soliloquy in which you just engaged, so the objection is

17   sustained.

18          But, Ms. Buchanan, I have a question, which is, I

19   think you said a minute ago that when you had that initial

20   conversation, after first meeting Mr. Newkirk and you were

21   explaining to him why you were there, that you specifically

22   said you were not representing him.  Did I hear that correctly?

23          THE WITNESS:  That's correct.  Because I certainly did

24   not want him to have that impression.  And the agents

25   understood that I was not there to represent him.  I was not

F8l2newH                          Buchanan - Direct

going to oppose any of their questioning but for to protect the

attorney/client privilege.  Harvey Newkirk didn't at any time

ask me anything.  He didn't ask me to represent him.  He didn't

ask me if he should continue.  There wasn't any discussion

other than with regard to the attorney/client privilege

questions and looking at documents and determining whether

those documents could be privileged.

            MR. KENEALLY:  Thank you, your Honor.

BY MR. KENEALLY:

Q.  Ms. Buchanan, I want to be clear on a couple of other

things.

            You knew before the interview that Mr. Darden, Jr.,

had been arrested earlier that day?

A.  That's correct.

Q.  And you knew that he was involved in this transaction?

A.  That's correct.

Q.  And you knew that the agents were moving quickly and were

seeking to speak to an attorney from your firm who had an

integral role in that transaction?

A.  That's correct.

Q.  And you knew that this was a serious matter for the firm

and Mr. Newkirk beyond simple attorney/client privilege issues,

is that correct?

A.  Yes.

Q.  And, with all that, you didn't ask about Mr. Newkirk's

F8l2newH                    Buchanan - Direct

1    status in the investigation until the end of his interview, is

2    that correct?

3    A.   I did not ask the agents any questions about Mr. Newkirk

4    because I was not representing him.

5              THE COURT:  Why did you ask at the end?

6              THE WITNESS:  Well, the interview was over and I --

7    I -- I felt that the interview had gone really well for

8    Mr. Newkirk.  I felt that he answered all the questions.  I

9    didn't think that there was anything that he had to be concern

10   about at all, and I really was expecting them to say, well, he

11   is a witness and we want to get more information from him.  So

12   that's why I asked.

13             THE COURT:  All right.  Mr. Keneally, anything else?

14   BY MR. KENEALLY:

15   Q.   A couple of questions about your conversation later that

16   night with Mr. Alfieri in which you told Mr. Alfieri that

17   Mr. Newkirk was a subject of the investigation.  You have

18   explained to us here today that that subject, the word

19   "subject" encompasses a rather wide definition under criminal

20   defense terminology and that it often includes people who don't

21   really have realistic criminal exposure.  Do you remember

22   explaining that to us?

23   A.   Yes, absolutely.

24   Q.   Did you explain that to Mr. Alfieri and try to tell

25   Mr. Alfieri that Mr. Newkirk was closer to the witness end of

F8l2newH                          Buchanan - Direct

1    the spectrum than the target end?

2    A.   You know, I don't recall whether we had that conversation

3    that night.  I think at some point we probably did.  The

4    substance of the conversation with Mr. Alfieri that evening

5    really had to do with telling him what had happened and helping

6    him make a firm decision on what to do with Mr. Newkirk.  And

7    as I also said earlier, from my view of that evening, I didn't

8    think that Harvey had any concern.  I thought that Harvey, at

9    worst, was duped by this Darden, Jr., and so I thought and

10   advised that let's just put him on leave and let's wait and see

11   how this shakes out.  Don't unfairly judge the guy.

12   Q.   During the interview, did you have any conversations with

13   Mr. Newkirk outside the conference room?

14   A.   I believe that there were -- there was at least one and

15   possibly two times that we stepped out of the interview room.

16   I think that on one occasion I asked him to step out because I

17   had a question about maybe the documents that they were -- the

18   agents were questioning him about, and I think maybe on one

19   question Harvey wanted to ask me something.  But both questions

20   were related to whether it was okay for him to answer the

21   question without breaching the attorney/client privilege.

22   Q.   Do you recall him asking to step out and asking you a

23   question about a statute that had been mentioned by the agents?

24   A.   I don't believe so, no.

25   Q.   You know what a 1001 warning is, don't you, Ms. Buchanan?

F8l2newH                      Buchanan - Direct

1    A.  Yes, I do.

2    Q.  Was Mr. Newkirk given a 1001 warning at the beginning of

3    his interview?

4    A.  You know, I think, yeah, I believe that he was.  I think

5    that was that it was the -- you know, the agent asked him if he

6    was willing to proceed and that this was voluntary and that he

7    understood that even -- that Newkirk understood that even

8    though this was voluntary, that he had an obligation to answer

9    the questions, you know, truthfully.  I don't specifically

10   remember the agent saying 1001, but I think that, from my

11   recollection, that the things I remember are that the agent

12   told him -- asked him if he was willing to proceed and saying

13   that it was voluntary but reminding him that even if it is

14   voluntary, you have to answer truthfully.  That's what I

15   recall.

16   Q.  Would you have memorialized that in a memo?

17   A.  You know, I didn't, because the purpose of my memo was to

18   try to sort of recite what were the things that were asked

19   really as best as I could to get the sense of what occurred at

20   the meeting, and I am sure you have seen that the time stamp on

21   this is after 1 in the morning, so I made every effort to do it

22   that evening, to make sure that I did the best job I could to

23   memorialize what occurred and what I thought was important at

24   the time.

25   Q.  Just to be clear, we have a book of government exhibits

F8l2newH                        Buchanan - Direct

1   here.  Have you been provided with any government exhibits

2   prior to this hearing?

3   A.   Yeah, I have two exhibits in front of me.  One is labeled

4   Government Exhibit 4, which is my memorandum from the February

5   12 interview; and then I have another one in front of me marked

6   Government Exhibit 8, which is a series of e-mail

7   communications between Bryan Cave and attorneys from Alston &

8   Bird, and it is 15 pages.

9   Q.   Do you say anywhere in your memo, in Government Exhibit 4,

10  that you offered to provide Harvey Newkirk with a list of

11  defense counsel?

12  A.   No, I didn't; and, again, as I said, you know, the

13  interview was over, I was walking Harvey to the elevator and,

14  as a friendly gesture, I said to him, you know, they said that

15  you were a subject, and if you need some recommendations for

16  counsel moving forward, I don't -- I am happy to get you some

17  names if you want them.  Just give me a call.

18  Q.   So you just said that in passing on the way to the

19  elevator?

20  A.   On the way to the elevator, yes.  And that was -- the only

21  conversations I had with Harvey on February 12 were during the

22  agents' interview, the two times that we stepped outside the

23  interview room, and as I walked him to the door of the

24  elevator.  I then did not speak to Harvey again until February

25  26, and then after that I never saw or spoke to Harvey Newkirk

F8l2newH                    Buchanan - Direct

1  again.

2  Q.  Thank you.  I have only a couple more questions, a couple

3  of questions about February 12.

4          It is a fact, is it not, Ms. Buchanan, that

5  Mr. Newkirk's interview on the 12th was not scheduled by

6  Mr. Newkirk, but was scheduled by Bryan Cave?

7  A.  I don't know the answer to that.

8  Q.  Ms. Buchanan, as a highly experienced criminal defense

9  attorney, in your opinion is it the best practice to allow

10  someone who turns out to be a subject of a criminal

11  investigation to walk unprepared and unrepresented into an

12  interview with government agents after a client of his has been

13  arrested?

14          MR. ADAMS:  Objection.

15          THE COURT:  The objection is sustained, as I am sure

16  Mr. Keneally knew it would be, but he felt he wanted to end his

17  questioning on a rhetorical point.

18          MR. KENEALLY:  Your Honor, if I might I have one or

19  two non-rhetorical questions to ask of Ms. Buchanan.

20          THE COURT:  Okay.

21  Q.  This has to deal with, you are subsequently speaking to

22  Mr. Newkirk on or about the 26th of February, and the purpose

23  of those discussions was, as you stated, to figure out who

24  Bryan Cave's clients were, is that correct?

25  A.  That's correct.

F8l2newH                    Buchanan - Direct

1   Q.  And the reason you were trying to figure that out is

2   because Bryan Cave was in discussions with lawyers from the

3   firm of Alston & Bird, correct?

4   A.  Well, there were two reasons that we were trying to figure

5   it out.  We were trying to figure it out because lawyers from

6   Alston & Bird wanted their file, they wanted their records, and

7   I believe that the government had also asked us for some

8   records and we couldn't even begin to consider turning anything

9   over to anyone until we were certain that we knew whose records

10  they were.

11  Q.  And Alston & Bird at the time was representing Calvin

12  Darden, Sr., is that correct?

13  A.  That is correct.

14  Q.  And you spoke to Harvey Newkirk for the purposes of being

15  able to speak to Alston & Bird, correct?

16  A.  Not for the purposes of being able to speak to them, but

17  for the purposes of clarifying exactly who our clients were and

18  in what capacity we represented them.  And so it was important

19  to make sure that we were absolutely clear about that.

20  Q.  When you interviewed Mr. Newkirk on or about February 26,

21  did you tell him that you would divulge to Alston & Bird

22  whatever he told you that day?

23  A.  At the time I met with Harvey Newkirk on February 26, it

24  wasn't an interview, it wasn't an interrogation.  It was a

25  meeting, it was a discussion, it was a "help us figure out who

F8l2newH                       Buchanan - Direct

1   our clients were, what documents do we have memorializing that,

2   are you absolutely sure, does the line change at any point?"

3   He knew that the purpose for which we needed to figure that out

4   ASAP is that our client needed the records to get the default

5   judgment lifted.  He knew that time was of the essence because

6   a default judgment had been entered against I believe it was

7   Calvin Darden, Sr., personally.  So, yeah, Harvey knew that we

8   needed this information to be able to give our client back its

9   records.

10  Q.  And following your meeting with Mr. Newkirk on the 26th,

11  Bryan Cave did in fact tell Alston & Bird what Mr. Newkirk had

12  told Bryan Cave, correct?

13  A.  I am not sure what you mean by did we tell them what Harvey

14  told us.  I don't know what you mean by that.

15  Q.  Well, with respect to the representation of Calvin Darden,

16  Sr., Mr. Newkirk provided you information on February 26,

17  correct?

18  A.  That is correct.

19  Q.  Did you pass that information on to Alston & Bird?

20  A.  Yes.

21        MR. KENEALLY:  Your Honor, may I just have one more

22  moment?

23        THE COURT:  Yes.

24        (Counsel confer)

25  BY MR. KENEALLY:

F8l2newH                              Buchanan - Direct

1   Q.  Just one more thing here.  You, Ms. Buchanan, have spoken

2   to government agents and to assistant U.S. Attorneys?

3   A.  In this case?

4   Q.  Yes.

5   A.  Yes.

6   Q.  And you have divulged to the government things that Harvey

7   Newkirk has told you, correct?

8   A.  Some things, yes.

9   Q.  And you are aware that other Bryan Cave attorneys have

10  spoken to the government and have told the government things

11  that Harvey Newkirk has told them, correct?

12  A.  That's correct.

13  Q.  And Bryan Cave has provided to the government

14  communications that it has had with Harvey Newkirk, correct?

15  A.  You are going to have to be more specific than that,

16  please.

17  Q.  Well, you have responded to government subpoenas, correct?

18          THE COURT:  Are you talking now about like written

19  communications as opposed to oral?

20          MR. KENEALLY:  Yes, your Honor.

21  A.  We have provided the government, in response to first their

22  informal request for documents, as well as in response to the

23  subpoena, we have provided various e-mail communications from

24  Harvey Newkirk.  So, yes, we have provided the government with

25  communications from Harvey Newkirk.

F8l2newH                          Buchanan - Cross

1          MR. KENEALLY:  Thank you.  No further questions, your

2    Honor.

3          THE COURT:  Anything from the government?

4          MR. ADAMS:  Just very briefly, your Honor.

5          On the basis of the questions and answers of

6    Government Exhibit 4, I would offer that exhibit.

7          THE COURT:  Exhibit 4 is received.

8          (Government's Exhibit 4 received in evidence)

9          MR. ADAMS:  Similarly, with respect to Government

10   Exhibit 8 on the basis of --

11         THE COURT:  Exhibit 8 is received.

12         MR. ADAMS:  Thank you.

13         (Government's Exhibit 8 received in evidence)

14   CROSS EXAMINATION

15   BY MR. ADAMS:

16   Q.  Ms. Buchanan, at the February 26 meeting with Mr. Newkirk

17   that you have described, during that meeting, what, if

18   anything, did Mr. Newkirk tell you about any prior meetings

19   with law enforcement that he had attended at which you were not

20   in attendance?

21   A.   During the February 26, 2014, meeting, I didn't have any

22   discussions with Harvey Newkirk about any meetings with law

23   enforcement.  I didn't know what contacts he had had with law

24   enforcement.  He didn't tell me anything about any contacts he

25   may have had with law enforcement.

F8l2newH                    Buchanan – Cross

1   Q.  When, if ever, has Harvey Newkirk asked you for legal

2   advice in his personal capacity?

3   A.  Harvey has never asked me for legal advice.

4            MR. ADAMS:  Nothing further.

5            THE COURT:  All right.  Thank you so much.  We will

6   hang up now.  Thanks again.

7            THE WITNESS:  Thank you, your Honor.

8            THE COURT:  We will take a brief recess.

9            (Recess)

10           THE COURT:  I was feeling a little guilty of the hard

11  time I gave Mr. Silverman.  On other hand, being Jewish, I

12  really enjoy feeling guilty.

13           So, at any rate, let's get Mr. Campriello.

14   AUSTIN CAMPRIELLO,

15      having been duly sworn, testified as follows:

16           THE COURT:  Mr. Campriello, we are sorry we had to

17  detain you so long because I understand you are involved in a

18  trial right now.

19           THE WITNESS:  Yes, sir.

20           THE COURT:  In this court?

21           THE WITNESS:  No, the Dewey LeBoeuf case in State

22  Supreme.

23           THE COURT:  Well, there are tons of lawyers in that

24  case.  They can carry on as best they will.  Besides which, my

25  understanding is that trials were extinct.  I am very surprised

F8l2newH                    Buchanan - Cross

1    there even is a trial these days.

2           Let's get down to business.

3           There came a time when you convened or were present at

4    a meeting on February 12, 2014, involving two agents and

5    Mr. Newkirk, true?

6           THE WITNESS:  Yes.  Not convened, but was present.

7           THE COURT:  How did that meeting come about?

8           THE WITNESS:  Earlier that day, three of my partners

9    came to my office -- Vincent Alfieri, Jay Dorman, Noah

10   Weissman -- and told me about problems or a problem that had

11   arisen in a matter that Mr. Newkirk had been working on.  I

12   don't remember the nature of what they told me, but there

13   clearly was a problem in the transaction on which he was

14   working.

15          On top of that, I learned that a federal agent had

16   contacted somebody there, probably Mr. Alfieri, because he is

17   the managing partner, but I don't know that; and I then,

18   because I was one of the criminal lawyers in the New York

19   office, called the federal agent, so we must have had his name

20   and number, spoke to him, and whatever I said triggered what

21   often happens when I call a federal agent, and that is, you

22   have to speak to the assistant.

23          THE COURT:  Go ahead.

24          THE WITNESS:  I think the assistant called us back.  I

25   don't think I called the assistant.  But I did speak to either

F8l2newH                         Buchanan - Cross

1     an assistant or two assistants on the phone, and I think

2     Mr. Alfieri was with me at the time.

3              THE COURT:  Roughly what time of day was this?

4              THE WITNESS:  Probably in the middle of the day

5     because the meeting that happened later was in the later part

6     of the afternoon is my recollection.

7              THE COURT:  Had you learned in these earlier

8     conversations that there had been an arrest?

9              THE WITNESS:  I don't remember.

10             THE COURT:  Go ahead.

11             THE WITNESS:  During the call with the assistants --

12    and I am going to say "assistants" even though I am not sure

13    there were two -- I said to them that Bryan Cave wanted to be

14    completely cooperative with the United States government, but

15    that they had to understand that, depending upon what they

16    wanted, Bryan Cave might have to assert privilege to protect

17    its client.  By "its client," I am not talking about

18    Mr. Newkirk.  I am talking about whoever or whatever entity or

19    human beings Mr. Newkirk had been working for.  I didn't want

20    the agent -- excuse me, the assistants to think that, by

21    asserting a privilege, we were using that as sort of an excuse

22    for not being cooperative.  I wanted to make sure that they

23    knew that the law firm wanted to cooperate with federal law

24    enforcement, but that we would have an ethical obligation,

25    depending upon what they were asking us to do, to protect the

F8l2newH                         Buchanan - Cross

1   client's privilege.

2              THE COURT:  So what happened next?

3              THE WITNESS:  What I remember next is there was a

4   meeting that same day, later in the day, in a conference room

5   in Bryan Cave.  I know I was present.  I know Ms. Buchanan was

6   present.  I believe there were two agents present.  There may

7   have been an assistant.  I don't remember.  Before --

8   Mr. Newkirk eventually came, but before Mr. Newkirk came, I

9   believe that I, in essence, reiterated again what I just said,

10  namely, we want to be cooperative, but if we have to assert

11  privileges, we are going to have to do it because that is our

12  ethical obligation.  That's before Mr. Newkirk came.

13             THE COURT:  I understand.  In these earlier

14  conversations, is it your recollection that the agents or the

15  assistants were seeking to get information from Bryan Cave?

16             THE WITNESS:  Yes, but I don't remember what.

17             THE COURT:  And was the decision to have the meeting

18  at Bryan Cave something you suggested?  I mean, it could have

19  been at the office of the U.S. Attorney's office, whatever.

20  How did it come about?

21             THE WITNESS:  I don't remember.  I don't remember.

22             THE COURT:  Okay.

23             Do you remember what, if anything, you said to

24  Ms. Buchanan before Mr. Newkirk arrived?

25             THE WITNESS:  I left something out and I am glad you

1    asked me that.  I left something out.  Between -- I believe it

2    was -- it was clearly before this meeting, but I think it was

3    between the meeting -- the telephone call with the assistant or

4    assistants and that meeting, I spoke with Ms. Buchanan and I

5    told her what had happened earlier.  That happened.

6              THE COURT:  Why was she going to be there?

7              THE WITNESS:  Ms. Buchanan was a relatively newcomer

8    to our office.  She obviously is a criminal lawyer.  She had

9    been the U.S. Attorney in the Western District of Pennsylvania.

10   She was the person who was going to deal with this.  I wasn't

11   going to deal with this.

12             I was going to be there at the beginning of the

13   meeting to reiterate to the agents where Bryan Cave was coming

14   from.  I wanted to make sure that when Mr. Newkirk arrived that

15   Ms. Buchanan made clear that we were not representing him; that

16   we were going to be there -- and when I say "we," I really mean

17   her -- we were going to be there to protect the underlying

18   client's privilege, so that's why I was there.

19             And then, as Mr. Newkirk came in with, I think,

20   Mr. Alfieri, after we had been there for a while, Ms. Buchanan

21   basically said to everybody in the room, so that we all started

22   out on the same playing field, that she was there to protect

23   the underlying client's privilege, and I got up and left.  I

24   don't think I was in the room with Mr. Newkirk for more than a

25   minute, two minutes tops.

F8l2newH                        Buchanan – Cross

1                THE COURT:  Did she say, if you recollect one way or

2       the other, I am not representing Mr. Newkirk or anything like

3       that?

4                THE WITNESS:  I believe she did.

5                THE COURT:  Why was that said in front of the agents

6       as opposed to calling Mr. Newkirk out of the room and saying, I

7       want you to understand before we go in here that we are not

8       representing you or something like that?  Why was that done in

9       this sort of --

10               THE WITNESS:  Probably so that everybody heard it

11      simultaneously and so that there was no side conversation.

12      That's what I am thinking.  She obviously will tell you

13      whatever she was thinking or has told you.

14               THE COURT:  So then you left.

15               THE WITNESS:  Yes.

16               THE COURT:  Subsequent to that, did you have any

17      further conversations, either in person or by telephone or by

18      e-mail, any form of communication with Mr. Newkirk?

19               THE WITNESS:  I don't believe I ever had any

20      communication whatsoever with Mr. Newkirk until about two

21      minutes ago, when we almost bumped into each other in the men's

22      room and, I think he said something like "excuse me" or "I am

23      sorry."

24               THE COURT:  I think we will hear the next questions

25      from Mr. Newkirk's counsel.

F8l2newH                          Campriello – Direct

1    DIRECT EXAMINATION

2    BY MS. CHAUDHRY:

3    Q.  Good evening, Mr. Campriello.  I am Priya Chaudhry.  I

4    represent Harvey Newkirk.

5    A.  Hello.

6    Q.  You are a former prosecutor, correct?

7    A.  Yes.

8    Q.  And you are a criminal defense lawyer now?

9    A.  Yes.

10   Q.  For how many years have you been a criminal defense lawyer?

11   A.  I have been --

12          THE COURT:  Remember, you are under oath.

13   A.  I have been a lawyer for almost 44 years, and I did two

14   stints in government, so I would say roughly 34 years, but

15   broken up.

16   Q.  You referred to yourself as the criminal lawyer in the New

17   York office of Bryan Cave at the time, right?

18   A.  Well, I was one of them, because Ms. Buchanan had joined

19   us.

20   Q.  Prior to that, were you the criminal defense lawyer?

21   A.  Yes.  I had associates who worked with me, but I was the --

22   yes, I was the criminal defense lawyer.

23   Q.  You have run internal investigations, haven't you?

24   A.  Yes.

25   Q.  And you have represented companies in the past, haven't

F8l2newH                    Campriello - Direct

1   you?

2   A.  Yes.

3   Q.  You have given *Upjohn* warnings to employees of the

4   companies you have represented, haven't you?

5   A.  Yes.

6   Q.  You have done this in writing previously, haven't you?

7   A.  Yes.

8   Q.  And when you have represented a company in the past, you

9   have referred employees of that company to their own lawyers,

10  haven't you?

11  A.  Yes.

12  Q.  How many times do you think you have done that in these 34

13  years?

14  A.  Many.  It's hard to quantify, but many.

15  Q.  And you have represented people who were asked by the

16  government to meet with the government, haven't you?

17  A.  Yes.

18  Q.  And in those cases, you met with your client prior to the

19  meeting with the government, didn't you?

20  A.  With my client, yes.

21  Q.  And you prepared your client?

22  A.  Yes.

23  Q.  You spoke with the government apart from your client,

24  correct?

25  A.  Yes.

F8l2newH                    Campriello - Direct

1   Q.  You asked what the person's status is in the investigation?

2   A.  Yes.

3   Q.  And you asked the government -- you have asked the

4   government what the government would want to know from your

5   client?

6   A.  Yes, I have asked.

7   Q.  Sometimes they don't tell you, correct?

8   A.  Often they don't tell me but, yes, I have asked.

9   Q.  And after that you speak with your client again, after

10  learning some information from the government, correct?

11  A.  Yes.

12  Q.  And you explain the criminal process to your client,

13  correct?

14  A.  Yes.

15  Q.  Have you represented a lawyer in the past?

16  A.  I am representing a lawyer now, but "in the past," you mean

17  prior to this situation?

18  Q.  In your 34 years, not including this hearing today, have

19  you ever represented a lawyer?

20          THE COURT:  He is representing somebody in the Dewey

21  trial right now.

22  A.  Yes.

23          THE COURT:  Who do you represent?

24          THE WITNESS:  Stephen DiCarmine, who was the executive

25  director.

F8l2newH                        Campriello - Direct

1    Q.  Even though you were representing a lawyer, you did explain

2    the criminal process to that lawyer, didn't you?

3    A.  You are talking about my current representation --

4    Q.  I don't want to go into your current representation, but

5    regardless of whether your client is a lawyer or nonlawyer, you

6    would explain the criminal process?

7    A.  Yes.

8    Q.  And you explain the consequences to your client of meeting

9    with the government, don't you?

10   A.  Yes.

11   Q.  And you let the client make the decision of whether or not

12   to have that meeting, correct?

13   A.  Yes.

14   Q.  You thoroughly interview your clients, before you take them

15   in, to understand your client's exposure, correct?

16   A.  Yes.

17   Q.  And in the past you have decided not to take certain

18   clients in to meet with the government, haven't you?

19   A.  Yes.

20   Q.  It is not your practice to meet a new client in the United

21   States Attorney's office in a conference room as a meeting

22   begins, is it?

23   A.  No.

24   Q.  And it is not your practice to tell someone that you are

25   not representing that they should meet with the government

1   without a lawyer, is it?

2   A.  No.

3   Q.  You would tell that person you were not representing to get

4   a lawyer, wouldn't you?

5   A.  Do that one again.  Ask me that again, please.

6   Q.  If someone who is not your client asked you if they should

7   speak with a federal agent, wouldn't you recommend that person

8   get a lawyer?

9   A.  You know, I would think about it, because I attended a CLE

10  program that I think was in this building many years ago where

11  there was a difference on the panel as to whether it is always

12  permissible to say, Get a lawyer, or whether you are supposed

13  to say, I can't give you that advice.

14  Q.  Would you offer to refer someone to a lawyer if they told

15  you that federal agents wanted to speak with them?

16  A.  I probably would.  Well, it would depend on the

17  circumstances.  Under certain circumstances I think I would,

18  and under other circumstances I might not.

19  Q.  There are circumstances in which you would not recommend

20  that someone speak to a lawyer before speaking to --

21          THE COURT:  I think we are getting very far away from

22  the facts of this case.  You are just asking him to in the

23  abstract --

24          MS. CHAUDHRY:  I was just about to focus here, so I

25  will divert.

1          THE COURT:  Okay.

2     Q.  I want to turn your attention to February 12, 2014.  You

3     said that's the first time you heard of the investigation here?

4     A.  No.  I said that's the first time that I remember something

5     happening.  I can't say for certain that I didn't know

6     something about the underlying matter earlier, but I think that

7     was the first time I learned of any federal interest in it.

8     Q.  And you were not previously involved in the Maxim deal,

9     were you?

10    A.  In the what?

11    Q.  The Maxim deal.

12    A.  I don't know the name of the deal, so no.

13    Q.  And you did not know Harvey Newkirk prior to that day?

14    A.  I knew Harvey Newkirk in the following sense:  Our New York

15    office has periodic partner/counsel lunches.  I was at one of

16    those, and Mr. Newkirk was introduced as a new counsel in the

17    firm.  He spoke briefly about whatever it is that he does, and

18    so I knew Mr. Newkirk to that extent before that day.  I don't

19    think that, from that introductory experience until that day, I

20    don't believe he and I ever had any communication whatsoever.

21         THE COURT:  The close collegiality of modern law firms

22    is certainly a wonder to behold.

23    Q.  Previous to February 12, no one at the law firm, including

24    Mr. Newkirk, had consulted you on any privilege issues, did

25    they?

F8l2newH                    Campriello - Direct

1   A.   Certainly Mr. Newkirk had never consulted me on any

2   privilege issue, and I don't remember anybody else doing it

3   either.

4   Q.   And no one at the firm consulted you on the potential

5   litigation involved from the Maxim deal, did they?

6   A.   I have no recollection of anything like that happening.

7   Q.   But you recalled when the federal agents called, correct?

8   A.   Yes.

9   Q.   And you called -- I'm sorry.  I think you said the federal

10  agents may have called Vinnie Alfieri, correct?

11  A.   Frankly, I shouldn't have said that.  I did say it.  That

12  was a supposition on my part, that he would be the person they

13  contact.  I don't know who they contacted.

14  Q.   They didn't contact you, did they?

15  A.   No.

16  Q.   And you learned that they wanted to speak to Harvey

17  Newkirk, correct?

18  A.   I must have learned it at some point during that day.

19  Q.   When you called the federal agents, you were calling on

20  behalf of Bryan Cave and Harvey Newkirk, weren't you?

21  A.   No.

22  Q.   You were not calling on behalf of Bryan Cave?

23  A.   On behalf of Bryan Cave, yes; on behalf of Harvey Newkirk,

24  no.

25  Q.   You set up a meeting between the federal agents and Harvey

F8l2newH                    Campriello - Direct

1    Newkirk, didn't you?

2    A.  I'm not sure I was the one who set it up.

3    Q.  You were the one speaking on behalf of your law firm with

4    both the U.S. Attorney's office and the federal agents, weren't

5    you?

6    A.  I was speaking on behalf of my law firm with them.

7    Mr. Alfieri I believe was on at least one of those calls with

8    me.

9    Q.  Was Mr. Newkirk on any of the calls during which the

10   meeting was being set up?

11   A.  Not with me.

12   Q.  Did you tell the agents to call Harvey Newkirk directly to

13   set up a meeting with them?

14   A.  No.

15   Q.  Did you call Harvey Newkirk before he came in to that

16   conference room and tell him that federal agents have called

17   and want to speak to him?

18   A.  No.

19   Q.  Did you call Harvey Newkirk and tell him that his -- that

20   Calvin Darden, Jr., had just been arrested?

21   A.  No.

22   Q.  Are you aware of anyone that day telling Harvey Newkirk

23   that federal agents had asked to speak to him?

24   A.  I don't know one way or the other.

25   Q.  You said this call happened in the mid afternoon, right?

F8l2newH                    Campriello - Direct

1    A.   No.   I said the conference happened, I believe, at some

2    point in the afternoon.   I think I said that the call happened

3    in the middle of the day sometime.   Could be a little bit in

4    the morning, could be a little bit in the afternoon.

5    Q.   How much time do you think elapsed between the discussion

6    that there would be a meeting with Harvey Newkirk and the

7    actual meeting with Harvey Newkirk?

8    A.   I can give you a guesstimate.

9    Q.   Okay.

10   A.   Two hours, three hours, four hours.   Assuming one happened

11   around noon, I think the other one happened in the latter part

12   of the afternoon, middle to latter part of the afternoon.

13   Q.   And in those three or four hours, there were discussions

14   within Bryan Cave of what to do, correct?

15   A.   I know I talked with Ms. Buchanan about what had happened

16   earlier, yes.

17   Q.   And you called, you think, at least one assistant, maybe

18   two, to speak about this?

19   A.   It was one conversation and there may have been two of them

20   on the phone.

21   Q.   I see.   And you wanted to make clear that Bryan Cave was

22   going to be 100 percent cooperative, correct?

23   A.   Yes.

24   Q.   That was the purpose of your call?

25   A.   Yes.

F8l2newH                          Campriello - Direct

1   Q.  And then you did speak to other people at Bryan Cave who

2   had more information about the substance of this deal, correct?

3   A.  That was in the first meeting that I had with

4   Messrs. Alfieri, Dorman, and Weissman.

5   Q.  And then you spoke with Mary Beth Buchanan?

6   A.  Yes.

7   Q.  Again, she is a criminal partner at your firm, correct?

8   A.  Yes.

9   Q.  You didn't prep Harvey Newkirk before his meeting with the

10  government, did you?

11  A.  No.

12  Q.  And you didn't speak to him before his meeting with the

13  government?

14  A.  No.

15  Q.  You didn't give him the names of any criminal lawyers he

16  should contact before his meeting with the government, did you?

17  A.  No.

18  Q.  Did you tell Mary Beth Buchanan to call Harvey Newkirk in

19  preparation for the meeting that he was going to have that

20  afternoon?

21  A.  No.

22  Q.  Is it your testimony that you are not sure who arranged for

23  the meeting to happen at Bryan Cave, is that correct?

24  A.  I'm not sure.

25  Q.  But it did happen at Bryan --

F8l2newH                          Campriello - Direct

1    A.   When I say I'm not sure, we could have discussed it in the

2    conversation with the assistants, but I don't remember that.

3         I'm sorry.  I talked over your next question.

4    Q.   The meeting did happen at Bryan Cave?

5    A.   Yes.

6    Q.   And it was agreed that Jay Dorman, who is someone Harvey

7    already knew, would call Harvey and tell him to come back to

8    the office, correct?

9    A.   I thought it was Vincent Alfieri.

10   Q.   But somebody he already knew would tell him to come back to

11   the office?

12   A.   I thought it was Vincent Alfieri and I think he knew

13   Vincent Alfieri, so I guess the answer is yes.

14   Q.   And when Harvey came back to the office --

15   A.   When you say "came back to the office," I'm sorry.  I don't

16   know where Mr. Newkirk was, so if he was somewhere else, I

17   didn't mean to adopt that as part of my answer.

18   Q.   Between when you had your conversation with the agents and

19   the AUSAs, the first time you spoke to Harvey Newkirk was in

20   the conference room when he walked in, correct?

21   A.   I don't think I even spoke to him then.  I don't think I

22   said anything once he got in the room.

23   Q.   You don't believe you spoke to him at all?

24   A.   I don't believe I spoke to him at all.

25   Q.   You don't think you introduced yourself?

F8l2newH                    Campriello - Direct

1    A.  I don't know if I was doing -- well, I don't know if I was

2    doing the introducing or if somebody else was.  I don't

3    remember.

4    Q.  You believe that he came in to the conference room perhaps

5    with Vinnie Alfieri, correct?

6    A.  Yes.

7    Q.  He is the managing partner of the New York office of Bryan

8    Cave?

9    A.  Yes.

10   Q.  He was already intimately familiar with the underlying

11   transaction, correct?

12   A.  I don't know how familiar he was.  I know he had some

13   familiarity.

14   Q.  And you know he also had some familiarity with Harvey

15   Newkirk?

16   A.  He is the managing partner.  Yes.

17   Q.  And it wasn't -- and yet Vinnie Alfieri was not the one who

18   sat in just to assert the privilege on behalf of Bryan Cave's

19   client, was he?

20   A.  He is not a criminal lawyer, no.

21   Q.  It is your testimony that only a criminal lawyer can assert

22   a privilege?

23            MS. PAUL:  Objection.

24            THE COURT:  No, I think that's a fair question.  Give

25   the answer.

F8l2newH                    Campriello - Direct

```
 1   A.  No.  It is not my testimony that only a criminal lawyer can
 2   do it, but it would be my testimony that if there are criminal
 3   lawyers available, whenever one deals with a federal law
 4   enforcement agent, on behalf of the law firm, it is probably
 5   more prudent to have a criminal lawyer there.
 6   Q.  If the only issue is asserting privilege, then why does it
 7   have to be a criminal lawyer?
 8           THE COURT:  Sustained, but let me just make sure I
 9   understand.
10           The reason you wanted a criminal lawyer there was
11   because, although lawyers, both civil and criminal, are
12   familiar with the attorney/client privilege, this was, you
13   understood, a criminal investigation and therefore, given the
14   nature of the investigation, you wanted a criminal lawyer
15   there.  Do I have that right?
16           THE WITNESS:  Yes.
17   Q.  Did you ascertain in your conversations with the agents and
18   the prosecutors why it was such a matter of urgency that
19   Mr. Newkirk be interviewed that afternoon?
20   A.  I don't remember.
21   Q.  Did you ask them what his status was?
22   A.  I don't remember.
23   Q.  Is that something you think is important?
24   A.  Yes.
25   Q.  Did you tell Mr. Newkirk that you had already spoken to the
```

F8l2newH                    Campriello - Direct

1   agents and the AUSAs when he came in?

2   A.  I didn't talk to Mr. Newkirk.

3   Q.  Oh, you didn't give him *Upjohn* warnings?

4   A.  I was not the one, no.

5   Q.  Explain to me, when you went into that conference room, was

6   anyone already in there?

7   A.  I don't remember.

8   Q.  Who all was in that conference room before Harvey Newkirk

9   walked in?

10  A.  I was there.  Mary Beth Buchanan was there.  I believe two

11  federal agents -- by "agents" I mean not prosecutors, two

12  federal agents I believe were there.  There could have been a

13  prosecutor.  I don't know.  And I don't know if Mr. Dorman or

14  Mr. Alfieri was there, and I don't think anybody else was

15  there.

16  Q.  If Ms. Buchanan was going to sit in on the interview with

17  Harvey and she was already there, why were you still there?

18  A.  I think she came with me or she and I got there

19  simultaneously and, as I said, I was -- I wanted to make sure

20  that I reiterated to the federal people Bryan Cave's position,

21  and then I wanted to hear Ms. Buchanan give the *Upjohn*

22  warnings, what I am using loosely as the *Upjohn* warning, and

23  then I left.

24  Q.  You wanted to reiterate that Bryan Cave is being 100

25  percent cooperative, correct?

F8l2newH                          Campriello - Direct

1    A.   Yes.

2    Q.   That's why this meeting was set up, right?

3    A.   No.   There were -- I assume there were many reasons why the

4    meeting was set up.   The government had reasons why the meeting

5    was set up.   I didn't set up a meeting so that I could tell

6    them that we wanted to be 100 percent cooperative.   I had

7    already told them that.

8    Q.   Did they ask to speak to Mr. Newkirk or did they offer that

9    they should speak to Mr. Newkirk?

10   A.   I don't think I offered that they should speak to

11   Mr. Newkirk.

12   Q.   They asked to speak to Mr. Newkirk?

13   A.   I don't remember them asking, but we had the meeting, and I

14   don't believe I offered.

15   Q.   After that meeting, your understanding is that Bryan Cave

16   has been 100 percent cooperative in this case, correct?

17   A.   I would hope so, that they have done what they are supposed

18   to do, but I haven't been involved.

19   Q.   You never documented any discussions with Mr. Newkirk that

20   say that he is not a client of the firm?

21   A.   No, no.

22   Q.   And you never documented Ms. Buchanan stating at the

23   beginning of the meeting that she is not representing

24   Mr. Newkirk?

25   A.   She did.   I did not.

F8l2newH                          Campriello - Cross

1            MS. CHAUDHRY:  Thank you.  I have no further

2     questions.

3            THE COURT:  Anything from the government?

4            MS. PAUL:  Just a couple of questions, your Honor.

5            THE COURT:  Go ahead.

6     CROSS EXAMINATION

7     BY MS. PAUL:

8     Q.  Mr. Campriello, just a couple of questions about the

9     February 12, 2014 meeting.

10           At that meeting, were you at any point in time

11    planning to represent Mr. Newkirk in his personal capacity?

12    A.  No.

13    Q.  And was anyone, as far as you were aware of, at Bryan Cave

14    planning to do that?

15    A.  No.

16    Q.  Did you in fact represent Mr. Newkirk at this interview?

17    A.  No.

18    Q.  Did Ms. Buchanan represent Mr. Newkirk at this interview?

19    A.  No.

20    Q.  Did she tell Mr. Newkirk in your presence that in fact she

21    was not representing him?

22    A.  Yes.

23    Q.  Why did you stay for that portion of the meeting?

24    A.  To make sure I heard it happen.

25    Q.  And why were you, as a criminal lawyer, involved in this

1  meeting at all?

2  A.  Again, when federal law enforcement agents interact with

3  what I am thinking of as a client, namely, Bryan Cave in this

4  instance, I think that it is, as the judge's question posed it,

5  prudent to have a criminal lawyer there.

6  Q.  At any point before the interview began that day, did

7  you --

8          THE COURT:  At least to prevent your civil partners

9  from having heart attacks.

10          THE WITNESS:  It is not just that, but they bring a

11  very different attitude to bear.

12  Q.  Mr. Campriello, at any point before the meeting began that

13  day, did you consult privately with Mr. Newkirk?

14  A.  No.

15  Q.  Did you consult privately with Mr. Newkirk at any point in

16  time at all?

17  A.  No.

18  Q.  And at any point in time did Mr. Newkirk ask you for legal

19  advice?

20  A.  No.

21          MS. PAUL:  One moment, your Honor.

22          (Counsel confer)

23          MS. PAUL:  No further questions.

24          THE COURT:  Anything else.

25          MS. CHAUDHRY:  No, thank you, your Honor.

1          THE COURT:  Thank you so much.  You may step down.

2          THE WITNESS:  Thank you, Judge.

3          (Witness excused)

4          THE COURT:  Does the government have any other

5    witnesses they want to call?

6          MR. ADAMS:  Yes, your Honor.

7          THE COURT:  Go ahead.

8          MR. ADAMS:  We will call Special Agent Paul Deal next.

9          THE COURT:  While we are waiting, do I understand that

10   the government in the documents it has turned over previously

11   has held back some portions of those documents as 3500

12   material?

13         MR. ADAMS:  No, your Honor.  I think that the dispute

14   in the motion refers to certain portions that we turned over

15   after our last conference, and we were -- the government was

16   asked to turn over statements by Bryan Cave personnel regarding

17   the interviews that they had conducted of Mr. Newkirk.  So

18   statements by Bryan Cave personnel that are not related to

19   their interviews but were related more generally to the Maxim

20   deal were redacted, and those will be 3500 and produced in the

21   normal course.

22         THE COURT:  They will be 3500 because you are going to

23   be calling them as a witness in the underlying charges.

24         MR. ADAMS:  Yes, your Honor.

25         THE COURT:  So what's the harm in turning them over

1    now?

2              MR. ADAMS:  Your Honor, the general -- no specific

3    harm other than, with respect to this hearing, the relevant

4    issue was what was said --

5              THE COURT:  I understand why you did it, but now I am

6    just exploring.  You know you are going to have to turn it over

7    eventually.

8              MR. ADAMS:  Yes, sir.

9              THE COURT:  Of course I can't compel you under the

10   Jencks Act to turn them over until the conclusion of the direct

11   testimony of the witness to whom they apply, but it has, to the

12   great credit of the U.S. Attorney's office of the Southern

13   District of New York, never been its practice to wait that far.

14   Why are you waiting now?

15             MR. ADAMS:  Your Honor, at the last conference we

16   discussed an early production of 3500, and I forget the precise

17   date, it was significantly earlier than our normal practice,

18   and I would ask to stick with that.

19             THE COURT:  But why?  In other words, what I am trying

20   to get at is, I am not saying that the other side will be

21   prejudiced since you have graciously agreed to turn over 3500

22   in advance of trial on the date agreed to, which I think was

23   either one or two weeks before trial, at least that's my usual

24   request, but, golly, gee, what's the harm?

25             MR. ADAMS:  Your Honor, protecting trial strategy

F8l2newH                    Campriello - Cross

1   generally based on the questions I have been asking witnesses.

2           THE COURT:  Protecting trial strategy.  Oh, my gosh.

3   In other words, you want to surprise them.

4           MR. ADAMS:  Not badly, your Honor, which is why we are

5   offering the 3500.

6           THE COURT:  To surprise them a little, a little.  So

7   it's not a sandbag, it's sort of like a soft sandbag.

8           MR. ADAMS:  Your Honor, we are talking about mostly

9   witnesses with whom Mr. Newkirk worked intimately.  None of the

10  things that they will be testifying about should be things that

11  Mr. Newkirk isn't already aware of.

12          THE COURT:  Well, I think that you should reconsider

13  and maybe turn -- it seems to me, frankly, a waste of time to

14  turn over half a document and not the other half, so to speak.

15  I can't force you to do that if it is purely 3500 material.  Of

16  course if there is even a smidgen of *Brady* anywhere in that

17  material and you haven't figured that out, woe be to you.  But

18  I think you might want to reconsider that.

19          MR. ADAMS:  Thank you, your Honor.

20          THE COURT:  Let's call the next witness.  The agent

21  should come on up.

22   PAUL BAYLOR DEAL,

23      called as a witness by the government,

24      having been duly sworn, testified as follows:

25          THE COURT:  Counsel.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. ADAMS:  Thank you, your Honor.

2     DIRECT EXAMINATION

3     BY MR. ADAMS:

4     Q.  Agent Deal, where do you work?

5     A.  I am a special agent with the United States Secret Service

6     here in New York.

7     Q.  How long have you been with the Secret Service?

8     A.  Almost five years now.

9     Q.  In the course of your duties have you been involved in the

10    investigation of Harvey Newkirk in connection with an attempted

11    acquisition of Maxim Magazine?

12    A.  Yes.

13    Q.  Directing your attention to February 12, 2014, what were

14    you assigned to do on that day?

15    A.  Beginning that morning, we attempted to execute an arrest

16    warrant for Calvin Darden, Jr., at his residence in Staten

17    Island.  We conducted a consent search of the residence.  Later

18    that afternoon, he surrendered himself and finally that evening

19    I interviewed Mr. Harvey Newkirk.

20    Q.  Where did that interview take place?

21    A.  At the offices of Bryan Cave here in Manhattan.

22    Q.  When you arrived at Bryan Cave for that interview, who did

23    you initially meet with?

24    A.  Mary Beth Buchanan.

25    Q.  What did you and Ms. Buchanan discuss generally?

1    A.  In general we discussed how the interview of Mr. Newkirk

2    was going to happen at the law firm.  She expressed some

3    concerns that during the interview he may disclose some

4    attorney/client privileged information that the firm would be

5    obviously concerned about and although it is not our normal

6    practice, I understood that concern and I agreed to let her sit

7    in on the interview and object as necessary to protect any

8    attorney/client privilege information.

9    Q.  Did that interview ultimately take place?

10   A.  It did.

11   Q.  At the outset, what did you hear Ms. Buchanan say to

12   Mr. Newkirk, if anything?

13   A.  She turned to him and explained to him that she was not

14   there to represent him, that she was there solely to protect

15   the disclosure of any attorney/client privilege information in

16   the interest of the clients of the firm.

17          THE COURT:  Who else, if anyone, was present when that

18   statement was made?

19          THE WITNESS:  Your Honor, in the room when that

20   statement was made there was Austin Campriello, Vince Alfieri,

21   and Ms. Mary Beth Buchanan, and then myself and S.A. James

22   Hilliard from the F.B.I.

23          THE COURT:  Go ahead.

24          MR. ADAMS:  Thank you, your Honor.

25   Q.  After receiving that information from Ms. Buchanan did you

F8l2newH                          Deal - Direct

1   begin your interview?

2   A.  I did.

3   Q.  You took notes during your interview?

4   A.  I did.

5   Q.  Did you record in any way Ms. Buchanan's instructions

6   regarding her role during the interview?

7   A.  No, I did not.  I didn't start taking notes until I began

8   questioning and Mr. Newkirk began providing answers to the

9   questions.

10  Q.  As you sit here today, do you have a present recollection

11  of her providing that instruction?

12  A.  Yes.

13  Q.  What legal advice, if any, do you recall Mr. Newkirk

14  requesting from Ms. Buchanan during the course of the

15  interview?

16  A.  He received no legal advice during the interview.

17  Q.  To the best of your recollection --

18              THE COURT:  Did he at any occasion ask to step outside

19  with her.

20              THE WITNESS:  He did not, your Honor.

21              THE COURT:  Did she ask to have him step outside?

22              THE WITNESS:  Not to my recollection, your Honor.

23              THE COURT:  So they remained in the room to your

24  recollection throughout the interview.

25              THE WITNESS:  Yes, your Honor.

F8l2newH                        Deal - Direct

```
 1              THE COURT:  How long was the interview?

 2              THE WITNESS:  Approximately an hour to 90 minutes,

 3    your Honor.

 4              THE COURT:  Go ahead.

 5              MR. ADAMS:  Thank you, sir.

 6    BY MR. ADAMS:

 7    Q.  To the best of your recollection, what, if anything, did

 8    you inform Mr. Newkirk of regarding his status with respect to

 9    your investigation?

10    A.  I didn't inform him anything about his status in the

11    investigation.

12    Q.  While you were with Mr. Newkirk at Bryan Cave, did you ask

13    if he would be willing to meet with you again?

14    A.  I did, and I gave him my business card.

15    Q.  Did you in fact meet with Mr. Newkirk again?

16    A.  I did.

17    Q.  Directing your attention to February 14, 2014, did you

18    participate in a second interview of Mr. Newkirk on that day?

19    A.  Yes.

20    Q.  Where was that?

21    A.  At the U.S. Attorney's office for the Southern District of

22    New York.

23    Q.  Who participated in that interview?

24    A.  Mr. Newkirk, assistant United States Attorney James

25    Pastore, and myself.
```

1          THE COURT:  Are you single or married?

2          THE WITNESS:  I am married, your Honor.

3          THE COURT:  So that's why you were spending

4     Valentine's Day at the office.

5          THE WITNESS:  It's actually worse than that.  My child

6     was born a week later, too.

7          THE COURT:  Go ahead.

8          MR. ADAMS:  Thank you, sir.

9     BY MR. ADAMS:

10    Q.  Agent Deal, what warnings, if any, were provided to

11    Mr. Newkirk at that second interview?

12    A.  AUSA Pastore gave him what I would call the 18 U.S.C. 1001

13    warning, basically the fact that if he made a material

14    misstatement to law enforcement, he could be charged for that.

15    Q.  Was Mr. Newkirk present with counsel on that day?

16    A.  No.  It was just Mr. Newkirk.

17    Q.  What, if anything, did Mr. Newkirk say regarding whether or

18    not he had counsel with respect to your investigation?

19    A.  He said nothing about having counsel.

20         MR. ADAMS:  Your Honor, may I approach?

21         THE COURT:  Yes.

22    BY MR. ADAMS:

23    Q.  Agent Deal, I am showing you what I have marked as

24    Government Exhibit 9.  Do you recognize that document?

25    A.  I do.

F8l2newH                    Deal - Direct

1    Q.  What is it?

2    A.  This is an e-mail from Harvey Newkirk to myself at my

3    Secret Service e-mail account.

4    Q.  Have you most recently seen that exhibit before I just

5    handed it to you?

6    A.  I pulled this from our Secret Service archive this morning.

7    Q.  Was that e-mail kept in the normal course of the Secret

8    Service archive?

9    A.  Yes.  It is required by regulation.

10   Q.  Looking at the top line of the exhibit who does it appear

11   that the first or top e-mail is from?

12   A.  The first e-mail is from Harvey Newkirk at

13   hnewkirk06@gmail.com.

14         MR. ADAMS:  Your Honor, the government offers Exhibit

15   9.

16         THE COURT:  Received.

17         (Government's Exhibit 9 received in evidence)

18         MR. ADAMS:  Your Honor I would ask Agent Deal to read

19   the first e-mail, the one at the top unless --

20         THE COURT:  No, I have just read it.

21         MR. ADAMS:  Okay.  Thank you, sir.

22   BY MR. ADAMS:

23   Q.  Agent Deal, was the February 14 interview of Mr. Newkirk

24   the last time that you spoke with him in the course of your

25   investigation?

F8l2newH                         Deal - Direct

1   A.  No.

2   Q.  Directing you to January 22 of this year, did you interview

3   Mr. Newkirk on that day?

4   A.  I did.

5   Q.  Where did that take place?

6   A.  At the office of Stealth SME here in Manhattan.

7   Q.  Who was present at that?

8   A.  Mr. Newkirk, S.A. Hilliard from the F.B.I., and myself.

9   Q.  What did Mr. Newkirk's role at Stealth appear to be?

10  A.  This is --

11              MS. CHAUDHRY:  Objection: relevance.

12              THE COURT:  I'm sorry.  I didn't hear the question.

13  Q.  What did Mr. Newkirk's role at Stealth appear to be?

14              THE COURT:  Sustained.

15  BY MR. ADAMS:

16  Q.  Prior to speaking with Mr. Newkirk at Stealth on that day,

17  who, if anyone, did he call to come represent him during that

18  interview?

19  A.  He called no one to represent him.

20  Q.  And did anyone at any point arrive to provide him with

21  legal representation during that interview?

22  A.  No.

23  Q.  What, if anything, did he tell you regarding his status as

24  a represented person during that interview?

25  A.  Nothing.

F8l2newH                          Deal - Cross

1   Q.  And directing you now to March 17, 2015, did you interview

2   Mr. Newkirk again on that day?

3   A.  I did.

4   Q.  Where did that take place?

5   A.  Again, at the office of Stealth SME.

6   Q.  And who was present for that interview?

7   A.  Mr. Newkirk, S.A. Hilliard, and myself.

8   Q.  Who represented Mr. Newkirk during the second interview?

9   A.  Mr. Newkirk was alone at that interview.

10  Q.  When during that interview, if at all, did Mr. Newkirk tell

11  you that he had personal representation?

12  A.  Never.

13              MR. ADAMS:  Just one moment, your Honor.

14              THE COURT:  Yes.

15              (Pause)

16              MR. ADAMS:  No further questions.

17              THE COURT:  Cross-examination.

18  CROSS EXAMINATION

19  BY MS. CHAUDHRY:

20  Q.  Good evening, Agent Deal.  I am Priya Chaudhry.  I

21  represent Harvey Newkirk.

22  A.  Good evening.

23  Q.  You were an attorney before you became a Secret Service

24  agent?

25  A.  Yes, ma'am.  I am still licensed in the State of South

F8l2newH                          Deal - Cross

1    Carolina.

2    Q.  For how long have you been an attorney?

3    A.  I was admitted to the bar in 2009.

4    Q.  And did you practice?

5    A.  I did.

6    Q.  In what field?

7    A.  I was primarily family law and employment discrimination.

8    Q.  Before you went to Bryan Cave on February 12, 2014, you had

9    already arrested Calvin Darden, Jr., correct?

10   A.  Yes, ma'am.  He surrendered himself that afternoon.

11   Q.  You had already spoken to Calvin Darden, Sr., hadn't you?

12   A.  Yes Calvin Darden, Sr., actually called me as I was

13   crossing the Verrazano Bridge on my way back from Staten

14   Island.

15   Q.  How did he have your number, do you know?

16   A.  Yes.  My understanding is he got the number from

17   Mr. Darden's wife.

18   Q.  Before you went to Bryan Cave on the 12th, you called Bryan

19   Cave, correct?

20   A.  No, actually Bryan Cave called me.

21   Q.  Bryan Cave called you?

22   A.  Yes, ma'am.

23   Q.  Who called you?

24   A.  I believe it was Vince Alfieri called me.

25   Q.  What was the substance of your conversation?

F8l2newH                          Deal - Cross

1   A.  From what I could recall, it was essentially they found out

2   about the arrest of Calvin Darden, Jr.  I had been asking to

3   speak with Harvey Newkirk, and they were willing to arrange

4   that meeting to allow me to speak with Harvey Newkirk.

5   Q.  How did they know that -- did you tell them that you wanted

6   to speak to Harvey Newkirk?

7   A.  I did not.

8   Q.  It's your statement that they called you and said, We know

9   you want to talk to Harvey Newkirk?

10  A.  They said something to the effect that they wanted to

11  cooperate and that -- I can't remember the full context of the

12  conversation.  That's the gist of the conversation.

13  Q.  Do you remember whom you spoke with?

14  A.  Again, I believe it was Vince Alfieri.

15  Q.  And your recollection is he contacted you to tell you Bryan

16  Cave wanted to cooperate and that you could speak to Harvey

17  Newkirk?

18  A.  And that Harvey Newkirk was at the office at that time.

19  Q.  He volunteered that information to you?

20  A.  Yes, ma'am.

21  Q.  Did you talk about whether Harvey Newkirk was a subject

22  witness or target of this investigation?

23  A.  I did not.

24  Q.  What was he at the time?

25  A.  In my mind he was a subject.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F8l2newH                        Deal - Cross

1    Q.  Whose idea was it to interview Harvey Newkirk that day?

2    A.  That day?  After that conversation, I called AUSA Pastore,

3    informed him of the offer to allow the interview, and

4    Mr. Pastore instructed me to head over to Bryan Cave.

5    Q.  Did you have an appointment set up before you headed over

6    to Bryan Cave?

7    A.  After speaking to AUSA Pastore, I called back and confirmed

8    that I was en route to Bryan Cave.

9    Q.  Whom did you have this confirmation call with?

10   A.  Again my recollection is that it was Mr. Alfieri.

11   Q.  Did you speak to Harvey Newkirk on the phone before you got

12   to Bryan Cave?

13   A.  I did not.

14   Q.  Did you suggest to Mr. Alfieri that Harvey Newkirk should

15   get a lawyer?

16   A.  I did not.

17   Q.  Do you recall how long it was between your first call?

18            THE COURT:  Actually let me interrupt for a moment,

19   counsel.  I am going to ask the witness to step out for just

20   one minute and then we will call you right back.

21            (Witness exits courtroom)

22            THE COURT:  So at this point, we have already had

23   three witnesses who say that your client was advised at the

24   outset of this meeting by Ms. Buchanan that she was not

25   representing him.  He has a different recollection.  But

F8l2newH                        Deal - Cross

1    assuming I credited that testimony, is there anything left to

2    your motion?

3          MS. CHAUDHRY:  Assuming you credit the testimony of

4    the three witnesses?

5          THE COURT:  Yes.

6          MS. CHAUDHRY:  I believe there is, your Honor, because

7    there are two different litigations going on here.  One is the

8    one that was preexisting before this agent was offered up

9    Harvey Newkirk by Bryan Cave and the second is the criminal

10   investigation.

11         Bryan Cave had already established with Mr. Newkirk,

12   by their behavior and his reasonable understanding of that

13   behavior, that they are representing him in this litigation.

14   We have heard over and over that this is a firm that

15   self-represents.  They have their criminal partner call the

16   AUSA.  They have their general counsel and their own litigators

17   deal with a lawsuit that is swirling around them, and this

18   relationship was preexisting.  Whether or not Mr. Newkirk

19   decided or believed that, after the 12th, they were still

20   representing him on the criminal side, he still had a

21   reasonable and real belief that he was in a joint defense

22   situation with Bryan Cave in that they were representing him in

23   the litigation against them which there is only liability for

24   them if he is liable.  And they kept calling him in and kept

25   meeting with him and kept speaking with him and then turning

F8l2newH                        Deal - Cross

1    that information over to both the government and the alleged

2    victim in this case.

3            THE COURT:  Before February 12, what litigation are

4    you referring to?

5            MS. CHAUDHRY:  Before February 12, your Honor, the

6    Maxim deal, to sketch it out, was contingent on loans from

7    other parties, and the terms of some of those loans didn't come

8    through; therefore, some of those parties threatened to sue

9    Bryan Cave, the clients that Mr. Newkirk was representing

10   Calvin Darden, Sr. and Darden Media, and had threatened to sue

11   Harvey Newkirk personally.

12           THE COURT:  When did those threats occur?

13           MS. CHAUDHRY:  Those threats occurred I believe

14   starting in November.

15           THE COURT:  And were they oral or in writing.

16           MS. CHAUDHRY:  I believe that they were -- I believe

17   they were oral, but they came true and became in writing, and

18   those litigations are still happening.  Those were a lot of the

19   reasons that --

20           THE COURT:  My question is, it was before February 12

21   they are oral?

22           MS. CHAUDHRY:  They were oral.  The lawyers for the

23   lenders who felt that the loan had been defaulted on or the

24   contract had been breached had clearly contacted Bryan Cave and

25   threatened that they are going to sue.  This is why this deal,

F8l2newH                         Deal - Cross

which was in the mergers and acquisition department, suddenly

involved all these litigation partners and involved the general

counsel's office.

THE COURT:  But as of February 12, he now knows --

assuming I credited the three witnesses we just heard -- that

they are not representing him, and he learns at the end of the

conversation that he is a subject, so with respect to any

statements he makes after that, just take that for a moment, he

is already on notice that he doesn't have an attorney/client

privilege *vis-à-vis*, at the minimum, the criminal

investigation.

Now, are the statements -- let me ask the government

first -- that were received from Bryan Cave that are attributed

to Mr. Newkirk that relate to statements made by him to Bryan

Cave attorneys prior to February 12?

MR. ADAMS:  There are -- there would be evidence of

statements made to many Bryan Cave attorneys prior to February

12.

THE COURT:  But in the context of an inquiry by Bryan

Cave attorneys as to how to respond to threats of litigation.

MR. ADAMS:  In the following sense, sir.  The

defaulted loan that Ms. Chaudhry has been referring to, this is

the OpenGate matter that has come up a few times today, it is

true Mr. Newkirk accepted service for Calvin Darden, Sr., at a

point after that default occurred.  There would be -- and the

F8l2newH                          Deal - Cross

1   entities also party to the loan agreement were served with the

2   same default.  The service processor had that forwarded to

3   Mr. Newkirk as well.  So Mr. Newkirk had possession of the

4   information about that default.  Partners at Bryan Cave we

5   expect would be testifying that they did not know about that

6   default until sometime thereafter or that litigation had

7   actually significantly progressed to fruition of the default

8   judgment against Mr. Calvin Darden, Sr., until significantly

9   later.  There would certainly be some testimony about that

10  civil litigation in the context of Mr. Newkirk --

11          THE COURT:  Let me go back to defense counsel.  What

12  evidence is there from your side that any of those

13  conversations -- this is pre-February 12 -- involved

14  Mr. Newkirk asking for legal advice from the lawyers at Bryan

15  Cave?

16          MS. CHAUDHRY:  Your Honor, Mr. Newkirk is not a

17  litigator, and it had become a litigation.  He was asked to

18  respond to discovery requests I believe the government has

19  turned over in its materials here, actual interrogatories from

20  another party that Bryan Cave had Mr. Newkirk sit down, come

21  in, and tell them the answers to those things.

22          MR. ADAMS:  Your Honor --

23          THE COURT:  Here what -- please sit down.

24          Finish what you were going to say, and then I have a

25  question.

F8l2newH                          Deal - Cross

1          MS. CHAUDHRY:  During all of these conversations it

2    was understood that Bryan Cave and Harvey Newkirk could be

3    named and if Bryan Cave --

4          THE COURT:  Even assuming *arguendo* the existence of an

5    attorney/client relationship prior to February 12 -- because I

6    see none after February 12, to be frank -- if the

7    attorney/client privilege only protects statements made by the

8    client for the purpose of obtaining legal advice, first of all,

9    I expect that Mr. Newkirk learned that in law school.  But

10   let's assume he didn't.  It doesn't matter.  It is not a

11   subjective test at all.  It is a totally objective test.  If I

12   go to my lawyer and I say, by the way, while we are here, I

13   would like your business advice on X, Y, or Z, that's not

14   protected.  And the fact that you may think it is protected

15   because he is your lawyer is your tough luck.  It has to be a

16   communication made for the purpose of obtaining legal advice.

17   So based on the current record, I don't see a basis for

18   asserting privilege even as to the pre-February 12

19   communications.

20         MS. CHAUDHRY:  Our position is that Mr. Newkirk was

21   seeking the counsel of the litigation department so that he

22   would not be personally named and that Bryan Cave would also

23   not be named here, as one does with their counsel, agreeing to

24   answer any and all questions and provide any and all

25   information, assuming that those questions are being asked to

F8l2newH                          Deal - Cross

1    protect him and his interests.

2                 THE COURT:  That is a fair argument, but I haven't

3    heard yet any real evidence of that.

4                 Anyway, here is why I interrupt at this point, and

5    then we will continue.  I don't see any point in questioning

6    the agent any further.  I don't see any point, if you have the

7    other agent here, unless the defense wants to bring the agent

8    in for some reason that I can't understand, because I am

9    prepared to make now a finding, which I make, in the court's

10   view, by clear, convincing, wholly credible and total evidence

11   that he received full notice at the outset on February 12 that

12   the firm was not representing him and, moreover, he knew

13   certainly by the end of that meeting that he had some at least

14   potential liability.  So the motion with respect to any and all

15   statements made from February 12 on is denied.

16                So I guess my question for counsel, and you may want

17   to individually think about this -- we will take another short

18   break -- is whether there is anything else of an evidentiary

19   nature you want to present tonight bearing on the pre-February

20   12.  Otherwise, I will just hear oral argument on that.

21                We also have the subpoena, and I want to do that

22   tonight as well.  And just to warn the government up front, I

23   don't see any basis for -- and maybe Mr. Silverman on that

24   needs to be heard as well, as subpoena to Bryan Cave.  I don't

25   see any basis for quashing it in its entirety.  We may have to

F8l2newH                          Deal - Cross

1    limit its scope.

2                All right.  We will take a five-minute break.

3                (Recess)

4                THE COURT:  Okay.  My first question to both sides is,

5    does anyone want to call any other witness, given the ruling I

6    just made.

7                MR. ADAMS:  No, your Honor.

8                MS. CHAUDHRY:  No, your Honor.

9                THE COURT:  Now let's turn to oral argument on the

10   pre-February 12 statements.  Since the defense bears the

11   burden, I will hear from the defense first.

12               MS. CHAUDHRY:  Your Honor, whereas I don't want to

13   call any further witnesses given the court's ruling, I just

14   want to put on the record that -- I believe the court has

15   looked at the government exhibits -- neither this agent nor the

16   other agent's notes reflect anything about Mr. Newkirk being

17   unrepresented.

18               THE COURT:  I assume that to be the case.  I will take

19   that into consideration.  I assumed it already from what I

20   heard earlier.  And I assume that if defense counsel had wanted

21   to make the arguments, they could have argued that all three or

22   putatively all four people were lying because there was nothing

23   in the notes, because there were a variety of minor

24   inconsistencies between their various accounts, and because

25   they all had biases and motives to lie and so forth, all of

F8l2newH                         Deal - Cross

which I thought about as I was listening to them.  But the

court found them to be highly credible; and, on the key fact

that Mr. Newkirk was advised that they were not representing

him, there was no material inconsistency and they all have an

independent recollection of it.  Moreover, as to his being

advised he was a subject, which occurred at the end, even he

has that recollection.  So it seems to me, without going

through all the various nuances of this, that it is a fact

proven to the court's satisfaction -- to be frank, beyond a

reasonable doubt, not that that's the required standard at

all -- that he was advised at the outset that he was not being

represented by the firm and by their lawyers.  Moreover, he

learned at the end of the session that he was a subject and

that that was a serious matter, was confirmed by the very fact

that he was then put on leave knowing that there was a criminal

investigation, knowing that there had been already an arrest

made, knowing that the firm had advised him that they were not

representing him, knowing that a subject, even in the somewhat

tepid description given by Ms. Buchanan as more than just a

witness and he was so free of any desire to be represented by

any counsel that he calls up or e-mails the U.S. Attorney's

office within a day or so after the meeting on the 12th and

waltzes down to meet with them all by himself to continue the

providing to them of information out of his own mouth, knowing

by the way, as he admitted, of course, that he had a Fifth

F8l2newH                        Deal - Cross

 1  Amendment right independent of representation of counsel, and

 2  that was a strategic decision on his part, whether prudent or

 3  imprudent, time will tell, but totally inconsistent in the

 4  court's view with any notion that he is being represented by

 5  Bryan Cave.  If he was being represented in his mind by Bryan

 6  Cave, not that it's a subjective test in any event, he would

 7  have discussed with them, Should I go down?  Should I provide

 8  them with further information?  I am a subject.  Do I have any

 9  problems?

10          This is not like the classic *Upjohn* situation,

11  although even if it were, I would reach the same conclusion.

12  This is a lawyer; not one familiar with the criminal process,

13  but a man of education, a man of intelligence, and a man with

14  some understanding of the legal process.  Every step he took

15  is, in the court's view, inconsistent with the notion that he

16  believed he was represented by counsel, let alone the ultimate

17  question of whether in fact he was.

18          MS. CHAUDHRY:  Your Honor, if I may, your points are

19  all well taken and actually support the notion that his

20  behavior in the exact opposite way in the civil litigation

21  context shows that he was not freely acting as his own agent

22  there because, unlike in the criminal matter, where you say he

23  on his own contacted the government and he went and met with

24  them, in the civil matter, he did no such thing.  He still went

25  through Bryan Cave.

F8l2newH                        Deal - Cross

1          THE COURT:  And that's fair.  I just wanted to place

2     on the record why I thought there was no need to have further

3     argument on the post-February 12 stuff, but let's talk about

4     the pre-February 12.

5          MS. CHAUDHRY:  I'm sorry.  I just want to be clear.

6     When you say post-February 12 statements, are you talking about

7     his statements to the government or any statement he made after

8     February 12.

9          THE COURT:  Well, I think any statement, but I am

10    willing to hear you on that as well.  But let's start with --

11    before we even get to that question, so any time a firm is

12    threatened with litigation in connection with a civil matter,

13    of course they are going to meet.  Sometimes they will bring an

14    outside counsel, many times they will represent themselves; and

15    particularly before there is any lawsuit, they almost certainly

16    will represent themselves.  They will talk to all the partners,

17    associates, lawyers, who were involved in the matter to find

18    out what the facts were and how they should proceed.

19         So if that were the whole story, there would be no

20    reason for any reasonable lawyer in that situation to think

21    that somehow he or she was being individually represented, even

22    if they happened to be the partner on the case or whatever.

23         The only thing that gives me pause that I want to hear

24    from the government in a minute is your assertion, which I

25    can't remember whether they testified to this or not, but your

F8l2newH                          Deal - Cross

1    assertion that from early on the threat was to sue him

2    personally as well as the firm and what is the evidence of

3    that.

4            MS. CHAUDHRY:  Your Honor, I also can't recall if he

5    testified about it, but I think he also said asked him during

6    the court's questioning, yes, the issue was we were discussing

7    whether Bryan Cave and I were --

8            THE COURT:  All right, so I will assume that.  Is

9    there any independent evidence of that.

10           MS. CHAUDHRY:  Well, your Honor, here is where we

11   reach an interesting Catch-22.  The government has not turned,

12   I believe, looking at the subpoena that they just gave us that

13   they served on Bryan Cave, that they probably have all

14   communications with Bryan Cave and Harvey Newkirk about

15   anything and they have not turned over to us anything they

16   don't consider Rule 16.  We have gotten like a rolling rule 16

17   production including even this morning.  We don't have access

18   to those.  In the government's papers in response to our motion

19   they say, We didn't subpoena Bryan Cave; and then when we tried

20   to subpoena Bryan Cave, they objected and said --

21           THE COURT:  We are going to deal with that in a

22   moment.  So you are saying if there is a record of this, they

23   would have it and you would like to get it, but you don't have

24   it now.

25           MS. CHAUDHRY:  Succinctly said.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F8l2newH                      Deal - Cross

1          THE COURT:  So let me go to the government and we will

2     come right back to you in a minute.

3          So, if you know -- I don't know how voluminous these

4     materials were, but are there records of communications made to

5     Bryan Cave prior to February 12?  We also have to consider

6     after February 12 in a minute, but I just want to stick with

7     prior to February 12 in which someone says we are going to sue

8     you and we are going to sue Mr. Newkirk or we are seriously

9     considering that.

10         MR. ADAMS:  Two points, your Honor.  First, every

11    single e-mail record that I have received from Bryan Cave I

12    have handed over to Mr. Newkirk and his attorneys.

13         THE COURT:  Okay.

14         MR. ADAMS:  Second, I am aware of no such e-mail that

15    says that Mr. Newkirk personally was being threatened with suit

16    at all.  In fact, to be very clear about this, the suit that

17    has been brought up over and over again is the OpenGate

18    lawsuit.  It was in New York State Supreme Court, it was

19    actually filed, did not include Mr. Newkirk, it did not include

20    Bryan Cave.  My understanding is that Bryan Cave has not been

21    sued at all in connection with the Maxim deal, at least that's

22    my understanding right now.  And I popped up just briefly a

23    moment ago.

24         THE COURT:  I thought you were just getting exercise.

25         MR. ADAMS:  A bit of both, but I was going to make one

F8l2newH                          Deal - Cross

quick clarification which I will make now, which is,

Ms. Chaudhry was describing Mr. Newkirk speaking to Bryan Cave

about some interrogatories that were served, and it sounded to

me like that was being proffered in the context of sort of

pre-February 12 litigation.  If we are talking about the same

thing, that is well after February 12.  That is part of the

conversation with a third-year associate regarding a

third-party subpoena served on Bryan Cave.

            THE COURT:  Let me ask a different question.

Assuming, which at the moment it seems doubtful, but let's

assume for hypothetical that the firm says to Mr. Newkirk prior

to February 12 there are at least sounds about suing you and

suing us in connection with this deal, and from what you told

us there is absolutely no conflict, so we are going to

represent you and us.  None of these conversations apparently

took place, but I am just putting this as a hypothetical.  And

then on February 12, they learn that it is now a criminal

investigation.  But the civil stuff is still ongoing in my

hypothetical.  They are still being threatened with lawsuits

and maybe lawsuits follow.  So they say to him, you know, given

that you are a subject, we are putting you on leave, but you

still have to cooperate with us, and they bring him in to ask

him questions that are related to their potential civil

liability.

            If, in my totally made-up hypothetical they had

F8l2newH                        Deal - Cross

previously said to him, We are going to represent you as well

as the firm in the civil context, and after February 12 they

say, Well, we want you to come in and cooperate with us, as we

told you you had to do, because we are still preparing to head

off this potential civil litigation, would not it be reasonable

to infer that they were still representing him on the civil

litigation even if they weren't -- even if they had disclaimed

any criminal representation?

          MR. ADAMS:  No, your Honor, I don't think it possibly

could be.

          THE COURT:  Why?

          MR. ADAMS:  Given the complete overlap of the two

subject matters.  If there is a conflict on the criminal side

that has been made explicit, then there is a conflict on the

civil side of exactly the same fact pattern that has been made

explicit.

          THE COURT:  So that -- let me go back to defense

counsel -- you still have your argument for before February 12.

I will get back to that in a minute.  But why isn't the

government's response the right response with respect to

February 12?  He can't make this artificial distinction.  At

this point he knows that the firm is not representing him in

connection with the inquiries by the government and that's the

same subject matter that he is being asked about in connection

with the hypothetical preparation for civil litigation.

F8l2newH                         Deal - Cross

1          MS. CHAUDHRY:  Well, your Honor, I believe the answer

2    to your question is actually reality.  First, your hypothetical

3    is reality and, second is, law firms routinely represent a

4    client in one matter and not another.  In fact, engagement

5    letters have to state explicitly what you do represent the

6    person in and what you don't, and we do that for a couple of

7    reasons.  One is to curb our own liability, that we are only

8    responsible for this part of your life and other parts we are

9    not responsible for, and also we are required by ethics rules

10   to make that clear all the time.

11         THE COURT:  But, excuse me for interrupting, I

12   understand that general thing, but this is a little different.

13   Here they have told him two things at a minimum: one, we are

14   not representing you in connection with the government's

15   inquiry; and, number two, we are going to cooperate completely

16   with the government's inquiry.

17         MS. CHAUDHRY:  They have not told him that.

18         THE COURT:  Oh, I think -- I can't remember if anyone

19   said that explicitly during the meeting, but it was

20   self-evident, was it not, the whole point of the meeting was to

21   cooperate.

22         MS. CHAUDHRY:  Mr. Newkirk's testimony is that he did

23   not know Bryan Cave was doing this, and I don't believe there

24   is any testimony that the conversations between Bryan Cave and

25   the government saying we are cooperating ever happened in his

1    presence.

2                THE COURT:  I am willing to assume that, but isn't it

3    self-evident in the nature of the meeting?

4                MS. CHAUDHRY:  It would be self-evident to you,

5    myself, and the government because we are criminal

6    practitioners or at least you were at one point.  It would not

7    be self-evident to a mergers and acquisitions lawyers who that

8    is all he has done in his entire career and who had a class in

9    criminal law first year of law school.  That would not be

10   clear.  He is cooperating with Bryan Cave.  That is why he came

11   back to the office that day.  That's why he sat down and they

12   set up this meeting for him and they sent him an e-mail very

13   explicitly stating what he is and is not expected to do, what

14   he can and cannot do, and nowhere in there do they say anything

15   about we have no privilege with you.  Instead they say we

16   expect you to keep cooperating with us and then they behave

17   exactly the same pre-February 12 as they do post February 12.

18   They still call him.  In fact, the e-mails that are just

19   related to this hearing show that they set up a meeting with

20   him for an hour later and he comes in on February 26, and they

21   set this up in anticipation of speaking to Darden, Sr.'s

22   lawyers and meeting with Darden, Sr., but they don't tell him

23   that.  They are still treating him the same way, as Mr. Adams

24   points out, they have even a third-year litigation associate

25   sitting down with him, asking him questions, getting

F8l2newH                        Deal - Cross

1     information, gearing up to answer these questions.

2                THE COURT:  Let me hear anything further either side

3     wants to say, starting with the government.

4                MR. ADAMS:  Thank you, sir.

5                Two points.  First, you don't have to assume that it

6     was made clear that Bryan Cave wished to cooperate with the

7     government.  I think Mr. Campriello actually testified that

8     when he walked into the room that was one of the two purposes

9     for which he was there.

10               THE COURT:  Clearly he said it was the purpose, but

11    Ms. Chaudhry's point is that while Mr. Campriello said that to

12    the agents in the telephone conversations he had, and while

13    that was his desire and purpose and presumably Ms. Buchanan's

14    as well, that her point is it wasn't actually said in

15    Mr. Newkirk's presence, right?

16               MS. CHAUDHRY:  Yes.  And Mr. Campriello testified that

17    once Harvey Newkirk walked in the room, he doesn't even think

18    he spoke.

19               MR. ADAMS:  Your Honor, that's correct.  I think he

20    testified that he stayed long enough to make sure that it was

21    made clear that Bryan Cave wanted to cooperate.

22               THE COURT:  All right.  Are the agents still around?

23               MR. ADAMS:  I believe they are.

24               THE COURT:  We could call them back to ask them that

25    question, but let's hear what else you wanted to say.

F8l2newH                          Deal - Cross

1              MR. ADAMS:  Certainly.

2              Second, I don't disagree that their treatment of

3    Mr. Newkirk pre- and post February 12, other than the fact that

4    he was placed on leave and specifically told that he was the

5    subject of an investigation, changed all that much.  He was

6    treated like an employee of the law firm and requested and

7    required to provide information sufficient to allow the law

8    firm to protect its client.  In this case, the identity of that

9    client was in complete shroud, in large part because --

10             THE COURT:  We can call back the agent maybe to settle

11   that minor point.  The point I am still unclear of, the more

12   major consequence potentially, at least, is what evidence is

13   there in the record that Mr. Newkirk was being threatened with

14   being sued individually?  I don't know that there is anything

15   presently in the record, but there might be.  Ms. Chaudhry

16   remembers at least one answer the witness gave.  Her other

17   point is, well, there might be something in the documents.

18   According to the government, there is nothing like that in the

19   documents, true?

20             MR. ADAMS:  True.  And all the documents I have,

21   Ms. Chaudhry has.

22             THE COURT:  I am willing just to complete the record

23   tonight, so we don't have to continue this, to do two things.

24   First, call one or both agents for the extremely limited

25   purpose of asking whether they recollect whether anyone said,

F8l2newH                        Deal - Cross

1    We want to cooperate -- whether Ms. Buchanan, Mr. Campriello

2    said, in the presence of Mr. Newkirk, we want to cooperate

3    fully, and I will allow cross-examination but limited to that;

4    and then if you want to recall Mr. Newkirk on this question of

5    what he remembers about being told, if he does, that he was

6    going to be potentially sued, I will allow that.  So why don't

7    we do that right now, and then we will turn to the subpoena.

8    You don't have to call them both.  If you know one or the other

9    is prepared or has a recollection on this, that would be fine.

10           MR. ADAMS:  One moment, your Honor.  I am going to

11   recall Agent Deal.

12           THE COURT:  Okay.

13    PAUL DEAL, previously sworn.

14           THE COURT:  So the court reminds the witness he is

15   still under oath, and aren't you foolish for not leaving

16   sooner.

17           On the meeting of February 12, was Mr. Newkirk there

18   when you first began?

19           THE WITNESS:  No, your Honor.

20           THE COURT:  Starting with the point when he is in the

21   room, was any statement made by any of the people from Bryan

22   Cave as to what their intentions were?

23           THE WITNESS:  The only statement that was made was by

24   Ms. Buchanan that she was there to protect the attorney/client

25   privilege.

F8l2newH                    Deal - Cross

1             THE COURT:  So was there any -- let me put a more

2    pointed question.  Was there any statement ever made in

3    Mr. Newkirk's presence at this meeting that, We want to

4    cooperate fully, subject only to protecting attorney/client

5    privilege or anything like that?

6             THE WITNESS:  They may have made a statement about

7    they wanted to cooperate, but it was a general cooperation

8    statement.  As I recall, I think that statement was made

9    actually.

10            THE COURT:  Have you ever, in fact, had a witness

11   similarly situated to a law firm that hasn't said that?  That's

12   a rhetorical question.  You don't have to answer that.

13            All right.  Cross-examination.

14   CROSS EXAMINATION

15   BY MS. CHAUDHRY:

16   Q.  Agent Deal, you took notes of that meeting, correct?

17   A.  I did.

18   Q.  In those notes you did not list the people who were

19   present, did you?

20   A.  I did not.

21   Q.  And you did not list that -- you do not state in your notes

22   that it was stated in Mr. Newkirk's presence that the firm was

23   cooperating, correct?

24   A.  No.  As I said, I began taking notes once I began

25   questioning.  The answer to your question is no.

1  Q.  Weren't most of your conversations about cooperating on the

2  phone before the meeting?

3  A.  No.  I would actually say the initial phone call set up the

4  meeting, and then the conversations about cooperation occurred

5  prior to Mr. Newkirk arriving to the room.

6          THE COURT:  So I ask you, again, just so we are

7  crystal clear, was there any statement made about that after he

8  entered the room about cooperating?

9          THE WITNESS:  Your Honor, I cannot recall exactly when

10 the cooperation statement was made.

11         THE COURT:  So you don't know one way or the other.

12         THE WITNESS:  No, your Honor.

13         THE COURT:  Very good.  Anything else?

14         MR. ADAMS:  No, your Honor.

15         THE COURT:  Thank you so much.  Now you can really get

16 out of here.

17         Did you want to recall Mr. Newkirk?

18         MS. CHAUDHRY:  Yes, please.

19         THE COURT:  Let's get Mr. Newkirk back on the stand.

20         The court reminds the witness he is still under oath.

21  HARVEY NEWKIRK, previously sworn.

22         THE COURT:  Go ahead, counsel.

23         MS. CHAUDHRY:  Thank you, your Honor.

24 REDIRECT EXAMINATION

25 BY MS. CHAUDHRY:

1    Q.  Mr. Newkirk, at any point prior to February 12, 2014, did

2    you have conversations with Bryan Cave about the potential of

3    you being named in a lawsuit connected to the Maxim deal?

4    A.  Yes.

5              THE COURT:  Who did you have those conversations with?

6              THE WITNESS:  Vincent Alfieri.

7              THE COURT:  And how did that come about?

8              THE WITNESS:  It came about in two ways.  One was

9    conversations that he and I both had separately with Mark

10   Weinberg, and then also in discussions that he and I had

11   jointly with Noah Weissman and Jay Dorman, who are partners at

12   the firm.

13             THE COURT:  Did you ask him anything about whether,

14   for example, you were covered by insurance?

15             THE WITNESS:  No.

16             THE COURT:  Did you ask him anything about what they

17   thought your liability could be?

18             THE WITNESS:  Generally we just talked about the firm,

19   myself being named.  Not specifically.

20             THE COURT:  These conversations were when

21   chronologically?

22             THE WITNESS:  They would have been after mid November,

23   somewhere, mid November and January.

24             THE COURT:  All right.  Anything else?

25             MS. CHAUDHRY:  Nothing further.

F8l2newH                          Newkirk – Recross

1          THE COURT:  Cross-examination.

2    RECROSS EXAMINATION

3    BY MR. ADAMS:

4    Q.  Would you agree that your affidavit says nothing about any

5    statements made to anybody at Bryan Cave prior to February 12,

6    2014?

7    A.  I would have to look at it.

8          MR. ADAMS:  May I approach your Honor?

9          THE COURT:  I am assuming that's the case, but let him

10   look at it.

11         THE WITNESS:  That's correct.

12   Q.  Mr. Newkirk, prior to the filing of your reply memorandum

13   in connection with this motion, did you review that document?

14   A.  My affidavit?

15   Q.  No, sir, the reply memorandum.

16   A.  You are saying prior to -- can you show it to me so I can

17   see?

18         (Pause)

19   A.  I discussed it.  I didn't read it prior to its filing.

20   Q.  Are you aware, sir, that on page three of your reply

21   memorandum you note that -- you define the existence of an

22   attorney/client relationship as beginning on February 12, 2014?

23   A.  No, I'm not aware of it.

24   Q.  When did you receive the government's 3500 material in

25   connection with this hearing?

F8l2newH

1    A.   Within the last 48 hours.

2    Q.   And did you review it before coming in today?

3    A.   Yes.

4              MR. ADAMS:  No further questions, your Honor.

5              THE COURT:  Anything else from defense counsel?

6              MS. CHAUDHRY:  Nothing further, your Honor.

7              THE COURT:  You may step down.

8              (Witness excused)

9              THE COURT:  Let me ask defense counsel, aren't you

10   bound by the representation made in your reply memorandum at

11   page 3?

12             For the record, it states, "The government then argues

13   that the vast majority of materials produced by Bryan Cave to

14   the government and then to Newkirk predate the existence of an

15   attorney/client relationship, i.e., February 12, 2014, or are

16   otherwise not privileged and, thus, should not be suppressed.

17   This does not address the exclusion prong of Newkirk's motion.

18   To reiterate what we state in our original motion papers,

19   Newkirk seeks the exclusion of his statements to the government

20   and Bryan Cave because he made those statements believing that

21   Bryan Cave represented him.  To the extent that Bryan Cave has

22   turned over documents that predate the relationship or are

23   otherwise nonprivileged, then of course Newkirk does not seek

24   their exclusion."

25             Similarly, on the next page of the reply memorandum,

F8l2newH

1    it states as follows:  "The government also argues that it was

2    entitled to redacted notes from interviews of Bryan Cave

3    attorneys because 'most of the information reflected in those

4    notes, which will be produced as appropriate and in due course

5    as 3500 material, relates to statements made by Bryan Cave

6    personnel regarding events predating February 12, 2014.'

7    However, if, as we argue, there was a *bona fide* attorney/client

8    relationship between Newkirk and Bryan Cave, then the

9    statements of Bryan Cave attorneys, even those relating to

10   pre-February 12, 2014, events, would necessarily be informed by

11   their privileged conversations with Newkirk, unlike, for

12   example, documents predating February 12, 2014, between third

13   parties, clearly not in an attorney/client relationship, the

14   recollections of Bryan Cave attorneys who have had privileged

15   conversations with Newkirk cannot be distilled out from those

16   privileged conversations."

17        So the assertion there being made twice, albeit not

18   with total clarity, is that the defense accepts that the

19   attorney/client relationship began on February 12, but says

20   with respect to the notes that still they should be suppressed

21   because they are part of an inextricably intertwined statement

22   with those that arose after the February 12.  So where in the

23   defense submissions of any kind is there a statement that the

24   attorney/client privilege arose prior to February 12?

25        MS. CHAUDHRY:  Your Honor, with the court's

F8l2newH

1    permission, Mr. Keneally would like to address that.

2              THE COURT:  Sure, but I need an answer to my question.

3              MR. KENEALLY:  Of course, your Honor.  Thank you.  And

4    the answer to that, your Honor, is that our submission on the

5    motion addressed, admittedly, strictly speaking the criminal

6    aspect of the attorney/client relationship which, we submitted,

7    if it would have begun, would have begun on February 12.  So

8    these arguments that we are making here don't deal with

9    Mr. Newkirk's testimony today that there was a civil

10   relationship that predated the 12th of February.

11             THE COURT:  Why isn't that argument now waived?  You

12   can't come into court on the day of the evidentiary hearing,

13   having taken a totally different position up to then in your

14   papers and in your motion and say, well, I guess we lost on

15   that, but we got another prong to our argument because of

16   something our client said today on his testimony.  I think that

17   is long since waived.  So I will deny the motion in its

18   entirety.

19             Now let's talk about the subpoena.  As I understand

20   it, this is a subpoena that has been served on Bryan Cave.  Do

21   you have a copy of that subpoena?.  I have it.  It is an

22   attachment to the memorandum of the defendant.  It has four

23   categories.  If there are objections to the subpoena, with very

24   limited exceptions, they can only be raised by Bryan Cave.  The

25   government does probably have standing to make the argument

F8l2newH

1    that, if I recall correctly, it made in its papers that some of

2    this constitutes 3500 material.  I think that argument in this

3    context is totally unpersuasive.  So what?  There is nothing in

4    section 3500 that precludes a defendant from obtaining

5    information from a third party, and the mere fact that it

6    happens to constitute 3500 material is neither here nor there.

7              But let me hear from counsel for Bryan Cave, who has

8    been waiting for this moment.

9              MR. SILVERMAN:  Here is my moment.  Hope to do better

10   than the last time I spoke in this court a few hours ago.

11             THE COURT:  Stop rubbing it in.

12             MR. SILVERMAN:  Your Honor, first, as matter of

13   procedure, there is no subpoena that's been served.  Defendants

14   made a motion for permission to serve a subpoena.

15             THE COURT:  I see.  Forgive me.

16             MR. SILVERMAN:  And the government has opposed the

17   primary ground for the motion.

18             THE COURT:  So the government does have standing in

19   that sense.  You are right to remind me of that procedural --

20             MR. SILVERMAN:  We have not been served with a

21   subpoena, and we have not put in any papers because --

22             THE COURT:  So assuming I were to approve the

23   subpoena, does Bryan Cave have any objections?

24             MR. SILVERMAN:  Yes, your Honor.  I think it can be

25   fairly simple.  I think there are a number of arguments we

F8l2newH

1    could make, which I think I don't need to because this is the

2    simple fact.  The subpoena overlaps completely the subpoena

3    that was served by the United States in August of 2014, and the

4    United States has told us, and they have said it in open court

5    today, that what we have provided to them they have provided to

6    defense counsel.  So defense counsel --

7         THE COURT:  I think they said that as to e-mails.  I

8    am not sure I heard them say it across the board.  In fact, I

9    know that there is at least some material that they have

10   redacted as 3500 material.

11        MR. SILVERMAN:  Your Honor, I believe what they

12   redacted -- and I could be corrected -- is parts of their

13   notes.

14        THE COURT:  Their own notes.

15        MR. SILVERMAN:  Nothing, to my knowledge, of Bryan

16   Cave.  I would ask Mr. Adams if that is correct.

17        THE COURT:  That's fine.  Let's just make sure,

18   because I agree this could short circuit it.

19        Have you in fact turned over to the defense everything

20   called for by this subpoena that they wish to serve on Bryan

21   Cave?

22        MR. ADAMS:  With the exception of one item that I

23   received yesterday, yes, and I will be producing that

24   forthwith.

25        MR. SILVERMAN:  And let me explain to the court why

F8l2newH

there have been a few documents that have been produced

recently, and the explanation is this:  My firm was not

involved and did not represent Bryan Cave back in the summer of

2014.  We have been retained more recently.  We were asked by

Bryan Cave to review their document production to make sure it

was complete.  We have done that and have been doing that.

        As is unfortunately often the case, we found there

were some documents that should have been produced that were

not produced.  I personally went through those documents, and

there was some question of was another copy of this document

produced, and we have been checking that, but I wanted to see

if there were any documents that related to the events of this

hearing, specifically the February meetings between Mr. Newkirk

and Bryan Cave and the correspondence with Alston & Bird which

is relevant to this hearing.

        To the extent we found a number of e-mails, and we

did -- I think it was something like eight more e-mail

chains -- we immediately produced them to the government, and

my understanding is the government immediately produced them to

the defendants.  There are I think it is under 100 other

documents that we will be producing by next week that should

have been produced that weren't produced.  By memory, some of

them were e-mails between the government and Bryan Cave about

things that you have heard about today.  Some were just some

deal documents, you know, just relating to the Maxim deal that

F8l2newH

1    say, Attached is a draft of the this or the that.  So I wish I

2    could have come up here to say, your Honor, we have produced

3    absolutely everything to the government and absolutely

4    everything the government has produced to the defendant.  I can

5    say that next week we are working real hard to make sure that

6    happens.

7         And I guess the other point is, there are some Bryan

8    Cave privileged documents.  You have heard about Bryan Cave

9    general counsel, associate general counsel and threats and so

10   forth, so we have withheld from the production the Bryan Cave

11   privileged documents between Bryan Cave lawyers and the general

12   counsel and associate general counsel who were representing the

13   firm.

14        THE COURT:  All right.  So let me then ask the

15   government, is it your representation that, in addition to what

16   you have already turned over, when you get whatever additional

17   documents from Bryan Cave that Mr. Silverman just referred to,

18   that you will promptly turn them over to the defense as well?

19        MR. ADAMS:  It is, your Honor.

20        THE COURT:  So now I ask, and I am sorry, by the way,

21   did I misspeak, because the government does have full standing

22   since this was a 17(c) motion, but let me go to the defense.

23   So the representation is not only that you are getting

24   everything, but that independent counsel from Paul Weiss, at a

25   fee that is probably astronomical, is double checking and that

F8l2newH

1    you are going to get everything else that will be turned over.

2    So what do you need the subpoena for?

3          MS. CHAUDHRY:  We weren't aware that that was the

4    situation.

5          THE COURT:  That's fine, and no reason you should have

6    been.  But I assume that you now withdraw the motion without

7    prejudice to remaking it if it turns out that there is

8    something that's been inadvertently not produced or something

9    like that.

10         MS. CHAUDHRY:  Yes, on the representation of the

11   government that, as they get a rolling production, it will roll

12   to us.

13         THE COURT:  Yes, that's the representation they made

14   and that's enforceable by the court, of course.

15         All right.  Well, it's been fun, but anything else we

16   need to take up tonight?

17         MR. ADAMS:  Nothing from the government.

18         MS. CHAUDHRY:  No, thank you, your Honor.

19         THE COURT:  Thanks very much.

20                              - - -

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   HARVEY NEWKIRK

 4   Direct By Ms. Chaudhry . . . . . . . . . . .19

 5   Cross By Mr. Adams . . . . . . . . . . . . .31

 6   Redirect By Ms. Chaudhry . . . . . . . . . .44

 7   MARY BETH BUCHANAN

 8   Direct By Mr. Keneally . . . . . . . . . . .58

 9   Cross By Mr. Adams . . . . . . . . . . . . .76

10   AUSTIN CAMPRIELLO

11   Direct By Ms. Chaudhry . . . . . . . . . . .83

12   Cross By Ms. Paul  . . . . . . . . . . . . .98

13   PAUL BAYLOR DEAL

14   Direct By Mr. Adams  . . . . . . . . . . . 103

15   Cross By Ms. Chaudhry  . . . . . . . . . . 110

16   Cross By Ms. Chaudhry  . . . . . . . . . . 133

17   HARVEY NEWKIRK

18   Redirect By Ms. Chaudhry . . . . . . . . . 134

19   Recross By Mr. Adams . . . . . . . . . . . 136

20                      GOVERNMENT EXHIBITS

21   Exhibit No.                          Received

22    1, 2 and 3  . . . . . . . . . . . . . . . .35

23    4  . . . . . . . . . . . . . . . . . . . .76

24    8  . . . . . . . . . . . . . . . . . . . .76

25    9  . . . . . . . . . . . . . . . . . . . 108
```